PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 11-4200, 11-4201, 11-4315
_____

No. 11-4200
_____

AMBER BLUNT, on behalf of herself and all others similarly
situated; CRYSTAL BLUNT; MICHAEL BLUNT, on their
own behalf and on behalf of all others similarly situated;
S.H.; W.W.; ERIC ALLSTON, on his own behalf and on
behalf of all others similarly situated; LYDIA JOHNSON, on
her own behalf and on behalf of all others similarly situated;
LINDA JOHNSON; CAROL DURRELL, on her own behalf
and on behalf of her minor daughter S.H.; CHANTAE HALL,
and on behalf of all others similarly situated; JUNE
COLEMAN, on her own behalf and on behalf of her minor
son, R.C., and on behalf of all others similarly situated;
LYNDA MUSE, on her own behalf and on behalf of her
minor daughter Q.G. and on behalf of all others similarly
situated; CHRISTINE DUDLEY, on her own behalf and on
behalf of her minor daughter W.W. and on behalf of all others
similarly situated; THE CONCERNED BLACK PARENTS
OF MAINLINE INC; THE MAINLINE BRANCH OF THE
NAACP

v.

LOWER MERION SCHOOL DISTRICT; THE LOWER MERION SCHOOL BOARD; PENNSYLVANIA DEPARTMENT OF EDUCATION

Linda Johnson, Lydia Johnson, Carol Durell, Chantae Hall, S.H., Christine Dudley, W.W., Eric Allston, June Coleman, R.C. Lynda Muse, and Q.G.,

Appellants in No. 11-4200
_____

No. 11-4201
_____

AMBER BLUNT, on behalf of herself and all others similarly situated; CRYSTAL BLUNT; MICHAEL BLUNT, on their own behalf and on behalf of all others similarly situated; S.H.; W.W.; ERIC ALLSTON, on his own behalf and on behalf of all others similarly situated; LYDIA JOHNSON, on her own behalf and on behalf of all others similarly situated; LINDA JOHNSON; CAROL DURRELL, on her own behalf and on behalf of her minor daughter S.H.; CHANTAE HALL, and on behalf of all others similarly situated; JUNE COLEMAN, on her own behalf and on behalf of her minor son, R.C., and on behalf of all others similarly situated; LYNDA MUSE, on her own behalf and on behalf of her minor daughter Q.G. and on behalf of all others similarly situated; CHRISTINE DUDLEY, on her own behalf and on behalf of her minor daughter W.W. and on behalf of all others similarly situated; THE CONCERNED BLACK PARENTS OF MAINLINE INC; THE MAINLINE BRANCH OF THE

2

NAACP

v.

LOWER MERION SCHOOL DISTRICT; THE LOWER
MERION SCHOOL BOARD; PENNSYLVANIA
DEPARTMENT OF EDUCATION

Amber Blunt, Crystal Blunt, Michael Blunt and Concerned
Black Parents of Mainline Inc.,

Appellants in No. 11-4201
_____

No. 11-4315
_____

AMBER BLUNT, on behalf of herself and all others similarly
situated; CRYSTAL BLUNT; MICHAEL BLUNT, on their
own behalf and on behalf of all others similarly situated;
S.H.; W.W.; ERIC ALLSTON, on his own behalf and on
behalf of all others similarly situated; LYDIA JOHNSON, on
her own behalf and on behalf of all others similarly situated;
LINDA JOHNSON; CAROL DURRELL, on her own behalf
and on behalf of her minor daughter S.H.; CHANTAE HALL,
and on behalf of all others similarly situated; JUNE
COLEMAN, on her own behalf and on behalf of her minor
son, R.C., and on behalf of all others similarly situated;
LYNDA MUSE, on her own behalf and on behalf of her
minor daughter Q.G. and on behalf of all others similarly
situated; CHRISTINE DUDLEY, on her own behalf and on

3

behalf of her minor daughter W.W. and on behalf of all others similarly situated; THE CONCERNED BLACK PARENTS OF MAINLINE INC; THE MAINLINE BRANCH OF THE NAACP

v.

LOWER MERION SCHOOL DISTRICT; THE LOWER MERION SCHOOL BOARD; PENNSYLVANIA DEPARTMENT OF EDUCATION

Lower Merion School District,

Appellant in No. 11-4315
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civ. No. 2-07-03100)
District Judge:  Hon. Harvey Bartle, III
_____

Argued June 11, 2013

BEFORE: MCKEE, Chief Judge, and AMBRO and GREENBERG, Circuit Judges

(Filed: September 12, 2014)
_____

Patrick Castaneda
Matthew A. Goldberg

4

Carl W. Hittinger (argued)
John D. Huh
Lesli C. Esposito
Nathan P. Heller
DLA Piper
1650 Market Street
One Liberty Place, Suite 4900
Philadelphia, PA 19103

    Attorneys for Appellants Linda Johnson, Lydia
     Johnson, Carol Durrell, Chantae Hall, S.H., Christine
     Dudley, W.W., Eric Allston, June Coleman, R.C., Lynda
     Muse, and Q.G.

Jennifer R. Clarke (argued)
Benjamin D. Geffen
Sonja D. Kerr
Barbara E. Ransom
Public Interest Law Center of Philadelphia
1709 Benjamin Franklin Parkway
United Way Building, 2nd Floor
Philadelphia, PA 19103

Judith A. Gran
Reisman, Carolla & Gran
19 Chestnut Street
Haddonfield, NJ 08033

    Attorneys for Appellants Amber Blunt, Crystal Blunt,
     Michael Blunt and the Concerned Black Parents of
     Mainline Inc.

5

Jenna B. Berman
Michael D. Kristofco (argued)
Wisler Pearlstine
460 Norristown Road
Suite 110
Blue Bell, PA 19422

    Attorneys for Appellees Lower Merion School District
    and Lower Merion School Board

Amy C. Foerster
Saul Ewing
Two North Second Street
Penn National Insurance Tower, 7th Floor
Harrisburg, PA 17101-0000

M. Abbegael Giunta
Howard G. Hopkirk (argued)
Office of Attorney General of Pennsylvania
Strawberry Square
15th Floor
Harrisburg, PA 17120-0000

    Attorneys for Appellee Pennsylvania Department of
    Education

_____

OPINION OF THE COURT
_____

6

GREENBERG, <u>Circuit</u> <u>Judge</u>.

TABLE OF CONTENTS

I.  INTRODUCTION                                        9

II.  FACTS AND PROCEDURAL HISTORY           15

III.  STATEMENT OF JURISDICTION                 33

IV.  STANDARD OF REVIEW                             34

V.  ISSUES PRESENTED ON APPEAL               37

VI.  SUMMARY OF THE LAW                           40

    A.  The Individuals with Disabilities Education
       Act                                                        40
    B.  Redress and the Statute of Limitations under
       the IDEA                                              44

    C.  Title VI of the Civil Rights Act of 1964     50

    D.  42 U.S.C. § 1983                                  53

    E.  Section 504 of the Rehabilitation Act
       and Relevant Regulations of the
      Department of Education                         55

    F.  Americans with Disabilities Act              58

G.  Establishing a Prima Facie Case of
    Racial Discrimination Through
    Circumstantial Evidence                     59

H.  Class Actions and Res Judicata
    (Claim Preclusion) Defenses                  62

    1.  Claim Preclusion                         62

    2.  Application of Res Judicata
        (Claim Preclusion) in Class Actions      64
I.  Standing                                     65

VII.  ANALYSIS                                   71

A.  The Effect of the Gaskin Settlement
    on the Claims Against the PDE                72

B.  Whether CBP Has Standing in this suit       77

C.  The Blunts and the 90-day Statute of
    Limitations under the IDEA, as Revised
    by the Individuals with Disabilities
    Improvement Act of 2004                      96

D.  Whether Appellants Established a Prima
    Facie Case of Racial Discrimination         102

    1.  Rejection of Certain Evidence by
        the District Court and Alleged
        Impermissible Reliance on Other

Evidence Without a <u>Daubert</u>
Hearing                                    104

    a.  The MAP Presentation        106

    b.  Daniel Reschley's Report      107

2.  Whether the District Court Properly
   Viewed the Evidence in the Light
   Most Favorable to the Plaintiffs as
   Non-Movants and Whether Plaintiffs
   Established a Prima Facie Case of
   Discrimination                        109

3.  Statistical Evidence                116

VIII.  CONCLUSION                          121

## I. INTRODUCTION

In what may be an oversimplification, we introduce our opinion on this appeal by setting forth that the central controversy is a dispute over whether African American students in the Lower Merion School District ("LMSD") public schools in Montgomery County, Pennsylvania, were deprived of appropriate educational services due to racial discrimination and segregation in violation of federal law. The plaintiffs unsuccessfully brought this action pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 <u>et seq</u>.; the Americans with Disabilities Act ("ADA"), 42 U.S.C.

9

§§ 12101, 12132; § 504 of the Rehabilitation Act of 1973 (the "RA"), 29 U.S.C. § 794(a); Title VI of the Civil Rights Act of 1964 ("Title VI"), 42 U.S.C. § 2000d; 42 U.S.C. § 1983; and state law, claiming that African American students in the LMSD suffered from such discrimination.[1] They now appeal from portions of the District Court's orders on federal issues entered

---

[1] During the course of the District Court proceedings, plaintiffs, based on a then recent examination by a psychologist, asserted that five or six of the student plaintiffs had been identified incorrectly as being learning disabled. Tr. Oral Arg. June 11, 2013, at 12, 14, 19, 36. Therefore, at oral argument before us the parties focused on the Title VI and § 1983 claims, as the District Court had held that the IDEA, ADA and RA were inapplicable to the claims of the plaintiffs who by then contended that they wrongly had been identified. The plaintiffs' arguments were further limited because the IDEA, ADA, and RA claims of all individual plaintiffs except those of one family, the Blunts, were dismissed as a result of their failure to exhaust IDEA administrative remedies. Recently, however, in a related case, S.H. v. Lower Merion School District, 729 F.3d 248 (3d Cir. 2013), involving litigants who also are parties to this action, we held that students incorrectly identified as learning disabled may not bring claims under the IDEA, though they still may have claims under the RA and the ADA. Id. at 257, 260-61. But, as far as we can ascertain, Amber Blunt, a student plaintiff, and her parents continue to press their original claims under the IDEA. Consequently, we address a statute of limitations issue relating to their IDEA claims even though Amber now claims that she is not learning disabled.

at various times during the course of the litigation. We, however, are not concerned with the substance of the state law claims on this appeal as the District Court did not exercise jurisdiction over those claims.

This case encompasses a myriad of legal issues, including standing to bring suit, application of a statute of limitations, res judicata (claim preclusion), application of disability laws, appropriateness of education provided to students, anti-discrimination laws, and sections of the Code of Federal Regulations implementing the applicable laws. The case on appeal also includes a cross-appeal by the LMSD, but we will dismiss the cross-appeal without deciding it on the merits as it is moot. The District Court found that the plaintiffs did not present sufficient evidence to survive LMSD's motion for summary judgment on the discrimination charges and the Court dismissed plaintiffs' other claims for other reasons. Thus, the Court did not find that there had been any violations of federal law.

Plaintiffs, now appellants, appeal from the District Court's October 20, 2011 Memorandum and Judgment Order granting a final summary judgment to defendant LMSD and against all the plaintiffs in the case remaining at the time that the Court granted summary judgment, the Court already having dismissed several of the parties and claims from the case by previous orders.[2] Appellants also appeal from rulings in two

---

[2] Throughout the opinion we sometimes refer to the plaintiffs and appellants collectively even though two different groups of plaintiffs filed separate appeals which have been consolidated

11

intermediate orders that became final at the time of the entry of the October 20, 2011 Memorandum and Judgment Order, namely: the dismissal of all claims of plaintiffs, now appellants, Amber Blunt, a now former student at LMSD, and Crystal and Michael Blunt, her parents, in the District Court's memorandum and order of February 15, 2008, the "February 15, 2008 Order"; the dismissal of all plaintiffs' claims against the Pennsylvania Department of Education ("PDE") in the District Court's order and memorandum of August 19, 2009, the "August 19, 2009 Order"; and the dismissal of plaintiff Concerned Black Parents of Mainline Inc. ("CBP") as a party in the District Court's August 19, 2009 Order for lack of standing. Appellants' No. 11-4201 br. at 1.

Plaintiffs, with the exception of the CBP and the mainline branch of the NAACP (the "NAACP"), are present and past African American students of the Lower Merion Township public schools, who were placed in remedial classes after being identified as learning "disabled" under the IDEA and/or those students' parents. The plaintiffs repeatedly used the term "disabled" to describe the student plaintiffs throughout the pleadings, a term consistent with the IDEA, a statute under which they were making claims, as the IDEA safeguards the

---

along with the cross-appeal of the LMSD. Though LMSD is a cross-appellant we do not include it when we refer to appellants. We usually refer to the parties who brought this action as plaintiffs when describing proceedings in the District Court and as appellants when describing proceedings in this Court.

rights of disabled students. Nevertheless, at this stage in the litigation some appellants argue that the LMSD incorrectly identified them as learning disabled,[3] thereby causing them injury.[4] Appellants claim that their placement in remedial

[3] Even though by the time that the District Court considered the motion for summary judgment most of the student plaintiffs remaining in the case asserted that they had been misidentified as learning disabled, the pleadings continued to identify the students as learning disabled. In rendering its opinion on the summary judgment motion, notwithstanding the pleadings, the Court assumed with two exceptions that the student plaintiffs were not disabled. We also note that Appellants' No. 11-4201 br. at 1 n.2 recites that the correct name of Concerned Black Parents of Mainline Inc. is simply Concerned Black Parents, Inc.

[4] The Code of Federal Regulations sets forth that:

> Child with a disability means a child evaluated in accordance with §§ 300.304 through 300.311 as having mental retardation, a hearing impairment (including deafness), a speech or language impairment, a visual impairment (including blindness), a serious emotional disturbance (referred to in this part as 'emotional disturbance'), an orthopedic impairment, autism, traumatic brain injury, an other [sic] health impairment, a specific learning disability, deaf-blindness, or multiple disabilities, and who, by reason thereof, needs special education and related services.

34 C.F.R. § 300.8(a)(1).

classes had a negative impact on their opportunity for educational advancement, but by the time of the proceedings on the motion for summary judgment they were seeking relief in the District Court only pursuant to Title VI and the Equal Protection Clause of the Fourteenth Amendment through 42 U.S.C. § 1983. Appellants' case is largely based on their contention that the disproportionate placement of African American students in remedial classes had a discriminatory purpose and was the result of racial bias.[5]

Ultimately, the summary judgment question turns on whether there is enough record evidence to establish that LMSD intentionally discriminated against the plaintiffs, whether through its own actions or by failing to correct a third party's

---

[5] Initially, the individually named students sought to bring their claims on their own behalf and on behalf of the students similarly situated as a class action; however, the District Court ruled that class certification was inappropriate due to the highly individualized aspects of each student's claims. (No. 2:07-cv-3100, Doc. No. 124). At oral argument, one appellants' attorney acknowledged that the District Court had been correct in not certifying the case as a class action (Tr. Oral Arg. June 11, 2013, at 6:18-21, 14:4-7 ("You can't remedy it as a class action . . . because of the individual issues.")), and thus appellants no longer seek to proceed in this case on a class action basis.

14

intentional discrimination. Looking at the whole record, which includes statistical evidence showing that minorities are overrepresented in low achievement classes, we conclude that there is no genuine issue of material fact concerning LMSD's intent. There is no evidence showing that the District intended to discriminate against plaintiffs, nor that LMSD had knowledge of any intentional discrimination on the part of its employees, including deliberate indifference to discriminatory practices against African American students as a form of intentional discrimination. Accordingly, we will affirm the District Court's grant of summary judgment.

## II. FACTS AND PROCEDURAL HISTORY

This suit has had many plaintiffs and defendants, though some have come and gone, and includes many related issues and claims.[6] We now are dealing with what is left of this litigation

---

[6] The District Court's docket sheets lists numerous cases with separate numbers as being related to this action. It is particularly significant that in a related case, S.H. v. Lower Merion School District, No. 2:10-cv-06070, in the Eastern District of Pennsylvania involving two of the same litigants that are parties in this case, Carol Durrell and her daughter, identified in that case as "S.H." and in this case as "Saleema Hall," that we have decided an appeal in a precedential opinion. See S.H. v. Lower Merion Sch. Dist., 729 F.3d 248 (3d Cir. 2013). Saleema Hall is identified as a litigant in the most recent version of the complaint in this case in the caption as is her sister, Chantae Hall and her mother, Carol Durrell.

15

by entertaining the present appeals which have been consolidated with the cross-appeal in this Court under No. 11-4200.[7]

The plaintiffs filed the original complaint on July 30, 2007. At that time the plaintiffs were current or former students in the LMSD, four parents, and the two organizations that we have identified.[8] The original defendants were the LMSD and

We note that S.H. changed her theory of recovery in the other action from her theory in this case, although she filed it under the same statutes based on the same set of facts on which she previously had relied in this case. Her theory in the other action was that she is not and never has been learning disabled and was placed improperly in special education classes. Id. at 255-56. Other student plaintiffs in this case have asserted the same theory of liability (incorrect identification as learning disabled), but inasmuch as Saleema Hall and Carroll Durell have not withdrawn as plaintiffs in this litigation (they were named in the third amended complaint) it appears that they press their claims in the two cases on both theories though they are inconsistent.

[7] DLA Piper, LLP and the Public Interest Law Center of Philadelphia represent separate groups of appellants and have filed separate briefs on their behalf. For the sake of clarity we will distinguish between their briefs on the basis of the appeal numbers.

[8] The original plaintiffs were Amber Blunt, on behalf of herself and all others similarly situated; Crystal Blunt and Michael Blunt, on their own behalf and on behalf of all others similarly

16

two of its officials in their official capacity.[9] No. 2:07-cv-3100, Doc. No. 1.[10]

The plaintiffs filed a first amended complaint ("FAC") on September 26, 2007, adding three plaintiffs (two current or former students in the LMSD and one parent)[11] and several

situated; Linda Johnson, on her own behalf, on behalf of her daughter, Lydia Johnson, and all others similarly situated; Carol Durrell, on her own behalf, on behalf of her minor daughter, Saleema Hall, and on behalf of all others similarly situated; Christine Dudley, on her own behalf, and on behalf of her minor son, Walter Whiteman, and on behalf of all others similarly situated; Eric Allston on his own behalf and on behalf of all others similarly situated; Concerned Black Parents, Inc.; and the Mainline Branch of the NAACP. No. 2:07-cv-3100, Doc. No. 1.

[9] The officials were Jamie Savedoff, Superintendent, and Michael Kelly, Director of Pupil Services. No. 2:07-cv-3100, Doc. No. 1.

[10] Though the parties sometimes have used the term "the District" to refer to the LMSD, because this usage may be confusing inasmuch as we regularly refer to the District Court, we have used the term "LMSD."

[11] Chantae Hall, the daughter of Carroll Durrell and sister of Saleema Hall, both of whom were parties in the original complaint, was added as were June Coleman, on her own behalf

17

defendants, including the Lower Merion School Board, its President, Vice President, and various members of the Board (together, the "School Board"), the Pennsylvania Department of Education (the "PDE"), and two of its officials. No. 2:07-cv-3100, Doc. No. 10. Inasmuch as the LMSD and the School Board have the same interest in this case and are represented by the same attorneys, we sometimes refer to them together as the LMSD. The plaintiffs named the PDE as a defendant because they believed that it failed to meet the supervisory, monitoring and compliance procedural obligations that federal law imposed on it. The FAC concerned, inter alia, as appellants indicate in one of their briefs, "a decision of the Pennsylvania Special Education Due Process Appeals Review Panel (the 'Appeals Panel') pursuant to the IDEA." Appellants' No. 11-4201 br. at 8-9;[12] see also J.A. vol. 2, at 91-151. As stated above, the

---

and on behalf of her minor son, Richard "Ricky" Coleman, and on behalf of all others similarly situated.

[12] The brief further explains that Crystal and Michael Blunt are the parents of Amber Blunt, a 2005 graduate of Lower Merion High School who "was identified as a student with a Specific Learning Disability." Appellants' No. 11-4201 br. at 8-9. The Blunts sought payment by LMSD for the tuition for a six-week remedial program that West Chester University required Amber to take as a condition of her admission. Id. The Blunts argued that the LMSD "should pay for this program to compensate for the fact that it failed to develop and implement transition services for Amber as required by the IDEA." Id. The Blunts also were dissatisfied that Amber was not admitted into her first choice college, Temple University, although two of the three

18

original complaint alleged that the defendants violated the IDEA, 34 C.F.R. § 300.600 (regarding the monitoring requirements imposed on states receiving federal funds for education of students with disabilities), the ADA, § 504 of the RA, Title VI, and 42 U.S.C. § 1983, all premised on the theory that plaintiffs had learning disabilities for which LMSD had not made adequate provisions. The FAC invoked the same legal theories/statutes as the original complaint. J.A. vol. 2, at 91-151.

On October 8, 2007, LMSD and the School Board filed a motion to dismiss the FAC, arguing that the plaintiffs had failed to exhaust their administrative remedies, the CBP and NAACP did not have standing, and the FAC failed to state a claim upon which relief could be granted. They also contended that the IDEA action was untimely. No. 2:07-cv-3100, Doc. No. 11.

On November 19, 2007, the PDE filed a motion to dismiss the FAC for lack of subject matter jurisdiction.[13] No. 2:07-cv-3100, Doc. Nos. 21-22; J.A. vol. 2, at 284. PDE argued that the Blunt plaintiffs' claims fell outside the IDEA's statute of limitations and that the other individual student plaintiffs had not exhausted their administrative remedies under the IDEA. Id. The PDE further argued that its sovereign immunity barred the

---

colleges to which she applied did admit her.

[13] Gerald Zohorchak and John Tommasini, who were named in their official capacities as officers of PDE, joined in this motion but they no longer are parties to this suit, and appellants do not challenge their dismissal.

state law claims asserted against it, and that plaintiffs had failed to state a claim upon which relief could be granted against it. Id.

On February 15, 2008, the District Court entered an order dismissing various plaintiffs and claims from the FAC. The Court methodically eliminated each federal law claim that the Blunt plaintiffs made against each defendant. In particularly significant holdings that we address at length below, the Court held that a 90-day statute of limitations in the IDEA barred the Blunts' claims under the IDEA, RA, and ADA and that a separate two-year statute of limitations barred their other claims. Consequently, the order dismissed the Blunts' federal claims in their entirety, although their state law claims remained. See No. 2:07-cv-3100, Doc. No. 9; see also J.A. vol. I, at 42.42-42.45. The Court also determined that the individual plaintiffs, other than the Blunts, had not sought an administrative remedy for their IDEA claims, and therefore it dismissed the IDEA claims of the remaining individual plaintiffs against the LMSD defendants for lack of subject matter jurisdiction. J.A. vol. 1, at 42.16. However, the Court found that the individual plaintiffs did not need to exhaust administrative remedies with respect to their claims against the PDE because Pennsylvania regulations provide for administrative resolution of disputes between students, their parents, and their representatives and school districts, but do not provide for administrative resolution of similar disputes with the Commonwealth. Id. at 42.17.

The District Court also dismissed plaintiffs' ADA and RA claims (other than the Blunts' claims) against the LMSD and the School Board for failure to exhaust their administrative

remedies, reasoning that the claims were based on the same allegations as plaintiffs' IDEA claims and that, if the plaintiffs were entitled to relief, it would have been available through the IDEA administrative dispute process. Id. at 42.18-42.19. The Court noted that "[t]he parties agree[d]" regarding the exhaustion requirement for those claims. Id. The Court found, however, that the IDEA exhaustion requirement did not bar plaintiffs' claims under Title VI because, unlike the IDEA, Title VI does not "focus on 'the rights of children with disabilities.'" Id. at 42.19. The Court also did not find that the plaintiffs needed to exhaust their § 1983 claims administratively.

In addition, as we indicated above, the District Court concluded that the NAACP and CBP lacked standing as plaintiffs.[14] Id. at 42.33. The Court also found that the counts against individual defendants in their official capacity (as representatives of the other defendants, LMSD, the School Board and PDE) were duplicative, and therefore it dismissed the FAC against those individuals to "simplify[ ] the litigation in a way that does not cause any prejudice to plaintiffs."[15] Id. at 42.35-42.36.

---

[14] Although the NAACP attempted in the next version of the complaint to allege facts to support its standing, as we already have indicated it does not appeal from the holding that it does not have standing. On the other hand, CBP has appealed from the order dismissing it from the case because of its lack of standing.

[15] The appellants have not appealed from this ruling and we therefore will not discuss it further.

The plaintiffs filed a second amended complaint ("SAC") on July 8, 2008, adding two plaintiffs, one parent and one student.[16] No. 2:07-cv-3100, Doc. No. 49. The SAC, in accord with the District Court's February 15, 2008 Order, removed as defendants the School Board members previously so-named in their official capacities. But the SAC continued to name the School Board in its caption though it did not make allegations against the School Board in its body. The SAC, however, included the PDE and two of its officials as defendants. The SAC continued to name the Blunts as plaintiffs, despite the circumstance that the Court had dismissed all of their federal claims in its February 15, 2008 Order.[17] The SAC also added several paragraphs discussing the CBP's alleged increase of expenditures that it attributed to "the inferior quality of LMSD's dual system of education." Moreover, the SAC named several persons who the CBP claimed were members of that organization in a clear attempt to demonstrate that the CBP had standing. SAC at 34-36. In addition, the SAC added six paragraphs regarding plaintiff NAACP's expenditure of

---

[16] The added plaintiffs were Lynda Muse, on behalf of herself and her minor son, Quiana Griffin, and on behalf of all others similarly situated. No. 2:07-cv-3100, Doc. No. 49.

[17] In contending that the District Court had jurisdiction, plaintiffs argued that "[t]he Blunt Plaintiffs have fully exhausted their administrative remedies under the IDEA, 20 U.S.C. § 1415; the other individual Plaintiffs are excused from doing so because such efforts would be futile." No. 2:07-cv-3100, Doc. Nos. 9, 55; J.A. vol. 2, at 95.

22

resources in addressing alleged issues with the LMSD. SAC at 37-38.[18]

The plaintiffs filed a third and final amended complaint ("TAC") on August 5, 2008. No. 2:07-cv-3100, Doc. No. 55; J.A. vol. 9, 3847-97. The plaintiffs remained the same in the TAC as previously except that one parent was no longer a plaintiff.[19] The TAC, however, no longer named two officials of the School Board as defendants, and it did not name the officials of the PDE that the plaintiffs previously had named as defendants. The TAC continued to list the School Board as a named defendant in the caption, and the PDE and LMSD remained named defendants in both the caption and the body of the TAC.[20] Despite the District Court's dismissal of all of the

---

[18] Inasmuch as the NAACP is no longer a party in this litigation, these paragraphs are now immaterial.

[19] Linda Johnson, the parent of Lydia Johnson, was dropped as a plaintiff in the TAC. No. 2:07-cv-3100, Doc. No. 55; J.A. vol. 9, 3847-97. Nevertheless, she was listed as an appellant in the notice of appeal.

[20] Specifically, in the introduction to the TAC:

> 3. Plaintiffs assert that LMSD routinely misuses so-called below grade level programs and modified classes to remove African American students from the general education curriculum, in some instances to avoid evaluating a student's eligibility for services under the

23

Blunts' federal claims in the complaint in its February 15, 2008 Order, the TAC included them again in Count VI against the LMSD and the School Board pursuant to the Pennsylvania Public School Code, 22 Pa. Code §14.102 et. seq.[21]  Plaintiffs

> IDEA.  Plaintiffs further assert that LMSD intentionally segregates these African American students in classes that are taught below grade level while depriving them of grade-level subject matter and materials that are provided to their Caucasian peers at all educational levels.

> 4.    Plaintiffs also assert that the Pennsylvania Department of Education (PDE) failed to enforce the IDEA's mandate that it ensure that children with disabilities receive an appropriate education in the least restrictive environment and that African American children in the LMSD are not inappropriately over-identified or disproportionately placed in special education classes.  By their claims against PDE, Plaintiffs seek to remedy wide-spread violations of the Equal Protection and Due Process Clauses of the Fourteenth Amendment . . . the IDEA, the [ADA], [Section 504 of the RA], [Title VI] and Section 1983 of the Civil Rights Act of 18971 [sic].

TAC at 2-3; J.A. vol. 9, at 3848-49.

[21] Several pages of the alleged factual basis for the Blunts' claims, appearing in the "Parties" section of the SAC, were deleted in the TAC, and the identification of Amber and her parents as "African American" was added to that section.  No. 2:07-cv-3100 Doc. Nos. 36, 55.

24

sought widespread injunctive relief and "compensatory damages each on their own behalf to offset the deprivations of an appropriate education to which they are entitled." TAC at 3, para. 6; J.A. vol. 9, at 3849.

The LMSD and the School Board filed an answer to the TAC and a separate motion for judgment on the pleadings on August 15, 2008. The PDE filed an answer to the TAC on August 19, 2008. No. 2:07-cv-3100, Doc. No. 58.

On August 15, 2008, the LMSD and the School Board filed a motion for partial judgment on the pleadings addressed to the Blunts' remaining state law claims, which the Blunts formally opposed on August 29, 2008. J.A. vol. 3, at 561-72, 575-89. The District Court issued a Memorandum and Order on November 18, 2008, (the "November 18, 2008 Order"), in which it noted that the motion incorrectly had been styled as a motion for partial judgment on the pleadings, when it was really a motion to dismiss for lack of subject matter jurisdiction. The Court granted the motion,[22] finding that it did not have supplemental jurisdiction over the Blunts' state law claims and

---

[22] The District Court noted that there was little overlap of the operative facts of Amber Blunt's claims with the claims of the other plaintiffs, as the claims involved different time periods, different treatment, and possibly different schools. J.A. vol. 3, at 602. In this regard, the Court noted that "each of the student-plaintiffs presents an entirely different factual predicate for his or her claims." Id. Accordingly, the Court concluded that it could not exercise supplemental jurisdiction over the Blunts' remaining claims, which were based on state law. Id. at 603.

25

that there was not a common nucleus of operative fact between her claims and those of the other students.[23]  J.A. vol. 3, at 597.

On December 22, 2008, the remaining plaintiffs moved for class certification.  No. 2:07-cv-3100, Doc. No. 64.  After the parties briefed the issues, the District Court held a hearing on the motion on July 21, 2009.  Id., Doc. No. 122.[24]  By an order of August 19, 2009, (the "August 19, 2009 Order"), the Court denied plaintiffs' motion for class certification (Appellants' No. 11-4200 br. at 39),[25] again dismissed the

_____

[23] The Blunts have not appealed from the District Court's ruling that it lacked subject matter jurisdiction over their state law claims.

[24] The District Court scheduled oral argument on the class certification issue for June 26, 2009, but we are uncertain whether the Court held an argument on that day in addition to the July 21, 2009 argument, or whether argument took place on the second date because the original argument had been postponed.  No. 2:07-cv-3100, Doc. No. 118.

[25] In doing so, the District Court explained that, among other rationales for this denial, it had determined that the factual circumstances of potential class members were too disparate to make final injunctive or declaratory relief appropriate to the class as a whole.  J.A. vol. 1, at 42.60.  The Court noted that the disparate factual circumstances of individual students also likely would overwhelm the litigation:

Analysis of whether an African American student with a

26

claims brought by the CBP and the NAACP for lack of standing, and found that a prior court-entered settlement agreement reached in Gaskin v. Pennsylvania, 389 F. Supp. 2d 628 (E.D. Pa. 2005), barred all claims against the PDE, which it therefore dismissed from the case. J.A. vol. 1, at 42.46-42.69.

In concluding that CBP lacked standing, the District Court found that it did not have a personal stake in the outcome of the litigation, and did not suffer an injury giving it standing. Rather, "[i]ts injuries [we]re more akin to an abstract, ideological interest in the litigation as opposed to the necessary 'personal stake in the outcome' of the controversy necessary to confer standing." J.A. vol. 1, at 42.52. In addition, the Court reasoned that CBP did not have standing to bring suit on behalf of its members because, according to CBP's bylaws, it did not have any members. J.A. vol. 1, at 42.53-54; August 19, 2009 Order at 9 ("The corporation's bylaws specifically state 'the Corporation shall have no members.' In light of this express statement in a formal document governing the conduct of the

disability was deprived of an appropriate education will be highly individualized and dependent upon that particular student's needs, capabilities, and the IEP in place for that child. These individual determinations, which must be made to determine whether a particular student falls within the class definition and whether such student has a cause of action, weigh against certifying this class.

J.A. vol. 1, at 42.61.

27

corporation, we find that it does not have standing to bring suit on behalf of its members because it has none."). J.A. vol. 1, at 42.54.

The District Court also dismissed the claims against the PDE because the settlement agreement that the parties had reached in Gaskin barred this action against the PDE. The Court noted that Gaskin was similar to this action, as 12 students with disabilities and 11 disability advocacy groups brought that case against the PDE, among others, pursuant to the IDEA, § 504 of the RA, and Title II of the ADA. The Gaskin plaintiffs made similar (although not identical) allegations as those in this case, alleging that the defendants failed to provide disabled students the opportunity to participate in regular education classrooms, provided insufficient supplementary aids and services, and generally failed to provide them with a free appropriate public education ("FAPE"). J.A. vol. 1, at 42.63, 42.67. Though the Court acknowledged that the Gaskin complaint had not alleged racial discrimination as "the basis for the improper treatment of those with learning disabilities," the Court nonetheless held that the causes of action in Gaskin and here arose from the same "common nucleus of operative facts." The Court therefore concluded that the release included in the Gaskin settlement agreement, which by its terms was effective for five years from September 19, 2005, to September 19, 2010, barred the claims in this case because the plaintiffs brought this action and individual plaintiffs in this action were evaluated and identified as learning disabled during this period. J.A. vol. 1, at 42.67, 42.68; Tr. Oral Arg. June 11, 2013, at 19:9-22. Significantly, the class of plaintiffs in the Gaskin litigation was very broad and included "all present and future school age

28

students with disabilities in the Commonwealth of Pennsylvania."[26]

On April 5, 2011, the District Court denied a motion by LMSD to amend its answer to the plaintiffs' TAC to include an additional defense based on releases that certain plaintiffs signed after the LMSD filed its answer in this case because the Court believed that the LMSD unreasonably had delayed making the motion. J.A. vol. 1, at 46-47. LMSD has filed a cross-appeal from the order but, as will be seen, this appeal is moot and thus we do not address it.

The LMSD filed a motion for summary judgment on July 15, 2011, (No. 2:07-cv-3100, Doc. No. 159), and it is that motion that has led to the order at the heart of this appeal. The

---

[26] We queried the attorneys for appellees at oral argument as to whether the Gaskin settlement should apply given that the plaintiffs in Gaskin brought their claims under the IDEA, ADA and RA, and the appellants other than the Blunts were advancing only § 1983 and Title VI claims. Tr. Oral Arg. June 13, 2013, at 27. However, as noted above, we recently indicated in a related case, S.H. v. Lower Merion School District, 729 F.3d 248 (3d Cir. 2013), that litigants who incorrectly were identified as disabled might be able to bring suit under the ADA and RA, but cannot bring suit under the IDEA, as that statute extends only to disabled individuals, not to individuals who incorrectly were identified as disabled. Id. at 257-58. But regardless of what claims could have been brought against the PDE, as we explain below the Gaskin settlement bars the claims in this case.

parties filed numerous documents in support of and in opposition to the motion for summary judgment. On October 4, 2011, the District Court held a hearing on the motion, at which time the Court afforded all parties the opportunity to present their arguments. No. 2:07-cv-3100, Doc. Nos. 174, 183.

On October 20, 2011, the District Court made three docket entries, two of which were orders and a third which is the memorandum explaining the basis for those orders (collectively, the "October 20, 2011 Memorandum and Judgment Order"). No. 2:07-cv-3100, Doc. Nos. 180-82. In the October 20, 2011 Memorandum and Judgment Order, the Court denied plaintiffs' motion to partially exclude and/or limit the report and testimony of Daniel J. Reschly, Ph.D., a witness for the LMSD, as moot. No. 2:07-cv-3100, Doc. No. 181. The Court's principal order granted summary judgment to the LMSD against all remaining plaintiffs in the action. J.A. vol. 1, at 1-39; also available at No. 2:07-cv-3100, Doc. No. 182. The Court held that the plaintiffs had failed to put forth any evidence from which a reasonable inference could be drawn that the LMSD intentionally segregated the students on the basis of race into inferior educational programs in violation of Title VI. J.A. vol. 1, at 30-32. The Court also held that plaintiffs had failed to establish a 42 U.S.C. § 1983 case for violation of the Equal Protection Clause of the Fourteenth Amendment, as they had not established that the LMSD had engaged in purposeful discrimination and had not been deliberately indifferent to plaintiffs' rights. J.A. vol. 1, at 33-34.

The District Court noted in particular that plaintiffs were required to "raise at least some reasonable inference that they

were placed into classes and offered services by the [LMSD] due to intentional discrimination based on their race and not simply due to errors in evaluation." The Court concluded that plaintiffs had failed to support this inference with sufficient evidence, and had not put forth more than a scintilla of evidence that the LMSD had acted with a racially discriminatory purpose in identifying them as disabled and placing them in special education courses (regardless of whether this identification was correct or not). They also failed to identify an official policy or custom that was deliberately indifferent to plaintiffs' rights. J.A. vol. 1, at 32-36;[27] also available at No. 2:07-cv-3100, Doc. No. 180.

On November 18, 2011, the Blunt plaintiffs and the CBP filed a notice of appeal from the District Court's October 20, 2011 Memorandum and Judgment Order. J.A. vol. 1, at 40-42. In an attempt to preserve their right to appeal from all of the Court's dispositive orders, their November 18, 2011 notice of appeal stated that "[w]ithout limiting their right to appeal any particular order rendered during District Court proceedings, Plaintiffs listed herein specifically appeal the following orders." The notice of appeal then went on to challenge the February 15,

---

[27] The District Court correctly observed that the LMSD's awareness (as evidenced by the formation of a committee to address the concerns of African American parents) of an achievement gap, between Caucasian and African American students, and its failure to eliminate that gap were not evidence of intentional discrimination or deliberate indifference toward African American students. J.A. vol. 1, at 36.

2008 Order dismissing the Blunts' claims under the IDEA and the District Court's orders of February 15, 2008, and August 19, 2009, as they pertained to CBP and its lack of standing.  J.A. vol. 1, at 40-42; see also No. 2:07-cv-3100, Doc. No. 186.

Also on November 18, 2011, plaintiffs Linda Johnson, Lydia Johnson, Durrell/Hall, Dudley/Whiteman, Allston, Coleman, and Muse/Griffin filed an appeal generally from the District Court's October 20, 2011 Memorandum and Judgment Order.  Their notice of appeal specifically cited the District Court's order of August 19, 2009, in which the Court dismissed the claims against defendant PDE, an order of October 20, 2011, entering the summary judgment in favor of LMSD, and an order of October 20, 2011, denying as moot plaintiffs' motion to preclude expert testimony.  No. 2:07-cv-3100, Doc. No. 187.

On December 1, 2011, LMSD filed a cross-appeal from the portion of the District Court's February 15, 2008 Order which denied LMSD's motion to dismiss plaintiffs' Title VI claims for failure to exhaust administrative remedies[28] and, as we have indicated, the District Court's April 5, 2011 denial of

---

[28] As explained above, the District Court dismissed plaintiffs' IDEA, RA and ADA claims against LMSD, other than those of the Blunts, for failure to exhaust administrative remedies, but had found that Title VI relief was not available through the administrative process set up for resolving IDEA disputes, and thus it did not dismiss the Title VI claims for failure to exhaust administrative remedies.  Of course, the Court similarly did not dismiss the § 1983 claims because there were no administrative remedies available under that section.

its motion to amend its answer to the TAC.  J.A. vol. 1, at 43-45; 2:07-cv-3100, Doc. Nos. 123-24.

## III.  STATEMENT OF JURISDICTION

The District Court had jurisdiction over the plaintiffs' federal law claims pursuant to 20 U.S.C. § 1415(i)(3)(A),[29] 28 U.S.C. § 1331,  and 28 U.S.C. § 1343(a)(3).  In addition, the plaintiffs claimed that the Court had supplemental jurisdiction over their state law claims pursuant to 28 U.S.C. § 1367.  We, however, do not determine whether the District Court had jurisdiction over the state law claims because no party contends that the Court erred in not exercising jurisdiction over those claims.  We have appellate jurisdiction under 28 U.S.C. § 1291.

## IV.  STANDARD OF REVIEW

It is well established that we employ a plenary standard in reviewing orders entered on motions for summary judgment, applying the same standard as the district court.  Kelly v. Borough of Carlisle, 622 F.3d 248, 253 (3d Cir. 2010) (citing

---

[29] "The district courts of the United States shall have jurisdiction of actions brought under this section without regard to the amount in controversy."  20 U.S.C. § 1415(i)(3)(A).

Giles v. Kearney, 571 F.3d 318, 322 (3d Cir. 2009)); Albright v. Virtue, 273 F.3d 564, 570 (3d Cir. 2001); see also Montone v. City of Jersey City, 709 F.3d 181, 189 (3d Cir. 2013); Pennsylvania Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995) (citing Beazer E., Inc. v. United States Envtl. Protection Agency, Region III, 963 F.2d 603, 606 (3d Cir. 1992)). Inasmuch as our review is plenary, "[w]e may affirm the District Court on any grounds supported by the record," even if the court did not rely on those grounds. Nicini v. Morra, 212 F.3d 798, 805 (3d Cir. 2000).[30]

In considering an order entered on a motion for summary judgment, "we view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." Babbitt, 63 F.3d at 236. As we also have explained, "[a] factual dispute is material if it bears on an essential element of the plaintiff's claim, and is genuine if a reasonable jury could find in favor of the nonmoving party." Natale v. Camden Cnty. Corr. Facility, 318 F.3d 575, 580 (3d Cir. 2003) (citing Fakete v. Aetna, Inc., 308 F.3d 335, 337 (3d Cir. 2002) (in turn quoting Cloverland-Green Spring Dairies, Inc. v. Pa. Milk Mktg. Bd., 298 F.3d 201, 210 (3d Cir. 2002))).

However, where a non-moving party fails sufficiently to

---

[30] We note that sometimes in our opinions we refer to the standard of review on an appeal from an order for summary judgment as "plenary" and sometimes as "de novo." We discern no difference between the plenary and de novo standards of review. See 19-206 Pratt, Moore's Federal Practice – Civil § 206.04 (2013).

establish the existence of an essential element of its case on which it bears the burden of proof at trial, there is not a genuine dispute with respect to a material fact and thus the moving party is entitled to judgment as a matter of law. Lauren W. v. Deflaminis, 480 F.3d 259, 266 (3d Cir. 2007). Further, mere allegations are insufficient, and "[o]nly evidence sufficient to convince a reasonable factfinder to find all of the elements of [the] prima facie case merits consideration beyond the Rule 56 stage." Id. (quoting and citing Celotex Corp. v. Catrett, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553 (1986) (internal quotation marks omitted)).

We review a district court's determinations concerning the admissibility of evidence for an abuse of discretion. See Martin v. Monumental Life Ins. Co., 240 F.3d 223, 232 (3d Cir. 2001) ("Where a party makes known the substance of the evidence it desires to introduce, we review the District Court's decision to exclude the evidence for an abuse of discretion.") (citing Narin v. Lower Merion Sch. Dist., 206 F.3d 323, 334 (3d Cir. 2000)). There is an abuse of discretion if the district court's decision "'rests upon a clearly erroneous finding of fact, errant conclusion of law or an improper application of law to fact.'" Forrest v. Beloit Corp., 424 F.3d 344, 349 (3d Cir. 2005) (citing In re Merritt Logan, Inc. v. Fleming Cos., Inc, 901 F.2d 349, 359 (3d Cir. 1990)) (quoting Oddi v. Ford Motor Co., 234 F.3d 136, 146 (3d Cir. 2000)). "An abuse of discretion can also occur 'when no reasonable person would adopt the district court's view.' We will not interfere with the district court's exercise of discretion 'unless there is a definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon a weighing of the

35

relevant factors.'" Oddi, 234 F.3d at 146 (internal citations omitted).[31]

It is also well established that we review de novo a district court's determination of a party's standing to bring suit, as a court makes a determination of whether a party has standing on a legal basis, at least where, as here, the determination does not depend on the court's resolution of a factual dispute. See National Collegiate Athletic Ass'n v. Governor of N. J., 730 F.3d 208, 218 (3d Cir. 2013); Common Cause of Pa. v. Pennsylvania, 558 F.3d 249, 257 (3d Cir. 2009).[32]

Judgments of a court applying the IDEA's statute of limitations but not resolving disputes of fact are subject to plenary review as conclusions of law, but "whether [plaintiffs] proved an exception to the [IDEA] statute of limitations, and whether the [School] District fulfilled its FAPE obligations . . . are subject to clear error review as questions of fact. Such [f]actual findings from the administrative proceedings are to be considered prima facie correct, and if [we] do[ ] not adhere to

---

[31] On the other hand, "[t]o the extent an evidentiary issue turns on the interpretation of a Federal Rule of Evidence, rather than the mere application of the rule, our review is plenary." Forrest, 424 F.3d at 349 (emphasis added) (citing In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 749 (3d Cir. 1994)).

[32] Citing Taliaferro v. Darby Twp. Zoning Bd., 458 F.3d 181, 188 (3d Cir. 2006); see also Public Interest Research Grp. of N.J., Inc. v. Magnesium Elektron, Inc., 123 F.3d 111, 119 (3d Cir. 1997).

those findings, we must explain why." D.K. v. Abington Sch. Dist., 696 F.3d 233, 243 (3d Cir. 2012) (internal citations and quotation marks omitted) (citing and quoting P.P. ex. rel. Michael P. v. W. Chester Area Sch. Dist., 585 F.3d 727, 734 (3d Cir. 2009); S.H. v. State-Operated Sch. Dist. of Newark, 336 F.3d 260, 269-70 (3d Cir. 2003)).

When a district court reviews an administrative law judge's decision, a court of appeals exercises plenary review over the court's legal conclusions, and reviews its findings of fact with a "modified de novo" standard of review (giving the administrative factual findings "due weight" and considering them to be prima facie correct) for clear error. Lauren W., 480 F.3d at 266. However, we do not make such an analysis here, as the issue before us with respect to the Blunts, the only appellants who exhausted their administrative remedies, is whether the District Court correctly dismissed their case on the grounds that they brought it beyond the period allowed by the statute of limitations. The resolution of that issue would not be aided by administrative expertise.

## V. ISSUES PRESENTED ON APPEAL

Though the District Court made many rulings, the appellants have appealed only from some of them. Accordingly, we are able to summarize the issues on this appeal as follows:

1. Did the District Court correctly dismiss the action against the PDE on the basis of res judicata (claim preclusion)?

2. Did the District Court correctly conclude that CBP did not have standing as a plaintiff in this action?

3. Does the IDEA's 90-day statute of limitations, in which a party adversely affected by an administrative determination of an IDEA claim may bring a state or federal suit, enacted on December 3, 2004, and effective July 1, 2005, apply to bar the Blunts' federal action, given that they first began the administrative judicial process on April 8, 2005, when the IDEA's statute of limitations for bringing a claim in state or federal court after receiving an adverse administrative determination was two years, and they received their final adverse administrative disposition on August 31, 2005, almost two months after the new 90-day statute of limitations came into effect, and almost nine months after Congress enacted it?[33]

4. Did the District Court abuse its discretion in how it

[33] We note that although the statute of limitations issue was not discussed at oral argument, the Blunts' brief raises a challenge to the District Court's ruling on the issue as a prime point of argument. Appellants' br. No. 11-4201 at 31-37. Presumably, however, in the case of student appellants who no longer are claiming to be disabled, but rather are claiming to have been misidentified as disabled, a statute of limitations issue would be inapplicable. However, as far as we can tell from the record, at least one or two of the student plaintiffs do not challenge their identification as disabled, and counsel for the Blunts has not withdrawn the argument regarding the statute of limitations which thus has been preserved on appeal. Therefore, we address the statute of limitations issue.

treated certain evidence that plaintiffs offered by not giving it greater weight and not considering the evidence in the light most favorable to the plaintiffs when the Court considered and granted the motion for summary judgment made by the LMSD and, on the other hand, in how it treated certain evidence that LMSD offered for consideration on that motion?

5. Did plaintiffs establish a prima facie case of discrimination in violation of Title VI and § 1983 such that summary judgment was inappropriate?[34]


## VI. SUMMARY OF THE LAW

### A. The Individuals with Disabilities Education Act

Congress enacted the IDEA, 20 U.S.C. § 1400 et seq., with the goal of "improving educational results for children with disabilities." 20 U.S.C. § 1400(c)(1). The congressional findings and purposes section of the IDEA is quite broad and sets forth in great detail Congress' intention in adopting the IDEA.

Each public school district in a state that accepts federal

---

[34] LMSD argues that the District Court improperly denied its motion to amend its answer. We, however, do not reach that issue because our determination that the Court properly granted summary judgment in its favor and our affirmance of the other orders on appeal are dispositive of the issue.

funds under IDEA[35] has a continuing obligation, called the "child find" requirement, to identify and evaluate all students reasonably believed to have a disability, and each state receiving funds must establish procedures to effectuate this requirement. Ridley Sch. Dist. v. M.R., 680 F.3d 260, 271 (3d Cir. 2012). As we pointed out in Ridley, Pennsylvania has set forth child find procedures in 22 Pa. Code §§ 14.121 through 14.125. Id.

States receiving federal funding for assistance in the education of children with disabilities under the IDEA are responsible for providing a FAPE to any students who are identified as learning disabled until they reach 21 years of age. See 20 U.S.C. § 1400(c)-(d)); see also 34 C.F.R. §§ 300.1-300.2;[36] Jonathan H. v. Souderton Area Sch. Dist., 562 F.3d 527, 528 (3d Cir. 2009); Lauren W., 480 F.3d at 272. As we explained in Ridley:

---

[35] "The IDEA was enacted pursuant to the congressional spending power. [Thus, a] state is not generally bound by the IDEA unless it receives federal funding under the statute." A.W. v. Jersey City Pub. Schs., 341 F.3d 234, 247 (3d Cir. 2003) (internal citations omitted).

[36] "The purposes of this part are-- (a) To ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living; . . ." 34 C.F.R. § 300.1(a). Further, "[t]his part applies to each State that receives payments under Part B of the Act, as defined in § 300.4." 34 C.F.R. § 300.2(a).

A FAPE consists of educational instruction specially designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child to benefit from the instruction. Although a state is not required to maximize the potential of every handicapped child, it must supply an education that provides significant learning and meaningful benefit to the child. [T]he provision of merely more than a trivial educational benefit is insufficient.

680 F.3d at 268 (internal quotation marks omitted) (citing Bd. of Educ. v. Rowley, 458 U.S. 176, 206, 102 S.Ct. 3034, 3050 (1982); Ridgewood Bd. of Educ. v. N.E., 172 F.3d 238, 247 (3d Cir. 1999); L.E. v. Ramsey Bd. of Educ., 435 F.3d 384, 390 (3d Cir. 2006)).

In providing a FAPE to a disabled student, school districts must work with the student's parents to create an individualized education plan ("IEP"), containing certain elements that the Code of Federal Regulations specifies must be made available to each disabled student. We have explained the balance between reasonable goals for the IEP and a parent's fondest hopes for the parent's child as follows:

Under the IDEA, school districts must work with parents to design an IEP, which is a program of individualized instruction for each special education student. 'Each IEP must include an assessment of the child's current educational performance, must articulate measurable educational goals, and must specify the nature of the special services that the school will provide.' Although the IEP must provide the student with a 'basic floor of

41

opportunity,' it does not have to provide 'the optimal level of services,' or incorporate every program requested by the child's parents. . . . [T]he IDEA guarantees to a disabled child 'an education that is appropriate, not one that provides everything that might be thought desirable by loving parents' . . . . '[A]t a minimum, the IEP must be reasonably calculated to enable the child to receive meaningful educational benefits in light of the student's intellectual potential,' and 'individual abilities.'

Ridley, 680 F.3d at 276 (internal citations omitted).

Congress amended the IDEA through the Individuals with Disabilities Improvement Act of 2004 to require that an IEP include "a statement of the special education and related services and supplementary aids and services, based on peer-reviewed research to the extent practicable, to be provided to the child." Ridley, 680 F.3d at 276 (emphasis in original) (quoting and citing 20 U.S.C. § 1414(d)(1)(A)(i)(IV)). Because neither the text of the IDEA nor the regulations promulgated under it provided guidance regarding the peer-review research provision, we looked to the agency's interpretation of its own regulations for guidance, and determined (1) that although schools should strive to base a student's IEP on peer-reviewed research to the maximum extent possible, the student's IEP team must be allowed to be flexible in devising an appropriate program for any particular student in light of the available research; and (2) courts must accord significant deference to the choices made by school officials as to what constitutes an appropriate program

for each student.[37] Ridley, 680 F.3d at 277 (citing 71 Fed. Reg. at 46,665 (2006); D.S., 602 F.3d at 556-57; Ridgewood, 172 F.3d at 247).

> B.  Redress and the Statute of Limitations under the IDEA

"If parents believe that an IEP fails to provide their child with a FAPE, they may request an administrative

---

[37] We explained that "[g]iven that the IDEA does not require an IEP to provide the 'optimal level of services,' we likewise hold that the IDEA does not require a school district to choose the program supported by the optimal level of peer-reviewed research. Rather, the peer-review specially designed instruction in an IEP must be 'reasonably calculated to enable the child to receive meaningful educational benefits in light of the student's intellectual potential.'" Ridley, 680 F.3d at 277 (citing Chambers v. Sch. Dist. of Phila. Bd. of Educ., 587 F.3d 176, 182 (3d Cir. 2009)). While we recognized that "there may be cases in which the specially designed instruction proposed by a school district is so at odds with current research that it constitutes a denial of a FAPE," and that "if it is practicable for a school district to implement a program based upon peer-reviewed research, and the school fails to do so, that will weigh heavily against a finding that the school provided a FAPE," nonetheless we declined to set a bright-line rule as to what constitutes an adequately peer-reviewed special education program, and emphasized that the appropriateness of an IEP must be considered on a case-by-case basis, taking into account the available research. Id. at 279.

'impartial due process hearing,'" as may a school district if it wants to change an existing IEP or seeks an evaluation without the parents' consent. Ridley, 680 F.3d at 269-70 (citing 20 U.S.C. § 1415(f); Schaffer, 546 U.S. at 53, 126 S.Ct. at 532).

The burden of persuasion in an administrative hearing under the IDEA lies with the party seeking relief. See Schaffer, 546 U.S. at 62, 126 S.Ct. at 537. Similarly, the party judicially challenging an administrative decision bears the burden of persuasion with respect to the finding for each claim challenged. Ridley, 680 F.3d at 270.

On December 3, 2004, Congress revised the IDEA with the Individuals with Disabilities Improvement Act of 2004, which included a two-year statute of limitations governing the time during which an aggrieved party may file a request for an administrative due process hearing under the IDEA. P.L. 108-446, 118 Stat. 2647 (2004); 20 U.S.C. § 1415(f)(3)(c). The two-year period runs from the date that the parent knew or should have known about the alleged action that forms the basis for the complaint. The same two-year statute of limitations for bringing administrative claims also applies to other legal claims premised on the IDEA, such as claims under § 504 of the RA, or claims "invoking Child Find and FAPE duties." D.K., 696 F.3d at 244 (quoting P.P. ex. rel. Michael P., 585 F.3d at 734). In the same legislation, Congress shortened the statute of limitations to 90 days for a party dissatisfied with the result of the administrative proceedings to bring a federal or state judicial action to challenge that result. Though Congress mandated that these new statutes of limitations were to be retroactive, it delayed their effective dates until July 1, 2005.

44

In 2010, we determined that the seven-month "grace period" between the enactment of the two-year statute of limitations and its effective date provided litigants with reasonable notice and opportunity to bring claims, so that it was not unfair to impose the new statute of limitations and thus the period that the limitations period allowed was not impermissibly short. Steven I. v. Cent. Bucks Sch. Dist., 618 F.3d 411, 415-16 (3d Cir. 2010).[38] We further explained that "all persons are charged with knowledge of the provisions of statutes and must take note of the procedure adopted by them, [and] a legislature need do nothing more than enact and publish the law, and afford the citizenry a reasonable opportunity to familiarize itself with its terms and to comply." Id. at 416 (internal citations and quotation marks omitted). Thus, we noted that the Supreme

---

[38] In so doing, we cited a Supreme Court decision reciting that

[t]his court has often decided that statutes of limitation affecting existing rights are not unconstitutional, if a reasonable time is given for the commencement of an action before the bar takes effect.

It is difficult to see why, if the legislature may prescribe a limitation where none existed before, it may not change one which has already been established. The parties to a contract have no more a vested interest in a particular limitation which has been fixed than they have in an unrestricted right to sue.

Wilson v. Iseminger, 185 U.S. 55, 63, 22 S.Ct. 573, 575 (1902) (internal quotation marks omitted).

45

Court

> has upheld retroactive adjustments to a limitations period
> only when the legislature has provided a grace period
> during which the potential plaintiff could reasonably be
> expected to learn of the change in the law and then
> initiate his action. In the context of a retrospective
> statute of limitations, a reasonable grace period provides
> an adequate guarantee of fairness. Having suffered the
> triggering event of an injury, a potential plaintiff is likely
> to possess a heightened alertness to the possibly
> changing requirements of the law bearing on his claim.

Id. at 417 (quoting Texaco, Inc. v. Short, 454 U.S. 516, 549, 102
S.Ct. 781, 802 (1982) (internal quotation marks omitted)).

An IDEA claimant's right to redress does not end with
the administrative review process, for any aggrieved party who
received an adverse administrative determination regarding his
or her complaints with respect to IDEA compliance may bring
an action in a "[s]tate court of competent jurisdiction or in a
district court of the United States, without regard to the amount
in controversy," 20 U.S.C. § 1415(i)(2)(A), within 90 days of
the final administrative decision, 20 U.S.C. § 1415(i)(2)(B).[39]
Prior to the amendment of the IDEA shortening the limitations
period, the time for bringing suit in a state or federal court after
receiving an adverse administrative determination had been two

---

[39] But an action may be brought in a state with "an explicit time
limitation for bringing such an action . . . in such time as the
State law allows." 20 U.S.C. § 1415(i)(2)(B).

46

years.  The amendment adopting the 90-day statute of limitations passed by Congress on December 3, 2004, became effective July 1, 2005, seven months after its enactment.  This 90-day statute of limitations period begins running on "the date of the decision of the [administrative] hearing officer."  20 U.S.C. § 1415(i)(2)(B); see also Jonathan H., 562 F.3d at 530 ("Section 1415(i)(2)(B) limits a party's right to 'bring an action' to within 90 days after the final administrative decision.").

As with ADA claims, a party seeking redress under the IDEA must exhaust administrative remedies before filing an action seeking redress in a state or federal court.  See Komninos by Komninos v. Upper Saddle River Bd. of Educ., 13 F.3d 775, 778 (3d Cir. 1994) (citing Smith v. Robinson, 468 U.S. 992, 1011-12, 104 S.Ct. 3457, 3468-69 (1984)); see also I.M. ex rel. C.C. v. Northampton Pub. Schs., 869 F. Supp. 2d 174 (D. Mass. 2012) ("Plaintiffs' conceded failure to exhaust their administrative remedies with regard to the ADA-grounded claim and/or appeal such a decision within 90 days is fatal to its present viability.").

We have explained that the policy of requiring exhaustion of administrative remedies is strong but it has some very limited exceptions, namely:

- where exhaustion would be futile or inadequate (see Honig v. Doe, 484 U.S. 305, 327, 108 S.Ct. 592, 606 (1988));
- where the issue presented is a purely legal question;

- where the administrative agency cannot grant relief (for example, due to lack of authority); and

- an emergency situation, such as where exhaustion of administrative remedies would cause 'severe or irreparable harm' to the litigant.

Komninos, 13 F.3d at 778-79.[40]

Nonetheless, we have cautioned that "[t]he advantages of awaiting completions of the administrative hearings are particularly weighty in Disabilities Education Act cases.  That process offers an opportunity for state and local agencies to exercise discretion and expertise in fields in which they have substantial experience. . . . [Therefore], courts should be wary of foregoing the benefits to be derived from a thorough development of the issues in the administrative proceeding." Id. at 779-80.  We have explained that "the IDEA provides a comprehensive remedial scheme" and "includes a judicial remedy for violations of any right 'relating to the identification, evaluation, or educational placement of [a] child, or the provision of a free appropriate public education to such child.'" A.W. v. Jersey City Pub. Schs., 486 F.3d 791, 803 (3d Cir. 2007) (citing 20 U.S.C. § 1415(b)(6)).[41]

---

[40] Citing, inter alia, Honig, 484 U.S. at 327, 108 S.Ct. at 606.

[41] In A.W. we further noted that "[b]y preserving rights and remedies 'under the Constitution,' section 1415(l) does permit plaintiffs to resort to section 1983 for constitutional violations, notwithstanding the similarity of such claims to those stated directly under IDEA.  But section 1415(l) does not permit

## C. Title VI of the Civil Rights Act of 1964

Title VI of the Civil Rights Act provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. Title VI further provides, in relevant part, that the guidelines and criteria established by Title VI "dealing with conditions of segregation by race, whether de jure or de facto, in the schools of the local educational agencies of any State shall be applied uniformly in all regions of the United States . . . whatever the origin or cause of such segregation." 42 U.S.C. § 2000d-6(a).

---

plaintiffs to sue under section 1983 for an IDEA violation, which is statutory in nature. Nothing in section 1415(l) overrules the Court's decision in Smith [v. Robinson, 468 U.S. 992, 104 S.Ct. 3457 (1984)], to the extent it held that Congress intended IDEA to provide the sole remedies for violations of that same statute. . . . Indeed . . . the Court has continued to refer to the IDEA as an example of a statutory enforcement scheme that precludes a § 1983 remedy." A.W., 486 F.3d at 798-803 (emphasis added). Thus, we note that for the five or six student plaintiffs who have changed their theory of liability and now argue that the LMSD incorrectly identified them as disabled, this part of the analysis presumably would not apply, as they no longer make claims under the IDEA. However, as we previously have noted, appellants did challenge the District Court's determination on this issue in the briefs in No. 11-4201.

The application of Title VI to recipients of federal assistance through the Department of Education, as explained in the Code of Federal Regulations is especially germane to this case:

(a) General. No person in the United States shall, on the ground of race, color, or national origin be excluded from participation in, be denied the benefits of, or be otherwise subjected to discrimination under any program to which this part applies.

(b) Specific discriminatory actions prohibited.

(1) A recipient under any program to which this part applies may not, directly or through contractual or other arrangements, on ground of race, color, or national origin:

(i) Deny an individual any service, financial aid, or other benefit provided under the program;

(ii) Provide any service, financial aid, or other benefit to an individual which is different, or is provided in a different manner, from that provided to others under the program;

(iii) Subject an individual to segregation or separate treatment in any matter related to his receipt of any service, financial aid, or other benefit under the program;

(iv) Restrict an individual in any way in the

enjoyment of any advantage or privilege enjoyed by others receiving any service, financial aid, or other benefit under the program;

(v) Treat an individual differently from others in determining whether he satisfies any admission, enrollment, quota, eligibility, membership or other requirement or condition which individuals must meet in order to be provided any service, financial aid, or other benefit provided under the program;

. . .

34 C.F.R. § 100.3(a), (b)(1)(i)-(b)(1)(v).

Private individuals who bring suits under Title VI may not recover compensatory relief unless they show that the defendant engaged in intentional discrimination. Guardians Assoc. v. Civil Serv. Comm'n of N.Y., 463 U.S. 582, 597, 607, 103 S.Ct. 3221, 3230, 3235 (1983); see also Alexander v. Sandoval, 532 U.S. 275, 282-83, 121 S.Ct. 1511, 1517-18 (2001) (reaffirming that private individuals cannot recover compensatory damages under Title VI except in cases of intentional discrimination). Recently, we held that plaintiffs bringing claims under the ADA and RA may establish intentional discrimination with a showing of deliberate indifference. S.H. v. Lower Merion Sch. Dist., 729 F.3d 248, 263 (3d Cir. 2013). Given the parallels between Title VI and the statutes at issue in S.H., our rationale for adopting deliberate indifference as a form of intentional discrimination in S.H. applies with equal force in the Title VI context. We explained

51

that the deliberate indifference standard was "better suited to the remedial goals of the RA and the ADA," id. at 264, which is also true for Title VI given that the remedies available for violations of Title VI are coextensive with those available under the ADA and the RA, Barnes v. Gorman, 536 U.S. 181, 185, 122 S.Ct. 2097, 2100 (2002).

Other courts of appeals to have considered the issue agree that deliberate indifference may, in certain circumstances, establish intentional discrimination for the purposes of a Title VI claim. See, e.g., Zeno v. Pine Plains Cent. Sch. Dist., 702 F.3d 655, 664-65 (2d Cir. 2012) (explaining that deliberate indifference to teacher or peer harassment of individual may create liability if a plaintiff establishes "(1) substantial control, (2) severe and discriminatory harassment, (3) actual knowledge, and (4) deliberate indifference"); Bryant v. Indep. Sch. Dist. No. I-38 of Garvin Cnty., Ok., 334 F.3d 928, 934 (10th Cir. 2003) (holding that "deliberate indifference to known instances of student-on-student racial harassment is a viable theory in a Title VI intentional discrimination suit"); Monteiro v. Tempe Union High Sch. Dist., 158 F.3d 1022, 1033 (9th Cir. 1998) (finding that school district may violate Title VI if there is a racially hostile environment, the district had notice of the problem, and it failed to respond adequately). The Supreme Court, addressing claims under Title IX, explained that in order to establish deliberate indifference, a plaintiff must show that the school district had knowledge of the alleged misconduct and the power to correct it but nonetheless failed to do so. See Davis v. Monroe Cnty. Bd. of Educ., 526 U.S. 629, 645-49, 119 S.Ct. 1661, 1672-74; S.H., 729 F.3d at 265. Constructive knowledge is not sufficient; "only actual knowledge is a predicate to

52

liability." <u>Zeno</u>, 702 F.3d at 666.

D.  42 U.S.C. § 1983

42 U.S.C. § 1983 states, in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . .

To establish a § 1983 claim, a plaintiff must prove that a defendant's discriminatory action was purposeful:

> To bring a successful claim under 42 U.S.C. § 1983 for a denial of equal protection, plaintiffs must prove the existence of purposeful discrimination. They must demonstrate that they 'receiv[ed] different treatment from that received by other individuals similarly situated.'

<u>Andrews v. City of Phila.</u>, 895 F.2d 1469, 1478 (3d Cir. 1990) (internal citations omitted).  We further explained in <u>Brown v. City of Pittsburgh</u>, 586 F.3d 263, 293 (3d Cir. 2009):

> Our analysis yields the following conclusion: in order to establish municipal liability for selective

53

enforcement of a facially viewpoint- and content-neutral regulation, a plaintiff whose evidence consists solely of the incidents of enforcement themselves must establish a pattern of enforcement activity evincing a governmental policy or custom of intentional discrimination on the basis of viewpoint or content.

We also have explained that "[a]n essential element of a claim of selective treatment under the Equal Protection Clause is that the comparable parties were 'similarly situated.' Persons are similarly situated under the Equal Protection Clause when they are alike 'in all relevant aspects.'" Startzell v. City of Phila., 533 F.3d 183, 203 (3d Cir. 2008) (citing Hill v. City of Scranton, 411 F.3d 118, 125 (3d Cir. 2005)).

> E.  Section 504 of the Rehabilitation Act and Relevant Regulations of the Department of Education

Section 504 of the RA, 29 U.S.C. § 701 et seq., states, in relevant part:

> No otherwise qualified individual with a disability in the United States, . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance. . . .

29 U.S.C. § 794(a).  Thus, § 504 of the RA requires school districts receiving federal funding to provide a FAPE to each

54

qualified handicapped person within the recipient's jurisdiction. See Lauren W., 480 F.3d at 274; see also Ridley, 680 F.3d at 280 (quoting W.B. v. Matula, 67 F.3d 484, 492 (3d Cir. 1995), abrogated on other grounds by A.W., 486 F.3d 791); 34 C.F.R. § 104.33(a)-(b).[42]  We have explained that this means "a school

---

[42] 34 C.F.R. § 104.33 provides:

(a) General. A recipient that operates a public elementary or secondary education program or activity shall provide a free appropriate public education to each qualified handicapped person who is in the recipient's jurisdiction, regardless of the nature or severity of the person's handicap.

(b) Appropriate education.

(1) For the purpose of this subpart, the provision of an appropriate education is the provision of regular or special education and related aids and services that (i) are designed to meet individual educational needs of handicapped persons as adequately as the needs of nonhandicapped persons are met and (ii) are based upon adherence to procedures that satisfy the requirements of §§ 104.34, 104.35, and 104.36.

(2) Implementation of an Individualized Education Program developed in accordance with the Education of the Handicapped Act is one means of meeting the standard established in paragraph (b)(1)(i) of this section.

(3) A recipient may place a handicapped person or refer such a person for aid, benefits, or services other than

district must reasonably accommodate the needs of the handicapped child so as to ensure meaningful participation in educational activities and meaningful access to educational benefits. . . . However, § 504 does not mandate 'substantial' changes to the school's programs, and courts 'should be mindful of the need to strike a balance between the rights of the student and [his or her] parents and the legitimate financial and administrative concerns of the [s]chool [d]istrict.'" Ridley, 680 F.3d at 280-81 (internal citation omitted); Ridgewood, 172 F.3d at 247; Southeastern Cmty. Coll. v. Davis, 442 U.S. 397, 405, 99 S.Ct. 2361, 2366 (1979). On the other hand, mere administrative or fiscal convenience does not constitute a sufficient justification for providing separate or different services to a handicapped child. Ridley, 680 F.3d at 281 (citing Helen L. v. DiDario, 46 F.3d 325, 338 (3d Cir. 1995)).

To establish that there has been a violation of § 504 of the RA, a plaintiff must prove that: (1) the student was disabled;[43] (2) (s)he was "otherwise qualified" to participate in

those that it operates or provides as its means of carrying out the requirements of this subpart. If so, the recipient remains responsible for ensuring that the requirements of this subpart are met with respect to any handicapped person so placed or referred.

[43] Again, as noted, a recent psychological evaluation of the students in question, performed by plaintiffs' psychologist at their behest, has concluded that five or six of the students at issue are not learning disabled, and thus a § 504 analysis presumably is not relevant to those students' claims.

school activities; (3) the school district received federal financial assistance; and (4) the student was excluded from participation in or denied the benefits of the educational program receiving the funds, or was subject to discrimination under the program. See id. at 280.

### F. Americans with Disabilities Act

In a provision similar to the safeguards we have outlined above, Title II of the ADA provides, in relevant part:

> Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132.

The Code of Federal Regulations has effectuated the ADA by mandating that there be equal opportunity in benefits and services for disabled individuals. It provides, in relevant part,

> (b)(1) A public entity, in providing any aid, benefit, or service, may not, directly or through contractual, licensing, or other arrangements, on the basis of disability—

. . .

(ii) Afford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others;

(iii) Provide a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others;

. . .

(vii) Otherwise limit a qualified individual with a disability in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving the aid, benefit, or service.

. . .

28 C.F.R. § 35.130(b)(1)(ii), (iii), (vii).

We have explained that "the substantive standards for determining liability under the Rehabilitation Act and the ADA are the same." Ridley, 680 F.3d at 282-83 (citing McDonald v. Pa. Dep't of Pub. Welfare, 62 F.3d 92, 94-95 (3d Cir. 1995)).

G.  Establishing a Prima Facie Case of Racial
Discrimination Through Circumstantial Evidence

Inasmuch as we have recognized that individuals who violate the law based on discriminatory motives sometimes do not leave a trail of direct evidence, but instead "cover their tracks" by providing alternate explanations for their actions, we have found that a plaintiff may establish a prima facie factual foundation of discrimination by drawing reasonable inferences from certain objective facts that are generally not in dispute. See Barnes Found. v. Twp. of Lower Merion, 242 F.3d 151, 162-63 (3d Cir. 2001).[44]

In International Brotherhood of Teamsters v. United States, a Title VII employment discrimination case mentioned

---

[44] In Barnes, a case involving a museum with a primarily African American board of directors, the plaintiffs' evidence consisted mainly of affidavits from attorneys expressing their viewpoint that zoning enforcement had been unequal with respect to the museum.  In this regard, the plaintiffs claimed that there had been unequal treatment of the museum as compared to its neighbors in the enforcement of parking regulations.  Moreover, it was claimed that one resident of the municipality in which the museum was located used "code words" at a public meeting in a manner that the plaintiffs believed had racial undertones.  Nevertheless, we concluded that the evidence provided "a totally inadequate foundation on which to predicate an inference that racial animus motivated the appellants," 242 F.3d at 164, except perhaps as to the one individual who had used the "code words."

several times during oral argument in this case,[45] the Supreme Court rejected defendants' arguments that statistics never can establish a prima facie case of discrimination. Rather, the Court held that statistics, when bolstered by other evidence, may, depending on the circumstances, establish a prima facie case of racial discrimination. 431 U.S. 324, 338-40, 97 S.Ct. 1843, 1856-57 (1977). However, the Court cautioned that the "usefulness [of statistics] depends on all of the surrounding facts and circumstances." Id. at 340, 97 S.Ct. at 1856-57.

Importantly, the Supreme Court has explained that neither the "courts or defendants [are] obliged to assume that plaintiffs' statistical evidence is reliable," and has cited, for example, the weaknesses inherent in small or incomplete data sets and/or inadequate statistical techniques. Watson v. Fort

---

[45] Many of the cases that discuss statistical evidence as it relates to establishment of a prima facie case of discrimination do so in the context of employment litigation under Title VII. Though we are not suggesting that a Title VI prima facie case necessarily requires a plaintiff to meet the same burden of proof that a plaintiff must meet in a Title VII case, as we have no need to address that possibility, the general discussion of the usefulness of statistics as prima facie evidence in Title VII cases is instructive. Indeed, we have recognized that "[a]lthough the Supreme Court has not yet spoken on the issue, the courts of appeals have generally agreed that the parties' respective burdens in a Title VI disparate impact case should follow those developed in Title VII cases." Powell v. Ridge, 189 F.3d 387, 393 (3d Cir. 1999).

Worth Bank & Trust, 487 U.S. 977, 996, 108 S.Ct. 2777, 2790 (1988); see also Teamsters, 431 U.S. at 339 n.20, 97 S.Ct. at 1857 n.20 ("Considerations such as small sample size may, of course, detract from the value of such evidence.").

The Supreme Court also has rejected the use of particular standard deviations or "any alternative mathematical standard" in establishing a prima facie case of employment discrimination, and has stressed that the significance or substantiality of numerical disparities must be judged on a case-by-case basis. "[S]uch a case-by-case approach properly reflects our recognition that statistics 'come in infinite variety and . . . their usefulness depends on all of the surrounding facts and circumstances.'" Watson, 487 U.S. at 995 n.3, 108 S.Ct. at 2789 n.3 (internal citations omitted). Moreover, the Court has noted that its "formulations, which have never been framed in terms of any rigid mathematical formula, have consistently stressed that statistical disparities must be sufficiently substantial that they raise such an inference of causation." Id. at 995, 108 S.Ct. at 2789.

H.  Class Actions and Res Judicata (Claim Preclusion) Defenses

1.  Claim Preclusion

We have explained that

[c]laim preclusion, formerly referred to as res judicata, gives dispositive effect to a prior judgment if a particular issue, although not litigated, could have been raised in the earlier proceeding. Claim preclusion requires: (1) a

61

> final judgment on the merits in a prior suit involving; (2) the same parties or their privities [sic]; and (3) a subsequent suit based on the same cause of action.

Bd. of Trs. of Trucking Emps. of N. Jersey Welfare Fund, Inc. - Pension Fund v. Centra, 983 F.2d 495, 504 (3d Cir. 1992) (citing United States v. Athlone Indus., Inc., 746 F.2d 977, 983 (3d Cir. 1984)).

In analyzing whether these three elements have been met, we "[do] not apply this conceptual test mechanically, but focus on the central purpose of the doctrine, to require a plaintiff to present all claims arising out [of] the same occurrence in a single suit. In so doing, we avoid piecemeal litigation and conserve judicial resources." Sheridan v. NGK Metals Corp., 609 F.3d 239, 260 (3d Cir. 2010) (quoting Churchill v. Star Enters., 183 F.3d 184, 194 (3d Cir. 1999) (internal quotation marks omitted)) (in turn quoting Athlone, 746 F.2d at 984).

We further have explained that "[w]e take a 'broad view' of what constitutes the same cause of action" and that "res judicata generally is thought to turn on the essential similarity of the underlying events giving rise to the various legal claims." Sheridan, 609 F.3d at 261 (emphasis in original) (citing Churchill, 183 F.3d at 194) (quoting Athlone, 746 F.2d at 983-84). In analyzing essential similarity, we consider several factors: "(1) whether the acts complained of and the demand for relief are the same . . .; (2) whether the theory of recovery is the same; (3) whether the witnesses and documents necessary at trial are the same . . .; and (4) whether the material facts alleged are the same. It is not dispositive that a plaintiff asserts a different theory of recovery or seeks different relief in the two

62

actions." Id. at 261 (internal quotation marks omitted) (quoting Davis v. U.S. Steel Supply, 688 F.2d 166, 171 (3d Cir. 1982)); see also Elkadrawy v. Vanguard Grp., 584 F.3d 169, 173 (3d Cir. 2009) ("This analysis does not depend on the specific legal theory invoked, but rather [on] the essential similarity of the underlying events giving rise to the various legal claims.) (internal quotation marks omitted).

Thus, res judicata bars a claim litigated between the same parties or their privies in earlier litigation where the claim arises from the same set of facts as a claim adjudicated on the merits in the earlier litigation. "Moreover, 'res judicata bars not only claims that were brought in the previous action, but also claims that could have been brought.'" Id. (internal citations omitted) (quoting Davis v. U.S. Steel Supply, 688 F.2d at 171). Further, "[t]he fact that several new and discrete discriminatory events are alleged does not compel a different result. A claim extinguished by res judicata 'includes all rights of the plaintiff to remedies against the defendant with respect to all or any part of the transaction, or series of connected transactions, out of which the action arose.'" Id. at 174 (emphasis in original) (quoting Restatement (Second) of Judgments § 24(1) (1982)).

### 2. Application of Res Judicata (Claim Preclusion) in Class Actions

We have explained that "[i]t is now settled that a judgment pursuant to a class settlement can bar later claims based on the allegations underlying the claims in the settled class action. This is true even though the precluded claim was not presented, and could not have been presented, in the class action itself." In re Prudential Ins. Co. of Am. Sales Practice

63

Litig., 261 F.3d 355, 366 (3d Cir. 2001).  While "it may seem anomalous at first glance . . . that courts without jurisdiction to hear certain claims have the power to release those claims as part of a judgment . . . we have endorsed the rule because it serves the important policy interest of judicial economy by permitting parties to enter into comprehensive settlements that prevent relitigation of settled questions at the core of a class action."  Id. at 366 (internal quotation marks omitted) (quoting Grimes v. Vitalink Comm'ns Corp., 17 F.3d 1553, 1563 (3d Cir.1994)).

It is highly significant that adding parties to the class in a subsequent class action does not necessarily preclude parties from satisfying the second prong of the res judicata test, that the parties are the same or privies of the parties in the first action.  See, e.g., Sheridan, 609 F.3d at 261 ("The fact that there are additional parties in Sheridan II does not affect our conclusion.")  (citing Gregory v. Chehi, 843 F.2d 111, 119 (3d Cir. 1988) ("The essence of the cause of action asserted against the defendants in the state proceeding is not altered by the addition of more parties.")).

I.  Standing

Article III, § 1 of the Constitution confers judicial power on the federal courts, but limits their jurisdiction to cases and controversies "which are appropriately resolved through the judicial process."  Lujan v. Defenders of Wildlife, 504 U.S. 555, 560, 112 S.Ct. 2130, 2136 (1992) (quoting Whitmore v. Arkansas, 495 U.S. 149, 155, 112 S.Ct. 1717, 1722 (1990) ("[T]he core component of standing is an essential and unchanging part of the case-or-controversy requirement of

Article III.") (internal quotation marks omitted)). It is well established that plaintiffs bear the burden of demonstrating that they have standing in the action that they have brought. See Danvers Motor Co. v. Ford Motor Co., 432 F.3d 286, 291 (3d Cir. 2005) (citing Storino v. Borough of Point Pleasant Beach, 322 F.3d 293, 296 (3d Cir. 2003)).

The Supreme Court has explained that "the irreducible constitutional minimum of standing contains three elements": (1) the invasion of a concrete and particularized legally protected interest and resulting injury in fact that is actual or imminent, not conjectural or hypothetical; (2) a causal connection between the injury and the conduct complained of, meaning that the injury must be fairly traceable to the challenged action of the defendant; and (3) it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. Lujan, 504 U.S. at 560, 112 S.Ct. at 2136, 2147 (1992) (citing Sierra Club v. Morton, 405 U.S. 727, 740-41 n.16, 92 S.Ct. 1361, 1368-69 n.16 (1972)). See Nat'l Collegiate Athletic Ass'n, 730 F.3d at 218.

An injury is "concrete" if it is real, or distinct and palpable, as opposed to merely abstract, and is sufficiently particularized if "'it affect[s] the plaintiff in a personal and individual way.'" New Jersey Physicians, Inc. v. President of the United States, 653 F.3d 234, 238 (3d Cir. 2011) (citing City of L.A. v. Lyons, 461 U.S. 95, 102, 103 S.Ct. 1660, 1665 (1983)) (citing and quoting Lujan, 504 U.S. at 560 n.1, 112 S.Ct. at 2136 n.1). A harm is "actual or imminent" rather than "conjectural or hypothetical" where it is presently or actually occurring, or is sufficiently imminent. The determination of

65

what is imminent is somewhat elastic, but it is fair to say that plaintiffs relying on claims of imminent harm must demonstrate that they face a realistic danger of sustaining a direct injury from the conduct of which they complain. Id. (citing Babbitt v. United Farm Workers Nat'l Union, 442 U.S. 289, 298, 99 S.Ct. 2301, 2308 (1979)).

In the context of a motion to dismiss, we have held that the "[i]njury-in-fact element is not Mount Everest. The contours of the injury-in-fact requirement, while not precisely defined, are very generous, requiring only that claimant allege [ ] some specific, identifiable trifle of injury." Danvers Motor Co., 432 F.3d at 294 (quoting Bowman v. Wilson, 672 F.2d 1145, 1151 (3d Cir. 1982)).

The Supreme Court explained the difference in the burden placed on the plaintiff to satisfy the standing requirement at the motion to dismiss stage as compared to the motion for summary judgment stage, as follows:

> At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.' In response to a summary judgment motion, however, the plaintiff can no longer rest on such 'mere allegations,' but must 'set forth' by affidavit or other evidence 'specific facts,' Fed. Rule Civ. Proc. 56(e), which for purposes of the summary judgment motion will be taken to be true. And at the final stage, those facts (if controverted) must be 'supported adequately by the evidence adduced at trial.'

66

Lujan, 504 U.S. at 561, 112 S.Ct. at 2137 (internal citations omitted).

> The Court further has noted that:
>
> 'Beyond the constitutional requirements, the federal judiciary has also adhered to a set of prudential principles that bear on the question of standing.' One of these is the requirement that the plaintiff 'establish that the injury he complains of (his aggrievement, or the adverse effect <u>upon him</u>) falls within the "zone of interests" sought to be protected by the statut[e] [or constitutional guarantee] whose violation forms the legal basis for his complaint.' The 'zone-of-interests' formulation first appeared in cases brought under § 10 of the Administrative Procedure Act, 5 U.S.C. § 702, but we have subsequently made clear that the same test similarly governs claims under the Constitution in general. Indeed, we have indicated that it is more strictly applied when a plaintiff is proceeding under a 'constitutional . . . provision' . . .

<u>Wyoming v. Oklahoma</u>, 502 U.S. 437, 468-69, 112 S.Ct. 789, 807-08 (1992) (internal citations omitted) (emphasis in original).

An organization or association may have standing to bring a claim where (1) the organization itself has suffered injury to the rights and/or immunities it enjoys; or (2) where it is asserting claims on behalf of its members and those individual members have standing to bring those claims themselves. <u>See</u> <u>Common Cause of Pa.</u>, 558 F.3d at 261. Where an organization asserts its standing to sue on its own behalf, "a mere 'interest in

67

a problem,' no matter how longstanding the interest and no matter how qualified the organization is in evaluating the problem, is not sufficient by itself to render the organization 'adversely affected' or 'aggrieved.'" Sierra Club v. Morton, 405 U.S. at 739, 92 S.Ct. at 1368; see also Pennsylvania Prison Soc. v. Cortes, 508 F.3d 156, 162 (3d Cir. 2007).

Where an organization is asserting that it has standing on behalf of its members, it is claiming that it has "representational standing."   There are three requirements for this type of standing:

> (1) the organization's members must have standing to sue on their own; (2) the interests the organization seeks to protect are germane to its purpose, and (3) neither the claim asserted nor the relief requested requires individual participation by its members.

Pennsylvania Prison Soc., 508 F.3d at 163 n.10 (citing Hunt v. Wash. State Apple Adver. Com'n, 432 U.S. 333, 343, 97 S.Ct. 2434, 2441 (1977)); see also Public Interest Research Grp. of N.J., Inc. v. Magnesium Elektron, Inc., 123 F.3d 111, 119 (3d Cir. 1997).

Regarding the first prong, we have explained that "[t]he Supreme Court has repeatedly held that generalized grievances shared by the public at large do not provide individual plaintiffs with standing," and further that "the right to have the government act in accordance with the law [is] insufficient, by itself, to support standing." Id. at 120. Rather, the plaintiff organization must "make specific allegations establishing that at least one identified member had suffered or would suffer harm."

68

Summers v. Earth Island Inst., 555 U.S. 488, 498, 129 S.Ct. 1142, 1151 (2009).

We also have rejected the "formalistic argument" that an organization necessarily lacks standing "because [its] charter prohibits [it] from having members," but rather in some cases have relied upon "indicia of membership" in analyzing an organization's standing. See Public Interest Research Grp., 123 F.3d at 119 (citing Hunt, 432 U.S. at 334, 97 S.Ct. at 2436-37).[46] But we also have held that a plaintiff by making expenditures to advance litigation does not suffer sufficient damage to support standing. Fair Hous. Council of Suburban Phila. v. Montgomery Newspapers, 141 F.3d 71, 79 (3d Cir. 1998).[47]

Finally, "'the jurisdictional issue of standing can be

---

[46] In Hunt, the Supreme Court held that "it would exalt form over substance to differentiate" between the Washington State Apple Advertising Commission, which represented the interests of all apple growers and suppliers, whose membership in the State of Washington was mandatory and who paid dues and directly benefitted economically from the Commission's activities, and a traditional trade organization.

[47] Other courts of appeals "have, however, adopted different views of whether the injury necessary to establish standing flows automatically from the expenses associated with litigation." But we have aligned "ourselves with those courts holding that litigation expenses alone do not constitute damage sufficient to support standing." Fair Hous., 141 F.3d at 78-79.

69

raised at any time,'" by either a party or by the court. See Center For Biological Diversity v. Kempthorne, 588 F.3d 701, 707 (9th Cir. 2009) (quoting United States v. Viltrakis, 108 F.3d 1159, 1160 (9th Cir. 1997)) (citing Summers, 555 U.S. 488, 129 S.Ct. 1142); see also Steele v. Blackman, 236 F.3d 130, 134 n.4 (3d Cir. 2001) ("Although Appellees do not address standing, we are required to raise issues of standing sua sponte if such issues exist.") (internal quotation marks omitted). It is hardly surprising that we have this obligation inasmuch as "federal appellate courts have a bedrock obligation to examine both their own subject matter jurisdiction and that of the district courts [,and] . . . standing is 'perhaps the most important' of jurisdictional doctrines." Public Interest Research Grp., 123 F.3d at 117 (citing FW/PBS Inc. v. City of Dallas, 493 U.S. 215, 230-31, 110 S.Ct. 596, 607 (1990); Chabal v. Reagan, 822 F.2d 349, 355 (3d Cir. 1987)).


VII. ANALYSIS


Now that we have set forth the procedural history, facts, and applicable law in this case we directly address the issues raised in this appeal. We first will discuss whether the District Court correctly determined that the Gaskin settlement and final adjudication barred the claims against the PDE. Then we will discuss whether CBP has standing as a litigant in this case. Our third focus will be on the issue of whether the IDEA's 90-day statute of limitations bars the Blunt plaintiffs' claims. Finally, we will discuss whether any of the plaintiffs still in the action when the LMSD moved for summary judgment established a prima facie case of racial discrimination under Title VI and/or

70

presented sufficient evidence to demonstrate that the LMSD violated the Equal Protection Clause of the Fourteenth Amendment in violation of 42 U.S.C. § 1983 so that the District Court erroneously entered its October 20, 2011 Memorandum and Judgment Order granting summary judgment in favor of the LMSD.[48] As part of this last issue, we will review for abuse of discretion the District Court's determinations in using the evidence submitted on the motion for summary judgment.

> A.  The Effect of the <u>Gaskin</u> Settlement on the
> Claims Against the PDE

We conclude that the District Court correctly held that the <u>Gaskin</u> settlement barred the plaintiffs' claims against the PDE.  Although the <u>Gaskin</u> plaintiffs were basing their claims against the PDE on its alleged supervisory failure and did not assert that it engaged in racial discrimination, the <u>Gaskin</u> class consisted of "all school-age students with disabilities in Pennsylvania who have been denied a free appropriate education in regular classrooms with individualized supportive services, individualized instruction, and accommodations they need to succeed in the regular education classroom."  J.A. vol. 1, at 42.64.  The allegations against PDE in this case are strikingly similar to those made against it in <u>Gaskin</u>.  As the District Court

---

[48] Although we do not reach this issue with respect to the Blunts (as the brief in No. 11-4201 filed on their behalf did not and could not challenge the summary judgment), it is difficult to see how we would have come to a different result if we had done so.

71

summarized:

> As in <u>Gaskin</u>, the plaintiffs here claim that the PDE
> violated the IDEA by failing to identify children with
> disabilities and provide needed special education and
> related services and by failing to provide the plaintiffs
> and members of the putative class a free, appropriate
> public education. As in <u>Gaskin</u>, plaintiffs here bring a
> claim against the PDE under § 504 of the Rehabilitation
> Act.

J.A. vol. 1, at 42.67.

We conclude that the claims plaintiffs asserted against
the PDE in this case overlap with the claims made in <u>Gaskin</u>.
Though plaintiffs here advance theories of racial motivation not
raised in <u>Gaskin</u>, the claims here arise from a "common nucleus
of operative facts" when compared to the claims in <u>Gaskin</u>:
namely LMSD's failure to provide a FAPE to students by
mishandling identification and/or testing of students for learning
disabilities which resulted in incorrect placements. Thus, the
release entered into in <u>Gaskin</u> bars the claims here against the
PDE because the <u>Gaskin</u> release covered claims arising between
2005 and 2010 and included all present and <u>future</u> students with
disabilities within the Commonwealth of Pennsylvania. Indeed,
appellants acknowledge that most, though not all, of the plaintiff
students in this case were evaluated individually and their IEPs
formulated before the <u>Gaskin</u> settlement. Tr. Oral Arg. June 11,
2013, at 19:9-22.

As explained above, we apply res judicata and claim
preclusion as a consequence of settlement agreements because

72

by doing so we encourage settlements and "serve[ ] the important policy interest of judicial economy by permitting parties to enter into comprehensive settlements that 'prevent relitigation of settled questions at the core of a class action.'" Prudential, 261 F.3d at 366. We see no reason to depart from that policy in this case.

In considering the res judicata issue we recognize that, although the Gaskin release was broad,[49] there is no suggestion in the record that the attorneys who represented the parties in Gaskin did not negotiate the settlement at arms' length. Moreover, the district court in Gaskin reviewed and accepted the settlement; and the settlement led the parties to forego additional litigation in which they could have advanced their positions with the hope of obtaining what they perceived would be a more favorable outcome than the settlement agreement provided them. We agree with the PDE that the claims against it in this case, like those in Gaskin, deal with its alleged failure to monitor special education programs carried out by school districts in Pennsylvania, including the procedures regarding testing of students for special education services and other aspects of the provision of special education services to students entitled to them, and that the settlement covered the period from 2005-2010. Tr. Oral Arg. June 11, 2013, at 26:12-25.

We recognize that appellants argue that the District Court here erred in its interpretation of the parties' intent in entering into the Gaskin settlement agreement. Tr. Oral Arg. June 11, 2013, at 21-23. There can be no doubt that, as other courts have

---

[49] See Tr. Oral Arg. June 11, 2013, at 28.1.

73

held, "[t]he best evidence of . . . intent is, of course, the settlement agreement itself." Norfolk S. Corp. v. Chevron, U.S.A., Inc., 371 F.3d 1285, 1289 (11th Cir. 2004) (emphasis added); see also Davis v. Huskipower Outdoor Equip. Corp., 936 F.2d 193, 196 (5th Cir. 1991) ("[A] settlement agreement is an enforceable contract to which a court must give legal effect according to the parties' intent as expressed in the document."); Miller v. Ginsberg, 874 A.2d 93, 99 (Pa. Super. Ct. 2005);[50] Lubrizol Corp. v. Exxon Corp., 871 F.2d 1279, 1283 (5th Cir. 1989) (where parties express their intent in language in settlement agreement and were represented by skilled attorneys, court should not look beyond that language to understand agreement). Moreover, as the Court of Appeals for the Ninth Circuit explained in Facebook, Inc. v. Pacific Northwest Software, Inc., 640 F.3d 1034, 1040 (9th Cir. 2011), a settlement agreement may release all claims arising out of the transaction with which the release was concerned even if they are not yet known; and broad releases are valid at least when

---

[50] "Settlement agreements are regarded as contracts and must be considered pursuant to general rules of contract interpretation. The fundamental rule in construing a contract is to ascertain and give effect to the intention of the parties. Thus, we will adopt an interpretation which, under all circumstances, ascribes the most reasonable, probable, and natural conduct of the parties, bearing in mind the objects manifestly to be accomplished. Additionally, if the language appearing in the written agreement is clear and unambiguous, the parties' intent must be discerned solely from the plain meaning of the words used." Miller, 874 A.2d at 99 (internal citations and quotation marks omitted).

74

negotiated between sophisticated parties. Overall, we are satisfied from the terms of the Gaskin settlement that it included the claims made against the PDE here, and thus the settlement barred them.[51]

---

[51] We have not overlooked appellants' argument that the Gaskin settlement could not bar claims that arose after its effective date. Rather, we reject that argument because the settlement included claims of "future" students and therefore necessarily it included the claims that arose after its effective date.

75

B. Whether CBP Has Standing in this Suit[52]

---

[52] As a matter of convenience this subsection largely is written as though for the Court, but in fact this section in its entirety represents only the views of Judge Greenberg, as Chief Judge McKee and Judge Ambro agree with aspects of the section but, as they explain in their separate opinions, not its conclusion that CBP does not have standing. Although Judge Ambro, in his concurring opinion, concludes that "CBP has standing to sue on its own behalf," he also observes that "CBP has not explained how, were it permitted to continue as a plaintiff in the case, it could prevail where the individual Plaintiffs have failed." Chief Judge McKee writes that "CBP's likelihood of success on the merits has no bearing on its standing." Judge Ambro, however, did not make his observation to support Judge Greenberg's conclusion that CBP does not have standing. Rather, Judge Ambro's point is that, even if CBP has standing, it could not save its case as it could not survive LMSD's motion for summary judgment. Judge Greenberg agrees that, even if CBP had standing, it would lose on the merits. See infra note 62.

We note that Chief Judge McKee sets forth that CBP was dismissed at an "early stage" of the litigation and did not have the opportunity to engage in discovery. But as we explain below, the District Court considered the standing issue twice, once in proceedings leading to the February 15, 2008 Order dismissing CBP for lack of standing, and again in proceedings leading to the August 19, 2009 Order again dismissing CBP for lack of standing, and in entering the second order the Court considered testimony. See infra note 57. Indeed, there was a

76

The District Court dismissed CBP as a plaintiff on its own behalf in its February 15, 2008 Order because the Court concluded that CBP had failed to "allege any injury whatsoever" to itself beyond advancing evidence that at best insufficiently could support an inference that "the defendants' conduct may have caused [CBP] . . . to 'suffer a setback to the organization['s] abstract social interests.'" J.A. vol. 1, at 42.33. The Court also determined in its February 15, 2008 Order that CBP had not met the three-part test that Hunt v. Washington State Apple Advertising Commission indicated needed to be met for an organization to sue on behalf of its members. The CBP failed in this respect because it did not "provid[e] the court with the identity of any member or alleged in the Amended Complaint that any of [its] members has suffered an injury[, and

---

great deal of discovery in this case after the Court originally dismissed CBP as a party on February 15, 2008, and both this opinion and Chief Judge McKee's opinion refer to this discovery.

Judge Ambro and Judge Greenberg see no reason why CBP's participation in the discovery process would have made any difference in the outcome of this litigation by somehow having enabled it to survive the motion for summary judgment if it had been directed against it. In this regard, they point out that both groups of plaintiffs had the goal of establishing that LMSD had been violating anti-discrimination and anti-segregation laws and regulations and so would have had the same objective in the discovery process.

that w]ithout that information, the court ha[d] no basis to conclude that the organization[] ha[s] standing to bring claims on behalf of [its] members." J.A. vol. 1, at 42.33-42.34. Though CBP's lack of standing may make no difference with respect to its claims against the PDE inasmuch as the Gaskin settlement may have foreclosed those claims, its claim to have standing raises an issue that must be addressed, for it continues to assert claims against the LMSD.[53]

CBP has not demonstrated that it suffered an injury to itself conferring standing, and, even if its claim is true that it has members notwithstanding its bylaws, CBP does not have standing to sue on their behalf. CBP has a stated purpose to promote "equity and excellence in the response of school districts to the needs of diverse student populations; to address issues related to education for populations identified as minority and/or African American; and to identify, monitor, and inform parents about educational issues impacting disadvantaged students, their families and the community at large." J.A. vol. 1, at 42.50.

In its complaint, CBP identified itself as having been "operating as an organization in the LMSD for about 13 years," and as "a non-profit Pennsylvania corporation whose purpose is, inter alia, to promote equity and excellence in the response of school districts to the needs of diverse student populations; to

---

[53] "May have" is used because CBP was not a member of the plaintiff class in Gaskin though it might be so regarded to the extent that it asserts it has representational standing. This point need not be explored further.

address issues related to education for populations identified as minority and/or African American; and to identify, monitor, and inform parents about educational issues impacting disadvantaged students, their families and the community at large." No. 2:07-cv-3100, Doc. No. 1, pp. 23-24; J.A. vol. 2, at 509. CBP claimed to bring the action "on its behalf and on behalf of its members." Id. at 25. CBP identified its members generally as follows: "[t]he members of the organization are residents of the Lower Merion School District and current and former parents or students of the District." Id. at 510. The District Court noted that, notwithstanding these allegations, CBP supplied documents that stated that it had no members. See August 19, 2009 Order at 5, No. 2:07-cv-3100, Doc. No. 123 ("The organization's bylaws specifically state '[t]he Corporation shall have no members.'"). Nevertheless, CBP's prohibition in its bylaws against having members does not necessarily mean that it could not have standing as a plaintiff on behalf of its members. If such a determination were predicated solely on the basis of the bylaws, it would advance the strictly formalistic approach that we have rejected in other cases. See Public Interest Research Grp., 123 F.3d at 119. Nonetheless, the bylaws do provide context to the overall analysis, particularly in considering whether CBP has attempted to create standing for itself by changing its structure and membership and by its expenditure of resources in response to the District Court's observations concerning its standing.

In the TAC, the last revised complaint in this case, CBP did not change its statement of purpose quoted above. It, however, did identify 11 of its members by name, five of whom are individually named plaintiffs in this case, and it also

79

identified itself as "support[ing]" several more class members and individually named plaintiffs in this case at school-related meetings and court proceedings. TAC, No. 2:07-cv-3100, Doc. No. 55, pp. 25-26. CBP also went to great pains to explain the rise in its expenditures "over the five years" in relation to this case because, as discussed above, the expenditure of funds by an organization on behalf of a cause, though not determinative, is one factor that may be considered in resolving a standing issue. The CBP's alleged expenditures on behalf of the interests embodied in this case included:

- Use of its resources to 'host educational consultants and experts' with the purpose of providing information to the Plaintiffs, class members, community and LMSD;
- A 'sharp' rise in expenditures over the last five years due to its efforts to 'protect its members from the adverse impact' of 'the inferior quality of LMSD's dual system of education';
- Expenditure of resources as a result of its attending meetings related to IEPs, Section 504 and 'disciplinary meetings, court hearings and parent-teacher conferences with and/or on behalf of' various plaintiffs, CBP members and class members;
- Its efforts in facilitating a 'Conciliation Agreement between LMSD and the Pennsylvania Human Relations Commission in which the District promised, inter alia, to eradicate the disproportionate suspension of African American students as compared to White students';

80

- Production of a 45-minute video 'highlighting the issue of racial inequality';
- Making the public aware of 'racial graffiti and symbols' which 'were promulgated at both LMSD high school and middle school buildings';[54]
- Publication of a community newsletter and 'News Notes . . . to disseminate the compilations of data on' alleged racial disparities in application of disciplinary measures, segregation by race and 'under achievement of African American students in the [Lower Merion] District';
- The 'organization' of educational, career, standardized test, financial aid, and college preparatory seminars.

TAC at 25-26; J.A. vol. 9, at 3871-72.

Even if all of these expenditures were legitimate, CBP has not established organizational standing. An organization may establish a "concrete and demonstrable injury" sufficient to confer standing if a defendant's actions "perceptibly impair" the organization's ability to provide services. Havens Realty Corp.

v. Coleman, 455 U.S. 363, 378-79, 102 S.Ct. 1114, 1124 (1982). [55] In Havens, the Supreme Court determined that a

---

[54] It is not clear what these symbols were, who promulgated them, or why the LMSD should be held responsible for them. No. 2:07-cv-3100 Doc. No. 55, p. 26.

nonprofit organization formed to promote equal housing through counseling and referral services had standing to bring an action charging that operators of rental housing units had "steered" potential tenants to certain properties based on race. HOME alleged that its mission had been frustrated because it had to devote significant resources to identify and counteract the defendants' racial steering. The Supreme Court held that these allegations, if proven, would constitute an injury in fact, and thus HOME had standing to sue on its own behalf because the defendants' practices had impaired its ability to provide services. Id. at 379, 102 S.Ct. at 1124. However, organizations may not satisfy the injury in fact requirement by making expenditures solely for the purpose of litigation, Fair Hous., 141 F.3d at 75, nor by simply choosing to spend money fixing a problem that otherwise would not affect the organization at all. La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest, 624 F.3d 1083, 1088 (9th Cir. 2010). "It must instead show that it would have suffered some other injury if it had not diverted resources to counteracting the problem." Id.

CBP has failed to show how LMSD's actions have

---

[55] We all agree that Havens supplies the correct standard for determining whether an organization has alleged an injury in fact sufficient to confer standing. We disagree, however, about whether CBP's allegations are sufficient to meet that standard. This disagreement is irrelevant to the resolution of this appeal, however, inasmuch as Judge Ambro and Judge Greenberg point out that CBP has not explained how it could win on the merits. Thus, even assuming CBP does have organizational standing, our ultimate holding would be the same.

"perceptibly impaired" its mission.[56] CBP's very purpose relates to actions directly involving LMSD, and its expenditures were devoted to protecting students' interests in their interactions with LMSD. In Havens, HOME's purpose was to promote equality in the Richmond area overall and its interests thus went far beyond monitoring the specific actions at issue in the Havens case. By contrast, the CBP is targeted only at LMSD, so its very purpose was to expend resources to educate the public regarding the LMSD's behavior. J.A. vol. 2, at 510 (defining CBP's membership as residents of LMSD and LMSD parents and students). Because it is targeted at LMSD, all of CBP's resources would necessarily have been spent on LMSD-related projects. CBP has failed to show why this particular litigation has frustrated its mission, or caused a "concrete and demonstrable" injury to its activities. It appears that the alleged additional expenditures were consistent with CBP's typical activities, and it is thus unclear the effect, if any, that this litigation had on their expenditures. See Fair Hous., 141 F.3d at 77-78 (refusing to confer standing at summary judgment where plaintiff failed to present evidence that it altered its operations or diverted resources based on litigation); Havens, 455 U.S. at 379, 102 S.Ct. at 1124 (explaining that mere "abstract social interests" do not confer standing (citing Sierra Club, 405 U.S. at 739, 92 S.Ct. at 1368)). CBP simply has not established that the LMSD's actions have frustrated its efforts to fulfill its mission.

---

[56] We emphasize that much of what we write with respect to standing reflects the views only of Judge Greenberg.

83

Thus, it has not established standing to sue on its own behalf.[57]

CBP also has not established that it has standing to sue on behalf of its members, if it has any. Hunt v. Washington State Apple Advertising Commission is a useful starting point in the consideration of this issue because the Supreme Court discussed indicia of membership as a means of establishing that

[57] As we state above, see supra note 52, the District Court considered the standing issue twice, once in proceedings leading to the February 15, 2008 Order dismissing CBP for lack of standing, and again in proceedings leading to the August 19, 2009 Order again dismissing CBP for lack of standing. This latter consideration included testimony. The dissent parses this testimony in detail, and Judge Greenberg likewise considers it in his analysis. However, a plaintiff may not simply make repeated amendments to a complaint to "fix" the standing issue. In this regard, the court's reasoning in La Asociacion de Trabajadores is instructive: "[A plaintiff] may not effectively amend its [c]omplaint by raising a new theory of standing in its response to a motion for summary judgment. 'Simply put, summary judgment is not a procedural second chance to flesh out inadequate pleadings.'" 624 F.3d at 1089 (internal citations omitted) (quoting Wasco Prods., Inc. v. Southwall Techs., Inc., 435 F.3d 989, 992 (9th Cir. 2006)). This is not to say that a plaintiff never can cure a pleading with respect to a standing issue in response to a motion for summary judgment challenging its standing. Rather, the court of appeals' comments are appropriate in the circumstances of this case.

an organization has members.  432 U.S. at 344, 97 S.Ct. at 2442.

In <u>Hunt</u>, the Supreme Court determined that a commission created by the State of Washington to represent and promote the advertising interests of that State's apple growers, whose collective efforts constituted "a multimillion dollar enterprise which plays a significant role in Washington's economy," had standing to challenge a North Carolina statute prohibiting the display of apple grading codes on boxes of apples shipped to North Carolina.  <u>Id.</u> at 336, 97 S.Ct. at 2438. The Washington State apple grading system had been in place for over 60 years, and the stamp reflecting the apple grading was a selling point for Washington State apples because of the good reputation of that State's apple growing regulations.  But due to the structure of the industry, it would have been difficult to pack some apples in unstamped boxes and ensure that they were sent to North Carolina, while ensuring that stamped boxes were separated and not shipped to North Carolina.  <u>Id.</u> at 337, 97 S.Ct. at 2438-39.  The Supreme Court found that in the circumstances of that case[58] the Washington State Apple Advertising Commission had standing to bring the action challenging the North Carolina statute.  <u>Id.</u> at 344-45, 97 S.Ct. at

---

[58] "<u>Under the circumstances presented here</u>, it would exalt form over substance to differentiate between the Washington Commission [as a government-mandated organization] and a traditional trade association representing individual growers and dealers who collectively form its constituency."  <u>Hunt</u>, 432 U.S. at 345, 97 S.Ct. at 2442 (emphasis added).

2442. The Court explained that "while the apple growers and dealers are not 'members' of the Commission in the traditional trade association sense," because their membership was not voluntary, but rather was required by statute, "they possess[ed] all of the indicia of membership in an organization." Id. at 344, 97 S.Ct. at 2442.

In making this determination, the Court noted that only Washington State apple growers and dealers could elect the members of the Commission, and that the growers and dealers alone financed its activities, including litigation costs, through mandatory assessments levied on them. Id. at 344-45, 97 S.Ct. at 2442. The Court found that "[i]n a very real sense, therefore, the Commission represents the State's growers and dealers and provides the means by which they express their collective views and protect their collective interests." Id. at 345, 97 S.Ct. at 2442. The Court reasoned that the statutorily-mandated participation of apple growers and dealers through assessments did not bar the Commission from having standing, analogizing that

> [m]embership in a union, or its equivalent, is often required. Likewise, membership in a bar association, which may also be an agency of the State, is often a prerequisite to the practice of law. Yet in neither instance would it be reasonable to suggest that such an organization lacked standing to assert the claims of its constituents.

Id., 97 S.Ct. at 2442.

Further, the Court noted that the Commission had a

strong direct interest in the litigation, because its existence depended on the economic health of the Washington State apple-growing industry. Moreover, assessments based on the volume of apples grown and packaged provided the Commission's funding and the North Carolina regulation was expected to have a great economic impact on the Washington State apple industry. Id., 97 S.Ct. at 2442.

Though appellants rely heavily on Hunt, Judge Greenberg believes that it clearly is distinguishable. CBP is not funded through mandatory assessments of African American students or their parents residing in the LMSD. Further, CBP's funding is not tied directly to a clear economic interest which will be affected by the outcome of this litigation. The analogy of a traditional trade organization discussed in Hunt is simply not relevant to the CBP's position in this case. Moreover, in an entirely different setting, the Court based its decision in Hunt on the circumstances of that case, including an analysis of how the Commission functioned as an organization.[59]

---

[59] In support of his contention that CBP has standing, Chief Judge McKee indicates that if CBP "can establish both the discriminatory practices and resultant harm alleged, any injunctive or declaratory relief would surely inure to the benefit of African American students and parents in the school district. These students and parents are no more required have to be a party to this suit in order to benefit from the requested relief than the constituents in Hunt were required to be parties to benefit receive the benefits there." The problem with this statement is that, though it indicates that non-parties may benefit

87

Although appellants amended their complaint after the District Court's dismissal of the CBP to name several alleged individual CBP members as plaintiffs, CBP's organizational documents state that it does not have members. Moreover, even though appellants also added statements to the complaint asserting that the CBP was making expenditures related to this suit after the District Court noted the lack of economic impact of the litigation on CBP, this amendment does not supply the basis for standing. It is clear that a nonprofit entity cannot create standing in a lawsuit in which it has no direct economic interest by having its representatives attend meetings regarding the issue that the entity intends to raise in the suit, or by making expenditures to "educate" the public on what it regards as the factual or legal basis for its agenda. As the court said in Center for Law and Education v. United States Department of Education, 315 F. Supp. 2d 15, 24-25 (D.D.C. 2004):

> Without concrete and demonstrable injury to the groups' activities, however, evidence of a drain on the organizations' resources does not amount to an injury-in-fact for standing purposes. . . . [A]n organization's expenses in the pursuit of its agenda are self-effectuating and [claiming them as injury-in-fact] would allow any advocacy group to manufacture standing by choosing to expend

from any declaratory or injunctive relief that CBP obtains, a standing inquiry addresses the different matter of whether a party can seek that relief. Judge Greenberg believes that CBP cannot do so.

> resources to advocate against policy decisions made by the federal government.

Otherwise, the implication would be that any individual or organization wishing to be involved in a lawsuit could create a corporation for the purpose of conferring standing, or could adopt bylaws so that the corporation expressed an interest in the subject matter of the case, and then spend its way into having standing.

Fair Housing discussed the artificial creation of standing, and cited and quoted with approval a case that noted that "[a]n organization cannot, of course, manufacture the injury necessary to maintain a suit from its expenditure of resources on that very suit. Were the rule otherwise, any litigant could create injury in fact by bringing a case, and Article III would present no real limitation." Fair Hous., 141 F.3d at 79 (quoting Spann v. Colonial Vill., Inc., 899 F.2d 24, 27 (D.C. Cir. 1990) (internal quotation marks omitted)); see also Kennedy v. Ferguson, 679 F.3d 998, 1003 (8th Cir. 2012) (citing Spann for the proposition that litigation-related costs are not injuries for the purposes of assessing an organization's standing to bring suit on its own behalf); AHF Cmty. Dev., LLC v. City of Dallas, 633 F. Supp. 2d 287, 194 (N.D. Tex. 2009) ("The Fifth Circuit has held that an organization cannot 'bootstrap standing' by claiming a drain on its resources as a result of costs incurred for the particular lawsuit in which it asserts standing."). In City of Philadelphia v. Beretta U.S.A., Corp., 126 F. Supp. 2d 882, 897 (E.D. Pa. 2000), the district court made the following convincing statement with respect to artificial standing:

> It is also disturbing that the organizational

plaintiffs argue that they may sue for the costs of educational sessions and other programs which they run to counteract gun violence. By this logic, any social action organization may confer standing upon itself by voluntarily spending money on the social problem of its choice. Analogously, the environmentalist group in Lujan [v. Defenders of Wildlife, 504 U.S. 555, 1112 S.Ct. 2130 (1992)] would have standing to protest the endangerment of wildlife in Sri Lanka simply by running programs to preserve foreign fauna. This would be a novel and vast expansion of associational liability for which plaintiffs have advanced no precedential support. It also contradicts the prudential concern behind the standing doctrine that courts not become vehicles for the advancement of ideological and academic agendas.

In addition to not overcoming the foregoing problems with respect to its standing, CBP does not satisfy the third requirement for an organization to have standing to sue on behalf of its members, namely that neither the claim the organization is asserting nor "the relief requested requires the participation of individual members in the lawsuit." Hunt, 432 U.S. at 343, 97 S.Ct. at 2441. Even if the District Court's analysis regarding CBP's lack of members and its attenuated claims of injury did not demonstrate that CBP did not have standing, after considering this third criterion it is clear that the District Court reached the correct result. It is an accepted principle that "[b]ecause claims for monetary relief usually

90

require individual participation, courts have held associations cannot generally raise these claims on behalf of their members." Pennsylvania Psychiatric Soc'y v. Green Spring Health Servs., Inc., 280 F.3d 278, 284 (3d Cir. 2002).[60]

Here, individual student plaintiffs are seeking monetary reimbursement for remedial courses that they either already have taken or wish to take, and that they contend were necessary because of LMSD's failure to provide them with a FAPE or

_____

[60] Plaintiffs did seek prospective injunctive relief in the TAC, including an injunction prohibiting LMSD from placing African American students in special education programs "whether or not they have a disability" and forcing the LMSD to identify and evaluate African American students who may have been improperly placed in lower-level courses, as well as monitoring and training programs for parents and LMSD staff. J.A. 533-34. As we discussed below, because the individual plaintiffs are parties to the suit, prudential concerns restrict the conferring of representational standing on the CBP because the individuals affected are capable of litigating their rights on their own behalf. Moreover, in Pennsylvania Psychiatric Society, the distinction between compensatory and injunctive relief was justified by the need for assurance that "the the remedy, if granted, will inure to the benefit of those members of the association actually injured." 280 F.3d at 284 (quoting Hunt, 432 U.S. at 343, 97 S.Ct. at 2441). Although the relief would benefit CBP's members, the members actually injured are already parties to this suit. It is thus unnecessary for the CBP to have standing to vindicate their rights.

91

LMSD's incorrect analysis that they were learning disabled. Although a determination of whether this case should be certified as a class action is no longer an issue in this case, the District Court's explanation of the highly individualized nature of these claims is instructive on this last point. It should be readily apparent to anyone reviewing this case that, in view of the complex and varying facts asserted for the individual students and the myriad legal theories presented in the District Court, the Court was correct in finding that it would have been inappropriate to certify this case as a class action. For many of the same reasons, the facts of this case make organizational representation of the individual plaintiffs insufficient without their personal participation in this litigation. After all, the particular aspects of each student's educational needs, indeed the very individualized character of the application of IEP and FAPE to an individual student's needs, necessarily means that addressing the diverse factual assertions in this case would require individual participation from each student litigant involved.

Significantly, the third prong of the <u>Hunt</u> test is prudential, not constitutional. <u>See</u> <u>United Food & Commercial Workers Union Local 751 v. Brown Grp., Inc.</u>, 517 U.S. 544, 555-56, 116 S.Ct. 1529, 1535-36 (1996). As the Supreme Court explained, this inquiry is designed to ensure that sufficient reasons exist to justify departing from the "background presumption . . . that litigants may not assert the rights of absent third parties," and thus focuses on "matters of administrative convenience and efficiency." <u>Id.</u> at 556, 116 S.Ct. at 1536. CBP's claim to standing is grounded on the claims of its members—individual students—who are also plaintiffs in the

92

lawsuit. Unlike other cases conferring standing on organizations, the plaintiffs in this case are not absent. See, e.g., id. (organization suing on behalf of its members); Hunt, 432 U.S. at 343, 97 S.Ct. at 2441 (same); Pennsylvania Psychiatric Soc'y, 280 F.3d at 280 (same).[61] The remedies sought here—compensatory and injunctive—will benefit individual plaintiffs that are already parties to the suit. Permitting the CBP to litigate this case on behalf of its members, when those members are already parties to the lawsuit in their own right, does not fulfill the Supreme Court's guidance to focus on "administrative convenience and efficiency" in determining prudential standing. United Food, 517 U.S. at 557, 116 S.Ct. at 1536.

---

[61] The fact that the plaintiffs are parties to the suit distinguishes this case from "'the long line of cases in which organizations have sued to enforce civil rights'" to which Judge McKee's dissent has referred. It is true that, in many circumstances, an organizational plaintiff may be the best (and only) mechanism by which discrimination against a large group of individuals may be remedied. However, where—as here—individual plaintiffs have brought suit on their own behalf, courts are not justified in making an exception to the general rule that third parties may not assert their rights. Although, in Powell v. Ridge, 189 F.3d 391 (3d Cir. 1999), claims for both individual and organizational plaintiffs were permitted to proceed, the suit challenged state policy affecting all students in Philadelphia schools, a class far larger than the eleven parents who actually joined the suit. By contrast, the group at issue here affects a much smaller set of students who are all capable of joining the suit as individuals or as a class.

93

As the District Court explained:

> the amount of compensatory education necessary for each named plaintiff and class member would require a highly individualized inquiry into that student's unique needs, whether those needs were met, the extent to which the School District failed to provide that student with a free, appropriate public education and the proper amount of compensatory education necessary to redress any deficiencies. The individualized analysis of each student's educational history and needs precludes a finding that a class would be efficiently managed by this court.

August 19, 2009 Order at 17, No. 2:07-cv-3100, Doc. No. 123.

The District Court's findings regarding the individualized nature of the factual basis for each plaintiff's claim go directly to the third prong for organizational standing, which requires that, for an organization to assert standing on behalf of its members, their individual participation in the lawsuit must be unnecessary. It is very clear that the highly individualized components of the plaintiffs' claims, the complex history of each plaintiff's IEP and evaluations, and the changes in understanding of his or her disability status, led the Court to conclude correctly that the students' individual participation in this lawsuit was required. Thus, the Court believed that CBP is not an appropriate representational litigant for individual students and/or their parents.[62]

---

[62] Although the District Court's dismissal of CBP's claims due

94

C. The Blunts and the 90-day Statute of Limitations under the IDEA, as Revised by the Individuals with Disabilities Improvement Act of 2004

Appellants now argue, contrary to their original contentions in the District Court in their complaint even as amended, that five or six[63] of the individual student plaintiffs do not have a learning disability and the LMSD incorrectly identified them and placed them in special education classes. Nonetheless, we discuss the IDEA statute of limitations, as revised in 2004, because it appears that the Blunts still seek a recovery under the IDEA based on the contention that Amber

to lack of standing is believed correct by Judge Greenberg, even if CBP had standing it would not be successful in this case in light of our disposition of the other issues in this appeal. We, however, will not avoid deciding the standing issue on the ground that it is moot, for the necessity for a party to have standing is jurisdictional and thus a court of appeals always must determine if the district court from which the appellant took the appeal had jurisdiction.

[63] As we already have indicated, this new theory rests on an evaluation prepared by a psychologist that the plaintiffs engaged to evaluate the student plaintiffs. Tr. Oral Arg. June 11, 2013, at 36-38. During oral arguments, one of appellants' attorneys put the number of students who appellants claimed were classified incorrectly at five but the other attorney put the number at six. Tr. Oral Arg. June 11, 2013, at 12, 14, 19, 36. Our analysis does not depend on the figure being five or six.

was identified as disabled but without challenging the accuracy of the identification with respect to that contention. Accordingly, it is not clear that Amber in this litigation has joined in all respects with the other students now identifying themselves as having been incorrectly identified as disabled.

In its February 15, 2008 Order, the District Court found that the Blunts' ADA, RA, Title VI, and § 1983 claims were barred on a different basis than their IDEA claims. J.A. vol. 1, at 42.21-42.29.[64] In reaching its conclusion, the Court applied Pennsylvania's two-year statute of limitations for personal injury actions to the Blunts' ADA, RA, Title VI, and § 1983 claims because the applicable federal statutes did not include governing statutes of limitations with respect to these claims. See Sameric Corp v. City of Phila., 142 F.3d 582, 598-99 (3d Cir. 1998). The Court concluded that the claims were time-barred because Amber Blunt had graduated from high school on June 9, 2005, and the original complaint in this case was filed in the District Court on July 30, 2007, more than two years after Amber suffered her alleged injuries. J.A. vol. 1, at 42.28. The Blunts do not challenge this disposition. But the Blunts do challenge the Court's holding that the IDEA 90-day statute of limitations barred their IDEA claims.

In reviewing this determination, we note the following

---

[64] In its February 15, 2008 Order, the District Court noted that the Blunts conceded that their IDEA, ADA and RA claims against PDE were untimely, but contended that their IDEA, ADA and RA claims against the LMSD and the School Board were timely. J.A. vol. 1, at 42.29.

timeline: the LMSD denied the Blunts' request for "transitional services" on April 8, 2005, the Blunts requested a due process hearing under the IDEA on April 11, 2005, a two-day hearing followed, and the Hearing Officer issued his decision on July 25, 2005. Id. at 42.23. Both the Blunts and the LMSD filed exceptions to the Hearing Officer's decision with an Appeals Panel which issued its ruling on August 31, 2005. Id. Therefore, for purposes of calculating the time allowed by the statute of limitations for the Blunts to file their action under the IDEA, their cause of action accrued on August 31, 2005.

The Blunts argue that the 90-day statute of limitations for an IDEA claimant adversely affected by an administrative decision to bring suit in state or federal court does not apply to their case, even though this statute of limitations became effective on July 1, 2005, and the decision in their administrative case became final on August 31, 2005. They argue that we should reach this result because they filed their request for a due process hearing on April 8, 2005, before the change in the limitations period. Therefore, the Blunts believe that an earlier version of the IDEA under which their IDEA claims would have been timely should apply in their case. In their view, to apply the 90-day statute of limitations effective on July 1, 2005, to their case "would be an impermissible retroactive application of IDEA amendments." J.A. vol. 1, at 42.20. They assert that their case is unique because there has been no other case applying the statute of limitations in a situation in which the administrative due process hearing request was made before the 2004 IDEA amendments became effective, but the final administrative decision was rendered after the amendments had become effective. Thus, they contend that the

97

90-day statute of limitations should not bar their IDEA claims.

We, however, agree with the District Court, which "[was] not persuaded" by their contention because "[t]he date that the hearing was requested is irrelevant." J.A. vol. 1, at 42.23. Rather, we look at the statute of limitations in effect on the date of the final administrative decision, August 31, 2005. Indeed, it might be asked why we even would consider applying any other limitations period as the Blunts could not have brought their IDEA action before August 31, 2005. Consequently, when the Blunts' federal cause of action arose, the 90-day statute of limitations was in effect, and when they brought their case in the District Court on July 30, 3007, it was untimely. Inasmuch as the law setting forth the limitations period changed on December 3, 2004, and became effective on July 1, 2005, the change as applied to them was hardly abrupt and it left the Blunts with nine months, from December 3, 2004, until August 31, 2005, to become familiar with the revisions, and an additional 90 days after August 31, 2005, in which to file their action.

The LMSD cites Steven I. for the proposition that the two-year statute of limitations governing due process hearings is retroactive to the extent that it applies to proceedings pending when it became effective. It further contends that the seven months between the enactment of this new statute of limitations and its effective date gave potential claimants sufficient notice so that its retroactive application did not violate due process. The Blunts contend, however, that Steven I. is not applicable because that case dealt with the two-year statute of limitations for bringing an administrative claim under the IDEA, rather than

98

the specific statute of limitations at issue, i.e., 90-day statute of limitations for bringing a state or federal suit after receipt of an adverse administrative determination. But the Blunts cannot convincingly explain why an analysis regarding the 90-day statute of limitations, embodied in 20 U.S.C. § 1415(i)(2)(B) and applicable to the filing of a judicial challenge in a state or federal court to an administrative decision, should be different from an analysis of the validity of the changing of the time period in which to bring an administrative claim under the IDEA, embodied in 20 U.S.C. § 1415(f)(3)(C). In considering this matter we point out that the amendment of the IDEA on December 3, 2004, which took effect on July 1, 2005, dealt with both limitations periods.

We find that the reasoning we employed in Steven I. is applicable here. In that case we relied on the analysis in Texaco, Inc. v. Short, 454 U.S. at 532, 102 S.Ct. at 793. In Texaco v. Short, the Court spoke to the issue of fairness, which balances the need for a grace period when shortening a limitations period, with the need for injured parties to be vigilant in protecting their rights:

> The Court has upheld retroactive adjustments to a limitations period only when the legislature has provided a grace period during which the potential plaintiff could reasonably be expected to learn of the change in the law and then initiate his action. In the context of a retrospective statute of limitations, a reasonable grace period provides an adequate guarantee of

99

fairness. Having suffered the triggering event of an injury, a potential plaintiff is likely to possess a heightened alertness to the possibly changing requirements of the law bearing on his claim. Because redress necessarily depends on recourse to the State's judicial system, the State is free to condition its intervention on rules of procedure, and further, to impose on the potential plaintiff the obligation to monitor changes in those rules. Plaintiffs, and their attorneys, are so aware.

Id. at 549, 102 S.Ct at 802.

We therefore concluded in Steven I. that the plaintiffs in that case had been afforded ample time to make themselves aware of the new two-year statute of limitations measured from the date of injury for seeking administrative review under the IDEA. We similarly conclude that the Blunt plaintiffs had ample opportunity to familiarize themselves with the 90-day statute of limitations with respect to judicial actions. In fact, we even question whether the application of the 90-day statute of limitations in this case should be regarded as retroactive inasmuch as the Blunts did not receive an administrative decision until after the new statute of limitations was in effect, and their federal court cause of action did not accrue under the IDEA until the final administrative decision in their case. We reiterate that the Blunts cannot adequately explain why the reasoning in Steven I. should not be applied in a consideration of the effectiveness of the 90-day statute of limitations that was

100

enacted at the same time as the two-year statute of limitations for bringing an administrative action addressed in Steven I. The fact is that the Blunts simply have not made a convincing argument for applying the two statutes of limitations in the same amendment to the IDEA in completely different ways.

### D. Whether Appellants Established a Prima Facie Case of Racial Discrimination

We deal now with appellants' challenge to the summary judgment rendered against them on their § 1983 and Title VI claims, which allege that the LMSD intentionally discriminated against them because of their race.[65] Appellants explain that "[t]his case ultimately rests upon a simple question: What quantum of evidence must a plaintiff produce to support an inference of intentional racial discrimination in order to overcome a summary judgment motion?" Appellants' No. 11-4200 br. at 21. In addressing the discrimination claims, the LMSD responds that, contrary to the plaintiffs' contentions, they "presented no evidence to establish: (1) that the classes they took were 'lower level' and/or 'below grade-level'"; (2)

---

[65] The Blunts and the CBP are not involved with the summary judgment as the District Court dismissed their claims before it considered the motion for summary judgment. We also note that the appeal with respect to the summary judgment on the § 1983 claim does not include the aspect of the plaintiffs' complaint under § 1983 to the extent the complaint was based on the IDEA, ADA, or RA because the Court dismissed the plaintiffs' claims, other than those of the Blunts, under those laws for failure to exhaust administrative remedies.

LMSD maintained any specific discriminatory custom, practice or policy; or (3) "that similarly situated Caucasian students were treated differently. Indeed, the record is replete with evidence that class placement . . . is driven by the decisions of students and parents." LMSD's br. at 36. Thus, the LMSD argues that "[t]here is . . . no dispute that Plaintiffs have no direct evidence of discrimination." Id. at 37.

Appellants argue that "if there is any evidence in the record from which a reasonable inference in the [appellants'] favor may be drawn, the moving party simply cannot obtain a summary judgment." Appellants' No. 11-4200 reply br. at 5-6 (quoting Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1081 (3d Cir. 1996) (internal quotation marks omitted)). Appellants then conclude that "[LMSD] (and the District Court) were required to accept [all] the testimony of record and any legitimate inference Appellants draw from it, regardless of whether they agreed with those inferences or not," and that the LMSD therefore should not have been granted summary judgment. Id. at 5-6 (appellants' emphasis removed). As stated above, in ruling on a motion for summary judgment a district court must view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion. Genuine and material factual disputes—meaning those that bear on an essential element of the plaintiff's claim—where the trier of fact could find in favor of the non-moving party must be considered in the light most favorable to the non-movant.

LMSD was entitled to summary judgment because there is no evidence to suggest either that LMSD itself acted with a

102

discriminatory intent, or that it knew of—but failed to correct—a third party's intentional discrimination.  See S.H., 729 F.3d at 264.  Although appellants present some evidence that African American students were overrepresented in a statistical sense in special education classes, given the record we see no way to avoid a finding that each individual student's educational needs were assessed and satisfied through a thorough and individualized process.  There is not sufficient evidence to show that the educators and administrators responsible for placing students intended to discriminate against them because of their race.  Moreover, in order to show that LMSD acted with deliberate indifference, appellants must show that it had knowledge of rights violations, but there is no evidence in the record to suggest that it did or that any third party under its control engaged in intentional discrimination.  See Davis, 526 U.S. at 646-47 (finding deliberate indifference may be met where school knows of intentional harassment but fails to act.)  Appellants argue that the District Court improperly assessed witnesses' credibility, and discounted its statistical evidence.  We discuss these arguments below, but ultimately agree with the District Court that the record is insufficient to establish a genuine issue of material fact regarding LMSD's intent.

> 1.  Rejection of Certain Evidence by the District Court and Alleged Impermissible Reliance on Other Evidence Without a Daubert Hearing.

As stated above, we review a district court's decisions on admissibility of evidence under an abuse of discretion standard

103

where a party made known to the district court the substance of the evidence it desires to introduce. Thus, in considering a district court's application of the Federal Rules of Evidence, we will reverse only where "'there is a definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors.'" Oddi, 234 F.3d at 146. Here, we conclude that the District Court did not make a clear error of judgment, or, indeed, any error at all in its consideration of the proffered evidence, and that, at trial, the excluded evidence could not have been made admissible. We therefore will uphold all of its rulings regarding the disputed evidence.[66]

### a. The MAP Presentation

Appellants contend that the District Court improperly discounted a powerpoint presentation discussing a "Minority Achievement Program" (MAP). J.A. vol. 5, at 1836-39. The presentation included a bulleted list of characteristics of African American students and how to teach them effectively. We assume the contention that this presentation, if used by LMSD,

---

[66] We have not overlooked such cases as Lexington Insurance Co. v. Western Pennsylvania Hospital, 423 F.3d 318, 329 n.6 (3d Cir. 2005), and Williams v. Borough of West Chester, 891 F.2d 458, 465 n.12 (3d Cir. 1989), in which we indicated that a court in assessing opposition to a motion for summary judgment might consider unauthenticated documents or hearsay provided that the evidence could be made admissible at trial. Here, however, we see no bases on which the deficiencies in the evidence could have been cured at the trial.

would provide evidence of discriminatory intent, or deliberate indifference to a third party's discriminatory intent. Yet we do not see any record evidence from which we could conclude that the LMSD ever used or implemented this presentation. The presentation does not contain any indication of who authored it or how it is connected to the LMSD.[67] Instead, appellants rely on the testimony of Dr. Barbara Moore-Williams, an education consultant retained by LMSD to help it develop "cultural proficiency among staff." J.A. vol. 4, at 1411. Appellants attempt to use her testimony for two purposes: to show that LMSD used and implemented the MAP presentation and to show intent.

In Dr. Moore-Williams' deposition, appellants' counsel questioned her about whether she had heard LMSD teachers or other personnel refer to specific bullet points from the MAP presentation. Id. at 1414. Dr. Moore-Williams responded that she had heard teachers or other personnel refer to some of the bullet points. Id. Crucially, however, Dr. Moore-Williams did not testify about the MAP presentation itself—she explains that she had heard LMSD personnel discuss in general the concepts raised in the presentation, but that does not establish who prepared the presentation, or whether LMSD ever used it or for what purpose. Indeed, even when Moore-Williams indicated that she had heard of certain bullet points, she noted that they were not related to African American students. See id. at 1414

---

[67] The dissent points out that the MAP was produced by LMSD during discovery, but we cannot assume anything from this fact.

(explaining, with respect to "active" classes, that she had not "heard about it in reference to African-American students"). At most, her testimony is relevant to the extent that she heard from LMSD personnel that they used different teaching strategies for particular students. But although purposeful use of such strategies may show racial bias and would be repugnant, it is not, as the dissent suggests, sufficient to show that LMSD created, used, or implemented the MAP presentation. Finally, the MAP presentation does not show that appellants suffered intentional discrimination; it does not discuss placement in lower-level classes and, as discussed, there is no evidence that these concepts were applied to LMSD's individualized special education placement decisions.

### b. Daniel Reschly's Report

Appellants argue that "[t]he District Court erred when it failed to conduct a Daubert hearing but still relied on the District's expert Daniel Reschly's definitions and principles to undercut Appellants' statistical evidence of discrimination by the District." Appellants further contend that "the portions of Reschly's report relied upon by the District Court form part of the basis for the two paragraphs that are specifically referred to in appellants' form of order," and thus the District Court erred in not holding a Daubert hearing on a motion in limine directed at the Reschly report. Appellants' No. 11-4200 reply br. at 34-38. See Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 113 S.Ct. 2786 (1993). Appellants contend that "Reschly's opinions should have no place in this appeal, as they should have had no place in the District Court's decision to grant summary judgment without a Daubert hearing. This provides

106

yet another basis to reverse and remand the District Court's ruling." Appellants' No. 11-4200 reply br. at 38. However, appellants do not specify the "definitions" and "principles" that the District Court adopted from Reschly's report.

It may be that appellants' specific objection with regard to Reschly's report lies with one paragraph of the October 20, 2011 Memorandum and Judgment Order which refers to Reschly's report, consisting of phrases commonly used by those studying the implementation of disability education and services under the IDEA. The paragraph reads:

> Disproportionality is defined as 'significantly greater or lower participation in special education by one or more groups compared to the participation rates for other groups.' The preferred methods of analyzing disproportionality are risk and relative risk or risk ratio. Risk is calculated by dividing the number of students with disabilities in a particular group by the total number of students in that group.

No. 2:07-cv-3100 Doc. No. 180 at 13; J.A. vol. 1, at 16.

We find this use of Reschly's wording to define disproportionality to be immaterial to the outcome of this litigation. The District Court did not draw inferences in favor of either side from this definition, which, we observe, seems very straightforward. Further, the concepts of risk and relative risk/risk ratio are commonly used statistical terms, and the Court described these definitions in the October 20, 2011 Memorandum and Judgment Order to give the reader a basic understanding of the statistical data that the plaintiffs presented

107

which the District Court's opinion goes on to discuss. We find no other "adoption" of Reschly's views or principles, notwithstanding appellants' objection to the use of his report. As stated above, the Court denied plaintiffs' motion to exclude Reschly's expert report as moot, as the Court was able to make a determination regarding whether plaintiffs had presented a prima facie case in its summary judgment analysis without the use of the report.

> 2. Whether the District Court Properly Viewed the Evidence in the Light Most Favorable to the Plaintiffs as Non-movants and Whether Plaintiffs Established a Prima Facie Case of Discrimination.

Appellants argue that, when the facts are viewed in the light most favorable to them as non-movants in the District Court, they established a prima facie case under Title VI and § 1983 applying the Equal Protection Clause. Thus, appellants contend that the Court erred in granting summary judgment against them on their claims predicated on these bases, as it refused "to view evidence in the light most favorable to [them]." Appellants' No. 11-4200 reply br. at 28. We point out, however, that a court's obligation to view the evidence in the light most favorable to a non-movant does not require the court to take into account evidence that will not be admissible at the trial. Thus, in considering appellants' argument with respect to the adequacy of the evidence, we take into account our holdings with respect to the evidence in which we uphold the District Court's disposition of the issues.

In its October 20, 2011 grant of summary judgment, the

108

District Court found that the plaintiffs had failed to "put forth any evidence that supports their contention that they were 'segregated' intentionally into inferior education programs in violation of Title VI," and that "plaintiffs have not raised a genuine issue of material fact regarding their § 1983 cause of action" based on the Equal Protection Clause. J.A. vol. 1, at 31-35. The Court, in considering the summary judgment motion, noted that the plaintiffs were required to "raise at least some reasonable inference that they were placed into classes and offered services by the School District due to intentional discrimination based on their race and not simply due to errors in evaluation." The Court concluded that plaintiffs failed to offer evidence sufficient to support an inference that the LMSD had intentionally discriminated against African Americans. Moreover, plaintiffs had not put forth more than a scintilla of evidence that the LMSD acted with a racially discriminatory purpose in identifying them as disabled and placing them in special education courses regardless of whether this identification was correct. Furthermore, the plaintiffs did not identify an official policy or custom that suggested that the LMSD was deliberately indifferent to their rights. J.A. vol. 1, at 32-36.

We emphasize that, as we explained above, a non-moving party—here, appellants—opposing a motion for summary judgment has the burden to produce evidence supporting its case with respect to material facts of the case on which it has the burden of proof. Appellants contend that they met this burden because they did offer more than a scintilla of evidence in support of their case and that a reasonable fact finder could have found that the evidence of discrimination they

offered was sufficient to support a finding in their favor. We, of course, recognize that in some race discrimination situations actors do not leave a "smoking gun" evidencing their intent, and in such cases plaintiffs can prove their cases only with circumstantial evidence. In this case, however, the piecemeal anecdotes to which appellants point were insufficient to survive LMSD's summary judgment motion.

The appellants attempt to meet this standard by pointing to an email by a member of the LMSD School Board, which they believe supported their prima facie case of discrimination when read in a light most favorable to them and considered as a part of the case as a whole. In discussing school redistricting to increase minority representation in certain schools, one member of the School Board apparently wrote an email expressing his concern that "moving any of the low income and African American students to Harriton [High School] when they can walk to [Lower Merion High School] simply creates an additional stressor that doesn't need to be there." Appellants' No. 11-4200 reply br. at 26.

Appellants believe that "[f]rom that comment, a reasonable jury could conclude that [LMSD] fostered an institutional culture (expressed by at least one Board member) that tolerated racial insensitivity and viewed African Americans [sic] students as creating unnecessary 'stress.'" Appellants' No. 11-4200 reply br. at 27. But we do not need to decide how a reasonable jury could construe this email because even though it was available when depositions were taken and a witness other than its author referred to it on a deposition, it was not properly submitted to the District Court as it was not introduced into

110

evidence and its author was not deposed. Consequently, appellants cannot rely on the email to defeat the motion for summary judgment. See Fed. R. Civ. P. 56(c).[68]  Thus, the email did not contribute to the admissible evidence appellants needed to have survived summary judgment.

Appellants also argue that the District Court wrongly discounted the deposition testimony of Dr. Moore-Williams, an independent consultant that the LMSD had engaged prior to this litigation to address minority issues in the LMSD, as being based on her personal beliefs and on hearsay. In considering this testimony, the Court found that her opinions were not based on anything that she had observed firsthand, but rather concerned attitudes about race in the country and the education system in general. Appellants seem to conflate the issue of admissibility of evidence with the requirement of taking evidence in the light most favorable to the non-movant when considering a summary judgment motion. Thus, during oral argument, appellants' counsel argued that the District Court

---

[68] As far as we can tell, the original email was submitted in an unrelated case against the LMSD, Doe v. Lower Merion School District, 689 F. Supp. 2d 742, 755 (E.D. Pa. 2010). We also point out that when the scope of this litigation is considered it is not easy to understand how an email by one school board member expressing concern about putting stress on students by requiring that they be transferred away from a school to which they can walk supports the allegations of the complaint. But we do not predicate our result on this observation.

should have found that there was evidence that LMSD committed an intentional wrong against African American students in its schools, not only because it did not consider the MAP presentation, but because it also wrongly discounted Moore-Williams' testimony as hearsay. Tr. Oral Arg. June 11, 2013, at 51-52. While the MAP issue seems to concern admissibility, it is clear from the October 20, 2011 Memorandum and Judgment Order that the Court did consider Moore-Williams' deposition testimony, and appellants referred to this testimony in their oral arguments on October 4, 2011, in the District Court on the summary judgment motion.[69] No. 2:07-cv-3100 Doc. No. 180 at 25.

The District Court's October 20, 2011 Memorandum and Judgment Order found that references to Moore-Williams' testimony by the plaintiffs during the October 4, 2011 oral argument was "selective and misleading," and that she had "admit[ted] that her statements about the School District [we]re not based on anything she observed firsthand but rather on her own personal belief and the hearsay statements of others. Accordingly, her statements cannot create a genuine issue of material fact regarding the School District's intent to

---

[69] Although appellants objected to the limited weight the District Court gave Moore-Williams' testimony both in their briefs and at oral argument, and made reference to her deposition in the appendix, they do not claim to have made a formal motion in limine regarding Moore-Williams' testimony seeking to have it considered, nor have they pointed to an order denying its admission or consideration by the District Court.

discriminate." Id. In this regard, we do not see how the deficiencies in her testimony could have been cured so that the evidence could have become admissible at trial. Clearly, we cannot say that the District Court erred in its treatment of her evidence.[70]

Indeed, putting aside inadmissible evidence, the allegations in all of the complaints and briefs are inconsistent in their logic. For example, appellants seem to be complaining both that LMSD's placement of individual students in special education courses has taken them away from "regular" courses, while at the same time alleging that they did not receive adequate special education and support.[71] It is unclear what actions LMSD could have taken that plaintiffs would deem appropriate. In order to participate in full schedules of both special education and regular education classes, students would need a longer school day than students taking only regular education classes. Further, if individual students require extra

_____

[70] We note that inasmuch as the Blunts do not appeal from the October 20, 2011 Memorandum and Judgment Order granting summary judgment, we will not address their allegations.

[71] One example, among many, is found in the following paragraph of the TAC: "Denying these Plaintiffs and the class the opportunity to participate in and benefit from federally-assisted regular education services, program and activities, including special education and related services . . ." TAC at para. 175(a); J.A. vol. 9, at 3889 (emphases added).

113

help in particular subjects, obviously it is counterintuitive to protest that, for example, they are not receiving foreign language instruction during the time that they are participating in remedial courses.

We also point out that at various points in the SAC the plaintiffs express dissatisfaction with grades that are too low, and at other points complain of grades that are too high. Plaintiffs seem to believe that the divergence in grades demonstrates that they were placed in courses that either were too easy or too difficult, depending on which plaintiff they are discussing.[72] But student placement is not an exact science, and different children have different needs. We repeatedly have explained that the teachers and parents, school districts, and administrative review boards are closest to the issues at hand, and therefore they are the best persons or entities to address individual concerns and complaints. Of course, this recognition underlies the need for the exhaustion requirements of the IDEA.

### 3. Statistical Evidence

In Meditz v. City of Newark, 658 F.3d 364, 371 (3d Cir. 2011), we cited several Supreme Court cases to support our conclusion that gross statistical disparities may serve to establish a plaintiff's prima facie case in a Title VII case if the statistical

---

[72] By this reasoning the only acceptable grade that would not give rise to a legal claim might be a "C," and the giving of any other grade might be viewed as evidence that a school district was at fault for not providing an appropriate education.

evidence is of a <u>kind and degree sufficient</u> to show that the policy or practice in question caused the discrimination. In considering the statistical evidence in this case, we note first that for <u>monetary</u> damages to be awarded under Title VI, the discrimination must be intentional. <u>See, e.g.</u>, <u>Lane v. Pena</u>, 518 U.S. 187, 191, 116 S.Ct. 2092, 2096 (1996) ("[D]amages are available under Title VI for intentional violations thereof." (citing <u>Guardians Ass'n v. Civil Serv. Comm'n of N.Y.C.</u>, 463 U.S. 582, 103 S.Ct. 3221 (1983))). However, even if this were not the case and we simply applied the analysis we articulated in the <u>Meditz</u> Title VII case, the statistics do not indicate gross disparities of the kind and degree sufficient to give rise to an inference that the non-uniform individualized analyses of students in the LMSD, utilized to determine appropriate classroom placement, reflected a pattern or practice of discrimination.

The District Court in its October 20, 2011 Memorandum and Judgment Order discussed in detail the statistical data that the plaintiffs put forward. No. 2:07-cv-3100, Doc. No. 180 at 13-18. As the Court pointed out, "[d]isproportionality is not per se evidence of discrimination" and, as plaintiffs' own experts have acknowledged, disproportionality can be either biased or unbiased. <u>Id.</u> at 14. Noting that "[t]here is no specific numerical criteria for disproportionality set forth in the IDEA or federal regulations," the Court explained that the PDE has established guidelines whereby it considers a disproportionality of 3.0, i.e., three to one, to be an indication of over-representation of that race, while the United States Department of Education's guidelines indicate that a 1.5 disproportionality ratio is an overrepresentation of that race. <u>Id.</u> at 14-15.

115

The District Court summarized the data presented by plaintiffs (collected by the PDE) for the LMSD for the years 2005-2010 as follows:

| Year | Total student body at LMSD | | | Students Participating in special education courses | | | |
|------|-------------------------------|------------------------------------------------------------------|--------------------------------------------------------------|-----------------------------------------------------------------|--------------------------------------------------------------------------|-----------------------------------------------------------------|------------------------------------------------------------------|
| | Total Number of students | % of total number of students who were African American | % of total number of students who were Caucasian | Total Number of students that participated in special education courses | % of total student body that participated in special education courses | % of special education students who were African American | % of special education students who were Caucasian |
| '05-'06 | 6,945 | 7.7% | 84.4% | 1,255 | 18.1% | 12.7% | 82.6% |
| '06-'07 | 6,981 | 7.9% | 83.2% | 1,187 | 17.0% | 14.5% | 80.2% |
| '07-'08 | 6,914 | 8.1% | 83.1% | 1,158 | 16.7% | 14.0% | 80.8% |
| '08-'09 | 6,788 | 8.0% | 81.6% | 1,101 | 16.2% | 13.7% | 80.5% |
| '09-'10 | 7,072 | 8.6% | 81.1% | 1,094 | 15.5% | 14.3% | 80.0% |

Id. at 16-17. Though these numbers undoubtedly show that it was more likely that an African American student than a Caucasian student would be placed in a special education course, the numbers are not so disproportionate that they suggest the presence of discrimination in student placement absent additional evidence that could justify drawing this inference.

In considering the statistics, it is critical to recognize that there was no evidence presented in the District Court that the LMSD applied different evaluation procedures for determining placement of African American students than for Caucasian students. After all, if the same evaluation procedures are used for all students regardless of their race there simply is no discrimination. Moreover, the opinion of the plaintiffs' expert, a psychologist, that five or six of the students in question incorrectly had been identified as learning disabled was not rendered until these proceedings were pending in the District Court and was insufficient to support a prima facie case for the plaintiffs, particularly inasmuch as she predicated her opinion on her personal evaluation of the students.

In fact, we doubt that anyone could explain better than LMSD's counsel did at oral argument why the divergence of views on student placement should not be a basis to support plaintiffs' claims:

> [LMSD] has procedures in place that are followed for all students. And the fact a psychologist could disagree with [LMSD's] psychologist and say 'No, I don't think this person met these criteria'

117

doesn't prove or produce any evidence to suggest that that was as a result of these students' races. The psychologist did not [attempt] . . . to ascertain . . . that identification process . . . to see if there was perhaps some other indicia that could be pointed to as to why that occurred. Instead, it was simply, 'I don't believe these students were [properly] identified.' From that, the plaintiffs had made the leap that therefore it must be because of their race.

Tr. Oral Arg. June 11, 2013, at 37-38.

In reaching our result, in addition to considering the statistics we have cited and plaintiffs' expert's claim that students were misidentified, we have considered plaintiffs' allegation that a small number of special education classes at LMSD were comprised of 100% African American students. But the problem with that evidence is that it was not offered in a context from which a meaningful correlation between race and class placement could be demonstrated because plaintiffs did not accompany it with testing data, grading, and other factors that might provide some meaning to the evidence that they offered. Under the IDEA structure, school districts that accept federal funds such as the LMSD must treat every student as an individual, and thus must evaluate, test, and monitor the student individually, as well as provide an IEP for the student on an individual basis. If by following this mandate a school district should make a special education placement for a particular student, the school district should not decline to make the placement merely because the application of the mandate leads

118

to students of a particular group being statistically overrepresented in special education grouping. We certainly are not going to require or even suggest that school districts use a quota system in assigning students to special education classes so that the percentages of students in such classes be proportionate to overall school ratios when measured on a racial basis. A school district has the function of educating its students, and should be concerned with that critical matter rather than with producing particular statistics.

Appellants' evidence of discrimination consists of statistical evidence that African American students were overrepresented in special education classes, testimony indicating that certain LMSD educators had discussed different learning styles and an email from a School Board member expressing concern about putting extra stress on black students. However, the record also reflects that each individual student's educational needs were assessed and satisfied through a thorough and individualized IEP process, and contains no evidence that the educators and administrators responsible for placing students intended to discriminate against them because of their race. Taking the record as a whole and drawing all inferences in appellants' favor, there is no genuine issue of material fact that LMSD itself—or a third party under its control—engaged in intentional discrimination.

## VII. CONCLUSION

First, we hold that the District Court correctly held that the action against the PDE was barred by principles of res

judicata (claim preclusion) as a result of the settlement of the class action in Gaskin v. Pennsylvania, 389 F. Supp. 2d 628. We reach that conclusion because the Gaskin class included all school-age students with disabilities in Pennsylvania who were denied a FAPE, and the claims pleaded against the PDE in this case were brought on behalf of students within the Gaskin class. Thus, the claims asserted against the PDE in this case overlap with the claims that had been brought against it in Gaskin.

Next, in reviewing the District Court's conclusions regarding the IDEA's statute of limitations for a party adversely affected by an administrative determination of an IDEA claim to bring a state or federal suit, we hold that the Court correctly concluded that the 90-day statute of limitations barred the Blunts' IDEA claims. In reaching this result, we hold that it did not matter that the Blunts' administrative judicial process began on April 8, 2005, a date on which the IDEA's statute of limitations for bringing a claim in state or federal court after receiving an adverse administrative determination was two years, because the Blunts' final administrative disposition was on August 31, 2005, almost two months after the 90-day statute of limitations came into effect, and almost nine months after Congress enacted it. Contrary to the Blunts' contention, the amended statute of limitations was not unfairly retroactively applied, for they had nine months notice regarding the amendment of the statute of limitations before their IDEA action was barred; thus they had ample time to bring their case. In fact, inasmuch as their cause of action did not arise until after the amendment of the statute of limitations, it is fair to say that the amendment simply was not applied retroactively in their case. Further, as noted above, the Blunts had the responsibility

120

to be vigilant about changes in legislation, including statutes of limitation. Our reasoning in Steven I. regarding the shortened IDEA statute of limitations for bringing an administrative claim plainly applies here with respect to the judicial claim.

Judge Greenberg concludes that CBP did not have standing to sue on its own behalf or on behalf of its members, but Judges Ambro and McKee conclude that the District Court erred in dismissing CBP for lack of standing because CBP had organizational standing under Havens. Although a majority of the Court thus does not accept the District Court's ruling that CBP did not have standing, this conclusion does not change our outcome in light of a different majority's independent conclusion that the Court properly entered summary judgment against the plaintiffs, as CBP has not explained why it could have prevailed where the individual plaintiffs did not.

We also hold that the District Court did not abuse its discretion in how it dealt with disputed evidence. The Court was correct in determining that the MAP presentation was not authenticated, and it did not abuse its discretion in discounting Moore-Williams' testimony or in not giving it more weight than it did. Further, the Court did not err in its use of Reschly's report.

Finally, plaintiffs did not establish a prima facie case of discrimination in violation of Title VI or § 1983; thus, the entry of summary judgment against them on their claims under those laws was appropriate. Evidence that the District Court found to be inadmissible need not have been considered in a light most favorable to the non-movant plaintiffs because the evidence could not have become admissible at trial. Further, the evidence

121

before the Court did not support a circumstantial prima facie case of racial discrimination in violation of Title VI or § 1983. In particular, the statistical evidence was insufficient to establish a prima facie case even when considered with other evidence.

The IDEA's goal is to ensure that educators and parents have necessary tools to improve educational results of disabled students. See 20 U.S.C. § 1400(d)(3) (stating as one purpose of the IDEA, "to ensure that educators and parents have the necessary tools to improve educational results for children with disabilities by supporting system improvement activities"). As we have noted in the past, it is not necessarily the case that when students do not achieve equal results from their education there is a constitutional violation. Coalition to Save Our Children v. State Bd. of Educ. of State of Del., 90 F.3d 752, 766 (3d Cir. 1996); see also Personnel Adm'r of Mass. v. Feeney, 442 U.S. 256, 273, 99 S.Ct. 2282, 2293 (1979) (It is a "settled rule that the Fourteenth Amendment guarantees equal laws, not equal results.").

In summary, we will affirm the District Court's orders of October 20, 2011, February 15, 2008, and August 19, 2009, on appeal at Nos. 11-4200 and 11-4201, and will dismiss LMSD's cross-appeal at No. 11-4315.[73]

---

[73] We are affirming the order of August 19, 2009, even though only Judge Greenberg agrees with the District Court that CBP does not have standing and the District Court dismissed CBP on that ground. Appeals are taken from judgments, not opinions, see Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842, 104 S.Ct. 2778, 2781 (1984), and Judge

122

Ambro joins in the disposition of the case dismissing CBP because it has not explained how, if it had been permitted to continue in the case, it could have prevailed, a conclusion with which Judge Greenberg agrees.

We recognize that Chief Judge McKee believes that we are not affirming the August 19, 2009 judgment because the judgment recites that the motion to dismiss for lack of standing is granted and both he and Judge Ambro reject the District Court's conclusion on the CBP standing issue. But obviously the judgment simply dismisses the claim and the reference to the lack of standing is merely an explanation for the operative order which is to dismiss CBP's claim. The reference to a lack of standing is no different than a reference to the Court's opinion finding that CBP did not have standing. Therefore, inasmuch as Judge Ambro is voting to affirm the August 19, 2009 judgment, though on a basis other than its lack of standing, the judgment is being affirmed.

Judge Ambro's vote brings into play the "well established [principle] that we are free to affirm the judgment of the district court on any basis which finds support in the record." Bernitsky v. United States, 620 F.2d 948, 950 (3d Cir. 1980). We have applied this principle in the context of affirming a district court's ruling on a motion to dismiss. See, e.g., Tourscher v. McCullough, 184 F.3d 236, 240 (3d Cir. 1999); Central Pa. Teamsters Pension Fund v. McCormick Dray Line, Inc., 85 F.3d 1098, 1107 (3d Cir. 1996) (acknowledging power to "affirm decision of the district court on grounds other than those relied

upon by the district court" but declining to exercise it).  The Supreme Court also has noted that "settled" rule "that, if the decision below is correct, it must be affirmed, although the lower court relied upon a wrong ground or gave a wrong reason." Helvering v. Gowran, 302 U.S. 238, 245, 58 S.Ct. 154, 158 (1937).

Amber Blunt, et. al. v. Lower Merion School District, et. al.
Nos. 11-4200, 11-4201 & 11-4315

_____

AMBRO, <u>Circuit Judge</u>, concurring

I agree with and join in Judge Greenberg's excellent and thorough opinion as to all but Part VII.B, which deals with whether Appellant Concerned Black Parents of Mainline Inc. ("CBP") has standing to sue. Although standing is a jurisdictional requirement that cannot be waived, <u>Pub. Interest Research Grp. of N.J., Inc. v. Magensium Elektron, Inc.</u>, 123 F.3d 111, 117 n.5 (3d Cir. 1997), "the presence of one plaintiff with standing is sufficient to satisfy that requirement." <u>Forum for Academic & Institutional Rights v. Rumsfeld</u>, 390 F.3d 219, 228 n.7 (3d Cir. 2004) (citing <u>Bowsher v. Synar</u>, 478 U.S. 714, 721 (1986)), <u>rev'd on other grounds</u>, 547 U.S. 47 (2006). The standing of the individual Plaintiffs here has never been challenged (nor should it). Thus the individual Plaintiffs confer standing and CBP's standing as an organization is irrelevant.

Were it necessary to decide, I would agree with Judge McKee that, under <u>Havens Realty Corp. v. Coleman</u>, 455 U.S. 363 (1982), CBP has standing to sue on its own behalf. However, I also agree with Judge Greenberg that the claims of the individual Plaintiffs were properly dismissed at summary judgment. CBP, who shared counsel with some of the individual Plaintiffs, has not explained how, were it permitted to continue as a plaintiff in the case, it could prevail where the individual Plaintiffs have failed. Thus I agree with Judge Greenberg's disposition of these appeals on their merits. For these reasons, I concur.

*Blunt v. Lower Merion* Nos. 11-4200, 11-4201, 11-4315

McKee, *Chief Judge,* concurring in part and dissenting in

part.

Today we hold that a group of African-American parents and students have not produced sufficient evidence to have a jury decide if race is a factor in how African-American students are assigned to special education classes in their school district. My colleagues reach this result even though the record contains numerous issues of disputed fact that would support plaintiffs' claims if a jury resolved those disputes in the plaintiffs' favor.

The allegations here are not pretty. No one likes to think that a school district, especially one with an outstanding educational reputation, allows race to be a factor in assigning African-American students to special education classes. However, there is sufficient evidence on this record to establish that a trial is warranted to determine whether this school district did exactly that. I therefore write separately to express my strong disagreement with my colleagues' conclusion that these plaintiffs cannot survive summary judgment.

Despite that strong disagreement, I do agree that the *Gaskin* settlement bars the Title VI and § 1983 claims that have been brought against the Pennsylvania Department of Education ("PDE") as discussed in Section VII.A of the Majority Opinion.[1]

The District Court's August 19, 2009 ruling that the settlement agreement bars claims against the PDE sets forth the relevant language of the settlement agreement. That agreement identified the plaintiffs as: "representatives of a certified class consisting of all school-age students with disabilities in Pennsylvania who have been denied a free appropriate education in regular classrooms with individualized supportive services, individualized instruction,

---

[1] I also join Part VII.C of the Majority Opinion in which my colleagues discuss the statute of limitations.

and accommodations they need to succeed in the regular education classroom." *Blunt v. Lower Merion School District*, 262 F.R.D. 481, 491 (E.D. Pa. 2009). The agreement was in effect from September 19, 2005 to September 19, 2010. *Id.* Although, as counsel for CBP noted at oral argument, those claims are very different from the claims here, the language of the settlement agreement is very broad in its scope and provides in part as follows:

> [i]n consideration of the performance of PDE's obligations under the Settlement Agreement, the plaintiffs, individually and collectively hereby remise, release, and forever discharge each of the defendants […] from all actions and causes of action, suits, . . . claims and demands *whatsoever . . . ,* <u>known or unknown, foreseen or unforeseen</u>, particularly those *which were or could have been set forth in Gaskin v. Pennsylvania Department of Education*, No. 94-CV-4048 (E.D. Pa.), or which any of the plaintiffs ever had or now has, . . . o*r may have, for . . . any reason of any cause, . . .* whatsoever arising out of or related to the claims brought by the plaintiffs against the defendants in the *Gaskin* case from the beginning of the world to the **effective date of the Settlement Agreement**[.]

*Id.* (ellipses and bold type and italics emphasis in original, underline emphasis added). The claims in this suit, though quite different from the claims in *Gaskin*, are clearly "related to the claims brought by the plaintiffs . . . in the *Gaskin* case."

However, for the reasons that follow, I cannot agree that Concerned Black Parents, Inc. ("CBP") lacks standing (as discussed in Section VII.B of the Majority Opinion) or that the District Court properly granted summary judgment on the claims that these Plaintiffs brought against the Lower Merion School District ("LMSD") under Title VI and 42 U.S.C. § 1983 (as discussed in Section VII.D of the Majority Opinion).

## I. CBP'S STANDING
### A. General Principles

As Judge Greenberg explains, Article III requires a plaintiff to demonstrate a sufficient interest in the outcome of litigation to establish a "case or controversy" and thus have standing to sue on the plaintiff's own behalf or as a

2

representative of others.[2] As the Supreme Court explained in *Warth v. Seldin*, 422 U.S. 490 , 511 (1975), "[t]here is no question that an association may have standing in its own right to seek judicial relief for injury to itself and to vindicate whatever rights and immunities the association itself may enjoy. . . . [e]ven in the absence of injury to itself, an association may have standing solely as a representative of its members." 422 U.S. at 511 (internal citations omitted).

The District Court held that CBP was unable to demonstrate a sufficiently concrete injury to itself or the parents it represents to have standing to bring this suit. *Blunt,* 262 F.R.D. at 486. In rejecting CBP's claim of standing, the District Court focused on the fact that CBP is not a student and therefore could only demonstrate "an abstract, ideological

---

[2]  Judge Greenberg properly notes that his discussion of CBP's standing is not the holding of this Court, because Judge Ambro agrees that CBP has personal standing. *See* Majority Opinion ("Majority Op.") at 97-98 & n.72. However, for reasons of convenience and clarity, with the exception of Judge Greenberg's discussion of personal standing, I frequently refer to his opinion in its entirety as the "Majority Opinion," or the opinion of "my colleagues."

 Judge Greenberg engages in a very detailed analysis to explain why he believes that CBP lacks standing. He explains that such a detailed analysis is appropriate because "[w]e . . . will not avoid deciding the standing issue on the ground that it is moot, for the necessity for a party to have standing is jurisdictional and thus a court of appeals always must determine if the district court . . . had jurisdiction." Majority Op. at 73 n.62. However, there is no dispute whatsoever about the standing of the individual plaintiffs, nor could there be. Accordingly, the jurisdiction of the District Court and this Court is clear and undisputed. Accordingly, Judge Greenberg's discussion of standing is *dicta. See Galli v. New Jersey Meadowlands Comm'n*, 490 F.3d 265, 274 (3d Cir. 2007) ("[W]e are not bound by our Court's prior *dicta . . . .*").

 Nevertheless, in order to respond to Judge Greenberg's very detailed analysis, and to avoid any questions about the impact of our discussion on future suits by organizational plaintiffs, I will discuss CBP's standing in some detail.

interest in the litigation as opposed to the necessary 'personal stake in the outcome' of the controversy necessary to confer standing." *Id.* (citing *Sierra Club v. Morton*, 405 U.S. 727, 735 (1972)).[3]

In his separate opinion, Judge Ambro states: " I would agree with Judge McKee that, under *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982), CBP has standing to sue on its own behalf." Ambro at 1. However, both Judge Ambro and Judge Greenberg believe that CBP's standing is irrelevant because they do not believe CBP can prevail on the merits. Majority Opinion ("Majority Op.") at 98-99 n.72; Ambro at 1. Of course, CBP's likelihood of success on the merits has no bearing on its standing. The issue of CBP's standing not only "matter[s], it is of the utmost importance . . ." as our decision here is precedential and can impact other organizations in the future. "In essence, the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Warth*, 422 U.S. at 498.

Moreover, the standing issue is dispositive for purposes of the merits of CBP's appeal of the August 19, 2009 judgment because we are not affirming that judgment. As the Majority Opinion correctly notes, "[a]ppeals are taken from judgments, not opinions." Majority Op. at 98 n.72 (citing *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984)). CBP appealed the District Court's August 19, 2009 judgment. That judgment states:

---

[3] The District Court also held that CBP did not have representational standing because its bylaws stated that CBP had no members, and "in light of this express statement in a formal document governing . . . the corporation, [the District Court concluded] that [CBP] does not have standing to bring suit on behalf of its members because it has none." Id. at 487. I do not discuss the issue of whether CBP has representational standing because there is no need to. Judge Ambro and I agree that CBP has standing to sue based on its own injuries. I do note that the District Court failed to appreciate the extent or nature of CBP's own injuries or the nature of CBP's efforts to advance the interests of parents of African-American children in the LMSD.

"the motion of defendants, the Lower Merion School District and the Lower Merion School Board, to dismiss the claims of Concerned Black Parents of Mainline, Inc. and the Mainline Branch of the NAACP <u>for lack of standing</u> is GRANTED." Joint Appendix ("J.A.") at 42.69 (emphasis added). It is therefore beyond dispute that CBP was dismissed from the case because of standing, and only because of standing. Because a majority of this Court now holds that CBP does have standing, *see, e.g.,* Majority Op. at 97, the District Court's August 19, 2009 judgment must be reversed as to the dismissal of CBP.

Thus, it is simply inaccurate to claim that our holding regarding standing "does not change [the] outcome in light of a different majority's conclusion that [the District Court] properly entered summary judgment against the plaintiffs." Majority Op. at 97. The appeal from the District Court's judgment granting summary judgment against the individual plaintiffs must be decided separately because it arises from a discrete judgment. *See Chevron U.S.A., Inc.*, 467 U.S. at 842. Furthermore, any suggestion that CBP must explain "why it could have prevailed where the individual plaintiffs did not," *see* Majority Op. at 97, has no basis in the law. Because CBP was dismissed from the litigation on a motion to dismiss, it was unable to engage in the same discovery as other parties; no summary judgment motion was filed against it and it therefore did not have a full opportunity to fairly oppose summary judgment.

When the District Court dismissed CBP for lack of standing, it did so without any motion to dismiss or motion for summary judgment being filed against CBP. The Majority is correct that the District Court considered CBP's standing twice—once before the Third Amended Complaint and once after it—and discovery was taken after the first dismissal, Majority Op. at 59 n.52. However, that does not resolve the procedural issue here. Plaintiffs filed for class certification. In opposing that certification, defendants argued that CBP could not serve as a class representative, but the defendants did not move to dismiss CBP from the lawsuit.

5

J.A. at 918-19.   Rather, the District Court *sua sponte* dismissed CBP for lack of standing.  J.A. at 42.69.[4]

While the Majority is correct in noting that a judgment may be affirmed for any reason that is supported by the record, this record is more than adequate to survive summary judgment based on the standing of CBP as well as the individual plaintiffs.  Judge Ambro and I agree that CBP has demonstrated that it is entitled to personal standing under *Havens Realty Corp.*  Ambro at 1.  However, unlike Judges Ambro and Greenberg, I also believe there is sufficient evidence to survive dismissal on the merits of the relevant discrimination claims.  As I discuss in detail below, the District Court failed to properly credit some evidence, and

---

[4] Although the District Court notes that defendants "move to dismiss the claims of Concerned Black Parents . . . for lack of standing," J.A. at 924-25, defendants' motion makes no such claim.  Instead, as part of its argument that plaintiffs' proposed class representatives cannot adequately represent the class, defendants' motion states:  "Plaintiffs' evidence does nothing to establish CBP's standing and completely fails to address the fact that CBP is not a member of the proposed class and therefore cannot be a class representative."  J.A. at 919.

Plaintiffs were neither required, nor expected, to present evidence to establish CBP's standing in order to move for class certification.   It is therefore not the least bit surprising that they did not then attempt to come forward with evidence to establish standing.  It appears that the District Court focused on the defendants' comment about standing and transformed it into a motion attacking standing.  J.A. at 928.  The District Court then focused on CBP's lack of formal membership, and concluded that CBP "does not have standing to bring suit on behalf of its members," ostensibly addressing plaintiffs' claims that CBP may represent the class.  J.A. at 932.  The District Court then concluded: "[a]ccordingly, we will enter an order dismissing Concerned Black parents from this lawsuit for lack of standing."  *Id.*  The District Court does not state that it is granting summary judgment against CBP for lack of standing.  Rather, it simply stated that it was "dismissing" CBP.  *Id.*

6

improperly discredited or ignored other evidence. When the evidence here is properly viewed in its entirety, the record establishes genuine issues of material fact pertaining to Plaintiffs' claims under Title VI and § 1983, and the resulting harm. *See infra* Section III at 30-60. CBP has also presented sufficient evidence to raise a genuine dispute of material fact regarding harm it suffered as a result of the LMSD's conduct. *See infra* Section I.B at 7-19.

For these reasons, the August 19, 2009 order, must be reversed as to CBP's dismissal for lack of standing; a majority of this Court now holds that CBP does have standing.

B. CBP's Personal Standing

An organization has standing to assert its own injuries ("personal standing") when it can show: (1) a concrete and particularized injury-in-fact, (2) a causal connection between the injury and the conduct complained of, and (3) a likelihood of redressability. *See Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-61 (1992); *see also Fair Housing Council of Suburban Philadelphia v. Montgomery Newspapers,* 141 F.3d 71, 76 (3d Cir. 1998) ("In order to defeat the summary judgment motion based on the issue of standing, [the opposing party] was required to submit 'affidavits or other evidence showing *through specific facts*…that…it [was] 'directly' affected [by the alleged discrimination]. . . .'") (emphasis in original).

To show an injury in fact, CBP must show that its activities or operations were sufficiently disrupted by the disputed conduct. In *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378-79 (1982), the Supreme Court held that the district court had erred in dismissing the claims of a nonprofit organization based on its alleged lack of standing. The nonprofit organization there ("HOME") was committed "to mak[ing] equal opportunity in housing a reality in the Richmond Metropolitan Area." *Id.* at 368 (internal quotation marks and citations omitted). In furtherance of its mission, HOME counseled potential renters and undertook investigations to determine if landlords were discriminating against potential tenants by "steering" them to particular

rental units or neighborhoods based on race. *Id.* at 368-69. HOME sent "testers" of different races into the community where they inquired about advertised rental units to determine if certain landlords were engaged in racially discriminatory steering. *Id.* at 368. As part of its investigation, HOME sent two testers to inquire about rental properties owned by Havens Realty Corporation ("Havens"). *Id.* The African-American tester was incorrectly told that certain apartments were not available. *Id.* Simultaneously, the Caucasian tester was told that the very same apartments were available. *Id.*

HOME sued Havens for housing discrimination, alleging that it had standing to sue in its own right and on behalf of its constituents. *Id.* HOME claimed it had itself been injured because Havens' conduct "frustrated the organization's counseling and referral services, with a consequent drain on resources." *Id.*

The Supreme Court agreed. The Court reasoned that where an organization's ability to provide its primary services has been "perceptibly impaired," the organization has personal standing to attempt recover for its injuries. *Id.* at 379. HOME asserted that it had "been frustrated by defendants' racial steering practices in its efforts to assist equal access to housing through counseling and other referral services." *Id.* That was sufficient to allege an Article III injury. The Court explained: "[s]uch concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources—constitutes far more than simply a setback in the organization's abstract social interests." *Id.* Specifically, HOME's complaint included an allegation that it "[had] to devote significant resources to identify and counteract the defendant's [sic] racially discriminatory steering practices." *Id.* (brackets in original). The additional expense and the need to counteract Havens' allegedly discriminatory conduct was a sufficiently particularized and concrete injury to confer standing upon HOME. *Id.*

We elaborated on *Havens Realty* in *Montgomery Newspapers*. There, the defendants raised the same issues raised in *Havens Realty*, but on a motion for summary judgment. 141 F.3d at 73. The plaintiff there was a nonprofit

8

organization that worked "to educate and promote fair housing and to oppose segregation based on the protected classes found in the Fair Housing Act of 1968, as amended." *Id.* In an effort to advance that objective, the organization sued multiple defendants, including a newspaper that had run advertisements that appeared to perpetuate housing discrimination on the basis of gender and familial status.[5] *Id.* The plaintiff's response to the defendant's motion for summary judgment relied heavily on *Havens Realty.* The plaintiff argued that it had sufficiently alleged its own injuries because the defendant newspaper's "acceptance and publication of discriminatory housing advertisements frustrated the organization's mission and [damaged] the organization . . . by . . . divert[ing] resources to fight the discrimination." *Id.*

We granted summary judgment to the defendants, but only because the plaintiff failed to offer any evidence to support its alleged injuries. "[S]omething more than . . . naked allegations were required at the summary judgment stage." *Id.* at 76. We explained that the nonprofit "was required to submit affidavits or other evidence showing *through specific facts* … that … it [was] **directly affected** by the alleged discrimination." *Id.* (italics, brackets, and ellipses in original, bold emphasis added, internal quotation marks omitted). The organization had not produced any evidence that it had "altered its operations in any way as a result of the allegedly discriminatory advertisements or diverted any of its resources to a bona fide investigation." *Id.* at 78. "[B]are allegations of injury such as those based on the investigation described [there were] not enough to establish standing." *Id.* (internal quotation marks omitted). Accordingly, we held that the organization had not established an Article III injury.

---

[5] "The complaint included copies of six advertisements which appeared in Montgomery newspapers between November, 1993 and March, 1994. Each of these advertisements contained one of the following allegedly objectionable phrases: 'mature person', 'ideal for quiet and reserved single and-or couple'; 'professional male … only' and 'quiet mature setting.'" *Montgomery Newspapers*, 141 F.3d at 73.

Thus, *Montgomery Newspapers* involved a failure of proof. It does not support the conclusion that CBP has failed to introduce sufficient evidence of its own injury to survive summary judgment here.

As discussed in detail below, CBP produced sufficient evidence of its own concrete and particularized injuries to create an Article III case or controversy. While it is obviously true (as the majority and the District Court note) that CBP is not itself a student within the LMSD, that circumstance is only minimally relevant at best.

In *Powell v. Ridge*, 189 F.3d 387, 391, 404 (3d Cir. 1999), a case also brought under Title VI and § 1983, we stated that organizational plaintiffs that "devote substantial resources to overcoming what they allege are the disparate and inadequate educational programs caused by" the state's failure to equally contribute funding and resources to minority school districts, had standing to sue on their own behalf.[6] We explained that "the standing of the plaintiff organizations to bring this suit is consistent with the long line of cases in which organizations have sued to enforce civil rights . . . ." *Id.* at 404 (citing *Walters v National Ass'n of Radiation Survivors,* 442 U.S. 347, 352 & n. 8 (1979); *Havens Realty*, 455 U.S. at 369 (1985); *Andrus v. Sierra Club*, 442 U.S. 347, 352, 353 & n.8 (1979); *Fair Employment Council of Greater Washington, Inc., v. BMC Marketing Corp.*, 28 F.3d 1268, 1276 (D.C. Cir. 1994); *N.A.A.C.P v. The Medical Center, Inc.*, 657 F.2d 1322 (3d Cir. 1981)). Some of the relevant organizational defendants in *Powell* such as "Parents Union for Public Schools" and "Parents United for Better Schools" had an organizational purpose quite similar to CBP's, and the actions they took to advance that purpose were also quite similar to actions CBP undertook here. *Id.* at 387, 391.

Any focus on the fact that CBP is an organization of parents (rather than students) is particularly hard to understand in the context of the allegations of racial bias that underlie this lawsuit. The interests of children in the quality

---

[6] Disapproved of on other grounds in *Fowler v UPMC Shadyside*, 578 F.3d 203, 404 (3d Cir. 2009).

of their education is identical to the interests their parents have in seeing them obtain such an education without the poisonous sting of racial bias. The harm African-American students allegedly suffered here cannot readily be amputated from a concomitant harm to their parents or to an organization that devoted scarce resources to remedying it. After all, the nonprofit organization in *Havens Realty* had not been denied housing. Yet, the Supreme Court ruled that the nonprofit had standing to challenge discriminatory housing practices because it had been forced to devote its own resources to its efforts to remedy racial discrimination in the housing market. *See Havens Realty,* 455 U.S. at 379.

Here, CBPs purpose includes efforts to "promote equity and excellence" in education for diverse students. It advances that purpose by addressing "issues related to education for populations identified as minority and/or African-American." Blunt and CBP Appellants' Br. at 11. There is no suggestion that this statement of purpose is inaccurate. Given that purpose, the record establishes that CBP has an interest in the outcome of the litigation, and that the alleged discriminatory conduct of LMSD negatively affects the organization's central activities, requiring it to incur extra expenses and provide resources to mitigate LMSD's conduct. *Blunt*, 262 F.R.D. at 486; *see also* J.A. at 3169.

Judge Greenberg lists several of the injuries that CBP alleges, but ignores the evidence produced to support those injuries. *See* Majority Op. at. 62-63. The following numbered headings recite some of the injuries Judge Greenberg lists, and the discussion that follows each heading explains where supporting evidence can be found in this record:[7]

> **[1] Use of its resources to 'host educational consultants and experts' with the purpose of providing information to the Plaintiffs, class members, community and LMSD;**

---

[7] Majority Op. at 62-63(citing TAC at 25-26; J.A. vol. 9, at 3871-72) (footnote omitted) (I have added bracketed numbers and bold emphasis for ease of reference).

11

CBP hosted numerous educational events featuring educational consultants and experts. These experts were paid to speak to parents about the effects of the LMSD's conduct *and how to counteract the consequences of that conduct*. CBP's president, Loraine Carter, testified that, "[s]ince 2006, [CBP has] coordinated public forums for parents in the community" by bringing in experts "to address the underachievement of African-Americans in the School District." J.A. at 3167. Moreover, CBP's newsletter references numerous speaking events held each month with prominent scholars and educational leaders. *Id.* at 1495. For example, in January 2004, CBP met with Dr. Donald Clark regarding educational law, history, and policy as it pertains to both African-American students and Pennsylvania. *Id.* In February 2004, it arranged for Dr. Freya Rivers, an educational consultant, to speak at a CBP meeting regarding strategies she uses to identify high achieving children and "closing the achievement gap." *Id.* CBP also listed the following activities, among others, in its Fall of 2004 schedule: "Special Education Action Roundtable; Youth Town Hall Meetings; Education Empowerment Sessions; Advocacy Training Sessions." *Id.*

> **[2] A 'sharp' rise in expenditures over the last five years due to its efforts to 'protect its members from the adverse impact' of 'the inferior quality of LMSD's dual system of education';**

There is evidence that CBP incurred expenses responding to the allegedly discriminatory conditions at LMSD and the resulting need to advocate on behalf of parents seeking to change the educational circumstances of their children. *Id.* at 3169. From December 2005 to March 2006, CBP had an income of approximately $1,090 and expenses of $1,106. *Id.* Like HOME in *Havens Realty*, CBP had to divert its scarce resources to counseling and otherwise supporting African-American families who were allegedly being discriminated against by LMSD, in order to minimize the impact of LMSD's purportedly discriminatory attitudes and actions toward African-American students. Evidence that CBP's expenses exceeded its income constitutes far more than the bare allegations of the complaint in *Montgomery*

12

*Newspapers;* this evidence demonstrates that CBP suffered a discrete and cognizable injury as a result of LMSD's conduct.

> **[3] Expenditure of resources as a result of its attending meetings related to IEPs, Section 504 and 'disciplinary meetings, court hearings and parent-teacher conferences with and/or on behalf of' various plaintiffs, CBP members and class members;**

Like HOME's board members in *Havens Realty*, CBP's board members had to attend LMSD's educational and disciplinary meetings, as well as court hearings, on behalf of African-American students. Barbara Metzger, who worked as a special education teacher at LMSD during the relevant time period, testified in her deposition that on at least one occasion she "was invited to and sat in on a portion of a Concerned Black Parents' conversation with some of the school administrators" regarding concerns that "African-American students, as a whole, . . . were not performing at the same rate, not experiencing the same success as other students." *Id.* at 1456. She also noted that, among other issues, CBP raised concerns that "these students didn't feel welcome in the school." *Id.* CBP engaged in dialogue with LMSD as part of their advocacy and counseling services for parents whose children were experiencing discrimination, in an effort to raise the concerns at issue in this case.

> **[4] Publication of a community newsletter and 'News Notes . . . to disseminate the compilations of data on' alleged racial disparities in application of disciplinary measures, segregation by race and 'under achievement of African-American students in the [Lower Merion] District';**

CBP published and distributed numerous newsletters addressing claims of bias in order to inform parents of LMSD's conduct. For example, in Volume 1, Issue 3 of its "Main Line Voice" newsletter, CBP sought "a district-wide strategic plan to close the achievement gap," citing statistics indicating that the same academic excellence that "characterizes the LMSD eludes more than sixty percent

(60%) of its African-American students." *Id.* at 1494. This newsletter also includes data demonstrating that African-Americans are statistically more likely than their Caucasian peers to have IEPs and significantly less likely to be classified as gifted. In fact, as I will discuss, for the years that were studied, the probability that an African-American student would be classified as "gifted" or assigned to an Advance Placement class was zero, as none were. *Id.*[8]

### [5] The 'organization' of educational, career, standardized test, financial aid, and college preparatory seminars.

Finally, there is ample evidence that CBP advocated for, and provided, college preparation resources that it believed African-American students needed because of LMSD's purported failure to properly address their needs. In her deposition, Ms. Metzger mentioned a meeting she attended with school administrators where she raised numerous claims of discrimination on behalf of African-American students. CBP "believed that at times, guidance counselors or others, personnel, maybe didn't afford [African-American students] the same consideration when it came to the college planning process." *Id.* at 1456. Ms. Carter similarly testified that CBP has "met with a number of . . . community organizations and institutions that we've identified to bring them together" with LMSD, to provide support to African-American students. *Id.* at 3406. Thus, CBP has demonstrated that it has provided career and college counseling services to the school's African-American students to make up for services that it claims LMSD unfairly withheld from these students.

Judge Greenberg's analysis suggests that these actions do not establish Article III injuries because "CBP's very purpose relates to actions directly involving LMSD, and its expenditures were devoted to protecting students' interests in their interactions with LMSD." Majority Op. at 64. He believes this is different from HOME's injuries in *Havens*

---

[8] I will discuss such evidence in detail below in order to explain how the District Court erred in concluding that there was no genuine dispute of material fact. *See infra* 50-81.

14

*Realty* because "HOME's purpose was to promote equality in the Richmond area overall and its interests thus went far beyond monitoring the specific actions at issue in the Havens case." *Id.* To the extent that I understand that argument, it appears to be the classic distinction without a difference. CBP would not have had to undertake any of the actions or expenses detailed on this record absent the alleged racial bias of LMSD toward African-American students. The fact that CBP's actions are focused on remedying the results of bias within a school district rather than promoting equality throughout the township of Lower Merion (or Montgomery County) is absolutely irrelevant. *See* Majority Op. at 64. Whether an organization monitors discrimination in a city or simply a school district does not affect whether it has standing to protect its own interests.[9] *See* Majority Op. at 64-65.[10]

Moreover, nothing in this record supports Judge Greenberg's suggestion that CBP's expenditures relate solely to this litigation or that it is thereby trying to manufacture standing through litigation. *See* Majority Op. at 64 ("organizations may not satisfy the injury in fact requirement by making expenditures solely for the purpose of litigation.") (internal citations omitted).

---

[9] As noted above, in *Powell v. Ridge*, this Court held that an organizational plaintiff similar to CBP contesting discrimination in a local school district had personal standing to assert its claims. *Powell*, 189 F.3d at 391, 404. Thus, it is incorrect to argue that an organizational plaintiff representing the interests of students in the school district is unable to make a personal standing claim under *Havens*. *Id.* (*citing* to *Havens Realty Corp.*, 455 U.S. at 369); Majority Op. at 64-65.

[10] Therefore, Judge Greenberg's observation that "[i]t appears that the alleged additional expenditures were consistent with CBP's typical activities and it is thus unclear the effect, if any, that this litigation had on their expenditures," Majority Op. at 64, misses the point. CBP's activities were all focused upon combating the effects of the racial bias alleged in LMSD toward African-American students. The fact that it had to make additional expenditures to combat any particular action or to mitigate the impact of the alleged bias is irrelevant to its standing.

15

Judge Greenberg states: "CBP has failed to show why this particular litigation has frustrated its mission, or caused a 'concrete and demonstrable' injury to its activities." Maj. Op. at 64.[11]  However, that is not the issue. The issue is not whether the litigation has drained CBP's resources, but whether CBP has had to devote its scarce resources to combating the perceived bias of LMSD and the inferior educational opportunities that CBP believes African-American students in that school district are afforded.

Moreover, this record establishes a diminution of CBP's resources irrespective of any subsequent litigation.  It is abundantly clear that the organization's goal was not simply to advance litigation against LMSD, but to counteract and monitor LMSD's day-to-day conduct. *See, e.g.,* J.A. at 3169 (Carter testifying that in 2005-2006, CBP's expenses exceeded its income).  The impact on CBP's scarce resources resulted from the organization's response to the bias it believed African-American children in LMSD were subjected to, not from the litigation that was brought to address it.  Judge Greenberg's approach would result in a classic Catch-22: nonprofit organizations that had devoted resources and incurred expenses to combat a particular activity would somehow lose their standing to sue if they decided that it was necessary to resort to litigation.  Judge Greenberg's observation that "CBP has failed to show why this particular litigation has frustrated its mission, or caused a 'concrete and demonstrable' injury to its activities," Majority Op. at 64, therefore misses the point of the standing inquiry.  The issue is not whether this litigation has drained CBP's resources, but whether CBP's efforts to combat perceived bias within the LMSD has drained CBP's scarce resources.   I do not doubt that the litigation has negatively impacted this nonprofit, but that is neither the beginning nor the end of our inquiry, nor should we focus on that one factor.

Moreover, even assuming that some of CBP's activities and expenses were incurred as a result of litigation, summary judgment review requires drawing all reasonable inferences in favor of the nonmovant and not against it. *Josey*

---

[11] In addition, far from frustrating CBP's mission, this litigation is absolutely consistent with that mission.

*v. John R. Hollingsworth Corp.*, 996 F.2d 632, 642 (3d Cir. 1993) ("in the context of an appeal from summary judgment [we] must evaluate evidence in the light most favorable to [the nonmovant] and draw all inferences in his favor.").

CBP operates on the proverbial "shoe string" budget, and clearly had to divert its already-scarce resources to mitigating the impact of the conduct alleged here. *See Havens Realty*, 455 U.S. at 379 ("[i]f, as broadly alleged, petitioners' steering practices have perceptibly impaired HOME's ability to provide counseling referral services for low - and moderate - income homeseekers, there can be no question that the organization has suffered injury in fact."). The evidence supporting CBP's assertions that it was injured by LMSD's discriminatory conduct distinguishes this case from *Montgomery Newspapers,* and suffices to meet the standard for personal standing at the summary judgment stage. *See Havens Realty*, 455 U.S.at 379.[12]

## II. THE DISTRICT COURT APPLIED THE WRONG TEST TO APPELLANTS' CLAIMS UNDER TITLE VI AND 42 U.S.C. § 1983

The District Court applied the wrong test in granting LMSD's motion for summary judgment on Plaintiffs' claims under Title VI and § 1983. As the Majority correctly notes, the appropriate standard for determining liability under Title VI is deliberate indifference. I note the following to amplify the Majority's discussion of the appropriate standard for liability under Title VI and § 1983.

---

[12] Judge Greenberg cites *La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*, 624 F.2d 1083, 1088 (9th Cir. 2010) (an out of circuit case that is obviously not binding) for the proposition that an organization "must . . . show that it would have suffered some other injury if it had not diverted resources to counteracting the problem" in order to demonstrate standing. Majority Op. at 64. However, we have never imposed any such impediment to Article III standing. This additional hurdle is simply contrary to the minimal injury required under Article III. *See, e.g., Havens Realty Corp.*, 455 U.S. at 377.

As the District Court notes, to establish a *prima facie* case under Title VI, plaintiffs must show that they: (1) were members of a protected class, (2) were qualified for the educational benefit or program at issue, (3) and that they suffered an adverse action, (4) which occurred under circumstances giving rise to an inference of discrimination. *Blunt*, 826 F.Supp.2d 749, 758 (E.D. Pa. 2011) (internal citations omitted).

In order to establish a *prima facie* claim under 42 U.S.C. § 1983, plaintiffs needed to show that their right to be free from racial discrimination, as guaranteed by the Equal Protection Clause of the Fourteenth Amendment, was violated, and that the violation was committed by a person acting under the color of state law. *See Chainey v. Street*, 523 F.3d 200, 219 (3d Cir. 2008).

The District Court concluded that both the § 1983 claim and the Title VI claims failed because Plaintiffs were unable to show a discriminatory purpose. The court determined that Plaintiffs failed to "put forth 'more than a scintilla' of evidence that the School District acted with a racially discriminatory purpose when identifying them as disabled and offering them special education services, even if this identification was somehow incorrect." *Blunt*, 826 F. Supp. at 764 (quoting *Williams v. Borough of West Chester*, 891 F.2d 458, 460-61 (3d Cir. 1989)).

According to the District Court, "there was no direct or circumstantial evidence of intentional racial discrimination by the School District," and this was fatal to Plaintiffs' claims. *Id* at 762. However, the test for "intentional discrimination" that the District Court applied to reach that conclusion is inconsistent with decisions of the Supreme Court, our sister Circuit Courts of Appeals, and our own precedential opinions. It is also inconsistent with the vast majority of courts that have interpreted the meaning of "discrimination" under statutes that are inextricably linked to, derived from, and applicable to provisions of Title VI. This is no minor concern because we cannot determine if there is sufficient evidence of Plaintiffs' claims to withstand summary judgment unless the correct test for evaluating this record is first identified and applied.

18

In *Pryor v. Nat'l Collegiate Athletics Ass'n*, 288 F.3d 548 (3d Cir. 2002), we emphasized that proof of disparate impact was not, by itself, sufficient to establish the requisite intent to discriminate under Title VI. *Id.* at 562 ("[a] mere awareness of the consequences of an otherwise neutral policy will not suffice" to establish intentional discrimination) (internal citations omitted). Rather, we held that, "[in order to] prove intentional discrimination by a facially neutral policy, a plaintiff must show that the relevant decisionmaker (*e.g.,* a state legislature) adopted the policy at issue 'because of,' not merely 'in spite of' its adverse effects upon an identifiable group." *Id.* (quoting *Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. 256, 279 (1979)) (internal quotation marks omitted). Our holding rested in large part upon *Alexander v. Sandoval*, 532 U.S. 275 (2001).

However, as we explained recently in *S.H. vs. Lower Merion School District*, 729 F.3d 248, 264 n.24 (3d Cir. 2013), "*Pryor* [reached its result] because it equated deliberate indifference with disparate impact." *Id.* at 264 n.24 (*citing Pryor*, 288 F.3d at 568). *S.H.* relied upon the Supreme Court's post-*Sandoval* jurisprudence as exemplified by *Jackson v Birmingham Bd. Of Educ.,* 544 U.S. 167, 173 (2005). There, the Supreme Court "[recognized] that deliberate indifference *is a form of* intentional discrimination." *S.H.,* 729 F.3d at 264 n.24.[13] (Emphasis added).

Given our unequivocal pronouncement in *S.H.* that deliberate indifference "*is a form of* intentional discrimination, and not a pseudonym for disparate impact," it is clear that the Plaintiffs here do not have to prove discriminatory animus, as the District Court held and as my colleagues' analysis implies. *Id.* (emphasis in original). Of course, I appreciate the fact that the District Court did not have the benefit of our decision in *S.H.* when it granted summary in favor of the defendants. However, my colleagues and I do.

---

[13] *Jackson* cited *Gebser*, and both involved claims filed under Title IX. However, as I have already mentioned, and as I explain in greater detail below, that is a distinction without a difference.

Although it is true that the claims in *S.H.* arose under the Americans with Disabilities Act (ADA) and the Rehabilitation Act (RA), not Title VI or § 1983, this is immaterial as the statutes are interrelated.

## A. The Proper Test for Discriminatory Intent

## 1. Civil Rights Statutes and the "Deliberate Indifference" Standard

In order to avoid any confusion over the applicability of the deliberate indifference standard, its application under Title VI here, or the relevance of cases decided under certain other statutes, it is helpful to expound on the majority's explanation of the relationship of Title VI to other civil rights statutes related to it, including the Rehabilitation Act of 1973, the Americans with Disabilities Act of 1990, and Title IX of the Educational Amendments of 1978 ("Title IX"). *See Barnes v. Gorman*, 536 U.S. 181, 185 (2002). Courts often look to the standard that applies under one of these statutes, to decide cases brought under one of the others. *Id.* The Supreme Court, this Court, and nearly all of our sister Courts of Appeals that have addressed the standard for establishing intentional discrimination under these interrelated civil rights statutes (the RA, ADA, and Title IX) have held that deliberate indifference can be sufficient to establish the required discriminatory intent. Evidence of discriminatory animus is not required.

### a. The Interrelationship of Title VI, The RA, and the ADA.

As my colleagues note, the RA prohibits discrimination on the basis of disability in federally funded programs, including employment programs receiving federal financial assistance. 29 U.S.C. § 701 *et seq.* (1998). The ADA prohibits discrimination on the basis of disability in employment, public accommodations, public entities and transportation, and telecommunications. 42 U.S.C. § 12101 *et seq.* (2009). As noted above, the RA and ADA are coextensive with Title VI. *Barnes*, 536 U.S. at 185 (2002); *S.H. ex. rel. Durrell v. Lower Merion School Dist.*, 729 F.3d 248, 261 (3d Cir. 2013). In *Barnes*, the Supreme Court

explained: "the remedies for violations of . . . the ADA and . . . the [RA] are coextensive with the remedies available in a private cause of action brought under Title VI of the Civil Rights Act of 1964, which prohibits racial discrimination in federally funded programs and activities." 536 U.S. at 185 (internal citation omitted). In *S.H.*, we explained that:

> Section 203 of the ADA states that the remedies available under § 202 of the ADA are the same remedies available under § 505 of the RA. Similarly, § 505 of the RA clearly states that the remedies available under § 504 of the RA shall be the same remedies available under Title VI of the Civil Rights Act of 1964.

*S.H.*, 729 F.3d at 260-61.

Under both the RA and the ADA, "deliberate indifference is *a form of* intentional discrimination . . . ." *S.H.*, 729 F.3d at 264 n.24 (emphasis in original) (internal citation omitted). Because the RA itself states that Title VI's rights and remedies should apply, the same deliberate indifference standard that applies under the RA should apply to claims brought under Title VI.

"Supreme Court precedent construing Title VI governs enforcement of the RA and the ADA as well," because both laws were modeled on Title VI. *S.H.*, 729 F.3d at 261 (internal citations omitted).

When we decided *S.H.*, this was an issue of first impression for us. *Id.* at 260 ("We have not yet spoken on this issue."). We therefore took pains to explain our inquiry into "[w]hich standard to apply – discriminatory animus or deliberate indifference. . .", and we provided a thorough explanation of our decision to adopt the majority rule. We explained that our discussion was (at least in part) in response to the Eleventh Circuit's observation that "despite the adoption of the deliberate indifference standard by many of our sister courts, 'there has been little explication for the conclusion that intentional discrimination under the RA may be established by deliberate indifference.'" *Id.* at 263 (quoting *Liese v. Indian River County Hosp. Dist.*, 701 F.3d 334, 345 (11th Cir. 2012)).

21

## b. Title VI and Title IX.

Fewer than ten years after Title VI was passed, Congress enacted Title IX of the Education Amendments of 1972 ("Title IX") to protect against gender-based discrimination in federally funded educational programs. 20 U.S.C. § 1681 (2014) ("No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."). Congress explicitly modeled Title IX on Title VI. "Except for the substitution of the word 'sex' in Title IX to replace the words 'race, color, or national origin' in Title VI, the two statutes use identical language to describe the benefited class." *Cannon v. Univ. of Chicago*, 441 U.S. 677, 694-95 (1979).

Given the interrelated nature of the statutes, "[t]he drafters of Title IX explicitly assumed that it would be interpreted and applied as Title VI had been during the preceding eight years." *Id.* at 696; *see also Barnes v. Gorman*, 536 U.S. 181, 185 (2002) ("The Court has interpreted Title IX consistently with Title VI . . ."); *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 254-58 (2009) ("Congress modeled Title IX after Title VI of the Civil Rights Act of 1964, and passed Title IX with the explicit understanding that it would be interpreted as Title VI was.") (internal citations omitted). The standard for intentional discrimination under Title IX is clearly deliberate indifference. *Davis v. Monroe County Board of Education*, 526 U.S. 629, 642 (1999); *Gebser v. Lago Vista Independent School District*, 524 U.S. 274, 290 (1998).

In *Davis*, a parent brought suit against the Monroe County Board of Education because her fifth-grade daughter had been repeatedly sexually harassed by another student in her class. *Davis*, 526 U.S. at 632-33. The harassed student (LaShonda) and her family reported the harassing student's conduct to various school officials, including her teachers and the principal. *Id.* at 634. The harassing student was eventually charged with, and pled guilty to, sexual battery for harassing LaShonda and others. *Id.* In the suit that followed, the plaintiffs alleged that, despite the fact that the student pled

guilty, the school took no disciplinary action in response to LaShonda's repeated complaints, and it failed to make any effort to protect LaShonda by separating her from the harassing student. *Id.* at 635. The defendants argued that plaintiffs needed to demonstrate that the defendants themselves had *actually* harassed LaShonda, not simply that they had ignored her harassment at the hands of another student. *Id.* at 636. The Supreme Court relied on *Gebser*, and held that the school board could itself be liable for sexual harassment under Title IX if it was deliberately indifferent to the peer-on-peer sexual harassment. *Id.* at 641-43 ("*Gebser* thus established that a recipient *intentionally* violates Title IX, and is subject to a private damages action, where the recipient is deliberately indifferent to known acts of teacher-student discrimination.") (internal citations omitted)(emphasis added).

The rational for allowing deliberate indifference to establish intentional discrimination under Title VI is further illustrated by limitations and obligations arising from the Sending Clause authority that each of the analogous statutes is based upon.

### c. The Relevance of the Spending Clause

Title VI, Title IX, the RA and the ADA are all based on the same exercise of congressional power under the Spending Clause. U.S. Const. art. 1, § 8, cl. 1. *Guardians Ass'n*, 463 U.S. at 598-99 (1983) (opinion of White, J.)(Title VI); *Gebser*, 524 U.S. at 287 (Title IX); *S.H.*, 729 F.3d at 264 (RA and ADA).

In *Gebser*, the Supreme Court explained how the source of congressional authority in enacting Title IX and Title VI informed interpretation of the statutes:

> Title IX's contractual nature has implications for our construction of the scope of available remedies. When Congress attaches conditions to the award of federal funds under its spending power, U.S. Const., Art. I, § 8, cl. 1, *as it has in Title IX and Title VI*, we examine closely the propriety of private actions holding the recipient liable in monetary damages for

23

noncompliance with the condition. Our central concern in that regard is with ensuring that "the receiving entity of federal funds [has] notice that it will be liable for a monetary award."

*Gebser*, 524 U.S. at 287-88 (emphasis added) (internal citations omitted).

In *S.H.* we explained:

> [t]he RA and ADA were enacted under Congress's Spending Clause power; legislation that is enacted under this power 'is much in the nature of a contract' between the federal government and recipients of federal funds" and "[t]he Supreme Court has thus reasoned that a recipient of federal funding, such as the School District here, may be held liable for money damages only when it is on notice by statute that it has violated the law.").

729 F.3d at 264 (internal citations omitted).

Under the Spending Clause analysis of *S.H.,* animus is not a condition precedent to a contractual breach. Rather, intent to breach can be assumed from knowledge of a set of circumstances, and a refusal to remedy them. This is true whether the law in question prohibits gender-based discrimination under Title IX, disability-based discrimination under the ADA or RA, or racial discrimination as is alleged here under Title VI.

**2. The District Court's Approach is Inconsistent with the Decision of Every Other Circuit Court That Has Decided This Issue**

Every Circuit Court of Appeals that has addressed this issue has held that the heightened discriminatory animus standard does not apply to Title VI claims.[14]  *See Bryant v.*

---

[14] In *S.H.*, we identified two Courts of Appeals that appeared to adopt a minority position. The First Circuit in *Nieves-Marquez v. Puerto Rico*, 353 F.3d 108, 126-27 (1st Cir. 2003)

*Independent School District No. 1-38 of Garvin County, Oklahoma*, 334 F.3d 928, 933-34 (10th Cir. 2003); *Zeno v. Pine Plains Central School District*, 702 F.3d 655, 665 n.10 (2d Cir. 2012) ("Although the harassment in *Davis*, and the 'deliberate indifference' standard outlined by the Supreme Court, arose under Title IX, we have endorsed the *Davis* framework in cases of third-party harassment outside the scope of Title IX.") (internal citations omitted); *Monteiro v. Tempe Union High School Dist.*, 158 F.3d 1022, 1034-35 (9th Cir. 1998) (internal citations omitted); *Liese v. Indian River County Hospital District*, 701 F.3d 334, 347-49 (11th Cir. 2012) (applying deliberate indifference to a disability discrimination case because the RA is based on Title VI, where deliberate indifference would be sufficient to show discriminatory intent).

In *Bryant*, the Court of Appeals for the Tenth Circuit relied on *Davis* in adjudicating a Title VI hostile environment claim. *Bryant*, 334 F.3d at 934. Plaintiffs there were students who alleged that they were subject to a racially hostile school environment. *Id.* at 931. The relevant school officials were "aware of the racial slurs, graffiti inscribed in school furniture, and notes placed in students' lockers and notebooks" and yet, "[t]he principal affirmatively chose to take no action." *Id.* at 932-33. While noting that the offending conduct must be intentional to pass muster under Title VI, the Tenth Circuit explained: "[c]hoice implicates intent" lest "school administrators . . . sit idly, or intentionally, by while horrible acts of discrimination occurred on their grounds by and to students in their charge." *Id.* at 933. The court added: "when administrators who have a duty to provide a nondiscriminatory educational

and the Fifth Circuit in *Delano-Pyle v. Victoria Cnty.*, 302 F.3d 567, 575 (5th Cir. 2002). However, neither decision actually adopts a "minority rule." *Nieves-Marquez* never rejected the "deliberate indifference" standard as a form of intentional discrimination. Similarly, in *Delano-Pyle*, the Court of Appeals for the Fifth Circuit did not affirmatively require discriminatory animus to establish intentional discrimination under the RA and ADA. Instead, the court affirmed the jury's verdict based on intentional discrimination.

environment for their charges are made aware of egregious forms of intentional discrimination and make the intentional choice to sit by and do nothing, they can be held liable" under Title VI. *Id.*

> The court instructed the district court on remand: to apply the test from *Davis v. Monroe County Board of Education*" to a Title VI hostile school environment claim because "Congress based Title IX on Title VI; therefore, the Court's analysis of what constitutes intentional sexual discrimination under Title IX directly informs our analysis of what constitutes intentional racial discrimination under Title VI (and vice versa).

*Id.* at 934. We should remand and do the same here.

The Plaintiffs here may not be able to ultimately convince a fact finder that they should prevail under Title VI or § 1983, but they have clearly produced sufficient evidence to survive summary judgment, and they are clearly entitled to have the correct legal standard of deliberate indifference applied to their proof.

## III. THIS RECORD AND SUMMARY JUDGMENT

My colleagues readily concede the difficulty of proving a discriminatory motive and the concomitant necessity of allowing plaintiffs to rely solely on circumstantial evidence. *See* Majority Op. at 45 ("individuals who violate the law based on discriminatory motives sometimes do not leave a trail of direct evidence, but instead 'cover their tracks' by providing alternate explanations for their actions."). We have discussed this in some detail in the context of claims of job discrimination. In *Aman v. Cort Furniture*, 85 F.3d 1074, 1082 (3d Cir. 1996), we stated: "defendants of even minimal sophistication will neither admit discriminatory animus nor leave a paper trail demonstrating it." This is especially true since those who harbor conscious (as opposed to subliminal) bias may attempt to "cover their tracks[.]" Majority Op. at 45.

26

Thus, bias will sometimes manifest itself only in subtle ways that the actor him/herself may not even be cognizant of. In *Cort Furniture*, we explained that "Discrimination continues to pollute the social and economic mainstream of American life, and is often simply masked in more subtle forms." 95 F.3d at 1082. In *Coombs v* 616 F.3d, 264, in discussing the possible unconscious bias of a prosecutor in striking Black jurors we explained, "[l]ike anyone else, trial attorneys possess those human frailties that make each of us far too susceptible to social conditioning and the subliminal bias that may result." Surely, teachers in our public schools, even though they may not be acting out of racial animus or conscious bias, are no less human, and no more immune to the "frailties that make each of us far too susceptible to social conditioning and the subliminal bias that may result," than attorneys are.

This does not eliminate the Plaintiffs' need to produce enough evidence to survive a motion for summary judgment. However, the nature of the fact to be proven must inform a court's analysis of the evidence that is produced. If Plaintiffs have produced enough evidence to raise a genuine issue of material fact as to Defendants' deliberate indifference, Plaintiffs are entitled to their day in court on their Title VI and § 1983 claims whether the deliberate indifference is borne of deliberate animus or the more insidious poison of social conditioning. [15] Here, plaintiffs' proof is more than sufficient to establish a genuine dispute of material fact, especially if we consider the ephemeral nature of the racially caused deliberate indifference they must prove.

## A. The Summary Judgment Standard Has Been Ignored

---

[15] For an interesting discussion of the neurological science underlying the subtleties of bias that we discussed in *Cort Furniture* and *Coombs, see* John A. Bargh, "Our Unconscious Mind: How Unconscious Thought and Perception Affect Our Every Waking Moment," Scientific American, Dec. 17, 2013, *available at* http://www.scientificamerican.com/article/how-unconscious-thought-and-perception-affect-our-every-waking-moment/

I reiterate that a court may not "weigh the disputed evidence and decide which is more probative," when deciding a motion for summary judgment. *Lawrence v. National Westminster Bank New Jersey*, 98 F.3d 61, 67 (3d Cir. 1996) (internal citations omitted) (holding that the district court erred in ruling that a plaintiff had failed to offer any evidence to survive summary judgment on its discrimination claim where the district court had simply discounted plaintiff's admissible evidence as less probative than defendant's.). Similarly, courts may not "make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed[,] and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus. Crafting Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

The District Court did acknowledge the Plaintiffs' "[e]vidence of procedural irregularities" in the way some of the children were erroneously placed into special education classes. *Blunt*, 826 F.Supp.2d at 760. Yet, the court dismissively refused to admit it based upon the court's belief that "there must be some evidence that irregularities were related to plaintiffs' race." *Id*. Thus, the Plaintiffs were denied the benefit of all reasonable inferences in defending against summary judgment and they were also expected to prove a negative by dispelling all causes for the "procedural irregularities" other than race.

After demanding that Plaintiffs prove the irregularities here were tied to race - irregularities that my colleagues ignore, the District Court not only failed to afford the Plaintiffs the inference demanded by summary judgment, the court ignored evidence that was relevant to the very racial nexus the court demanded proof of.

As I will explain below, the Plaintiffs' expert examined the extent to which African-American students are overrepresented in LMSD's special education classes while being completely absent from any "high expectation" college prep or advanced placement classes, and concluded both as a matter of statistical science as well as common sense that those numbers indicate "there is something systematic about

28

the LMSD practices *related to Ethnicity*." J.A. at 1676 (emphasis added). There is other evidence, that I will discuss, that is easily sufficient to create a genuine dispute of material fact if the record is properly viewed in its totality.

Any appropriately flexible inquiry, if guided by the correct legal test of deliberate indifference, would have realized the potential for a fact finder to conclude that Plaintiffs have met their burden based on all of the circumstantial evidence here. I reiterate: at this point, the burden is merely to produce sufficient evidence that there is a genuine dispute of material fact. Plaintiffs do not have to prove their case to survive summary judgment, and they are entitled to the benefit of all reasonable inferences.

Circumstantial evidence (which all involved concede is not only permissible but necessary in such cases) is nothing more than a fact derived from an inference drawn from proof of underlying circumstances. *See Black's Law Dictionary* 18c (9th ed. 2009). That is exactly what we have here. Although I do not suggest that this record would *necessarily* result in a reasonable fact finder inferring a racial motive based on deliberate indifference, such a finding would clearly be supported by this record, even absent the evidentiary equivalent of a "smoking gun."

I am thus at a complete loss to understand how the District Court could have looked at this record and concluded that Plaintiffs had "not put forth more than a scintilla of evidence that the LMSD had acted with a racially discriminatory purpose [i.e. deliberate indifference] in identifying them as disabled and placing them in special education courses . . . ." *See* Majority Op. at 86.

Although we are assured that plaintiffs in cases such as this need not produce the proverbial "smoking gun," it certainly appears that after today, they will be required to produce something akin to evidence of either a muzzle flash or a surveillance video in order to survive summary judgment.

In affirming this grant of summary judgment, my colleagues note that there "was no evidence presented in the

District Court that the LMSD applied different evaluation procedures for determining placement of African-American students than for Caucasian students." Majority Op. at 93. There does not have to be.[16]

There is an expert's conclusion that there is statistically significant evidence of African American being disproportionately assigned to special education classes while none are enrolled in advanced placement or "high expectation classes." We know that the African-American students who are plaintiffs here were placed in special education classes even though their tests did not indicate such a placement was warranted and/or that deficiencies were relied on for such placements that did not justify a special education placement.[17] This is evidence that was dismissed, even though we should be mindful of the difficulties of proof in such cases and that bias is no longer "worn on sleeves" or "carried on signs."

Moreover, as I have already explained, no evidence of different testing or separate evaluation procedures is required. Although such evidence would certainly have advanced the Plaintiffs' claim of racial bias, its absence is far from fatal to those claims given the other evidence on this record.

---

[16] A relevant article from the highly respected periodical mentioned above (n.15) contains a helpful illustration of why my colleagues' approach to claims of bias is both misguided and naivè: "A college admissions officer might zero in on a less than stellar grade in an otherwise solid medical school application from a prospective minority student without realizing those same negative features are not weighted so heavily for the other applicants." Bargh *supra* note 16 at 34. As I discuss below, it appears here that African-American students may well have been placed in special education classes based on evaluations that did not warrant such a placement. It is therefore irrelevant that the same evaluations were used to place White students in special education classes.

[17] And this does not even include evidence that should have been admitted but was erroneously labeled "hearsay," or could not survive an overly rigorous authentication requirement.

Whether or not the procedural irregularities in the erroneous and improper placement of these African-American students in special education classes was the result of bias (i.e. deliberate indifference), ineptitude, or coincidence should not be decided on summary judgment given the Plaintiffs' evidence.

My colleagues acknowledge that "plaintiffs' expert, a psychologist [concluded] that five or six of the students in question incorrectly had been identified as learning disabled. . ." Majority Op. at 93. Yet they attach no evidentiary significance to the fact that nearly every individual African-American student in this suit was improperly placed in special education classes, because that expert opinion "was not rendered until these proceedings were pending in the District Court . . . ." Majority Op. at 93. I do not understand how that bears on whether the Plaintiffs submitted sufficient evidence to survive summary judgment in the District Court, and the absence of legal citation or explanation of why this is the least bit relevant does not encourage comfort in such a strange principle. Indeed, I have no idea why one would go to the trouble and expense of obtaining an expert opinion about alleged improprieties before the evidence was required as proof in a judicial proceeding. The expert opinion was before the District Court when it ruled on the Defendants' motion for summary judgment. [18]

Although the abuse of discretion standard that governs our review of the District Court's evidentiary rulings is quite deferential, it is not insurmountable and focusing on the deference properly afforded an evidentiary ruling ought not to substitute for an objective analysis of whether the ruling was an abuse of discretion.

Thus, even if it was proper to ignore the MAP PowerPoint and all of Dr. Moore-Williams' testimony (and it was not), which I discuss in detail below, the remaining

[18] The District Court *never even mentioned* the fact that the record contained evidence that the level of disproportionality was statistically significant, and that it showed "there is something systematic about the LMSD practices related to Ethnicity." J.A. at 1676.

31

record should still have precluded summary judgment. "The totality of the evidence . . . must guide our analysis rather than the strength of each individual argument." Bray v. Marriott Hotels, 110 F.3d 986, 991 (3d Cir. 1997). Yet my colleagues attempt to "explain[] each of the discrepancies in [the] record in isolation and conclude[] that none of them creates a material issue of fact." *Id.* (internal citation omitted). "[S]uch an analysis is improper in a discrimination case." *Id*; *see also Andrews v. City of Philadelphia*, 895 F.2d 1469, 1484 (3d Cir. 1990) ("A play cannot be understood on the basis of some of its scenes but only on its entire performance, and similarly, a discrimination analysis must concentrate not on the individual incidents, but on the overall scenario.").

## B. Plaintiffs' Statistical Evidence was Not Properly Credited.

Plaintiffs' proof consists in part of strong statistical evidence. It is summarized in the following chart that is based on data collected by the Pennsylvania Department of Education:

| Year | Total student body at LMSD | | | Students Participating in special education courses | | | |
|---|---|---|---|---|---|---|---|
| | Total Number of students | % of total number of students who were African-American | % of total number of students who were Caucasian | Total Number of students that participated in special education courses | % of total student body that participated in special education courses | % of special education students who were African-American | % of special education students who were Caucasian |
| '05-'06 | 6,945 | 7.7% | 84.4% | 1,255 | 18.1% | 12.7% | 82.6% |
| '06-'07 | 6,981 | 7.9% | 83.2% | 1,187 | 17.0% | 14.5% | 80.2% |
| '07-'08 | 6,914 | 8.1% | 83.1% | 1,158 | 16.7% | 14.0% | 80.8% |
| '08-'09 | 6,788 | 8.0% | 81.6% | 1,101 | 16.2% | 13.7% | 80.5% |
| '09-'10 | 7,072 | 8.6% | 81.1% | 1,094 | 15.5% | 14.3% | 80.0% |

Majority Op. at 92-93.

My colleagues ignore the force of these numbers by stating that "[d]isporportionality is not per se evidence of discrimination, […] [because disproportionality] can be either biased or unbiased." Majority Op. at 92 (internal quotation

marks and citations omitted).  Although that is true, recitation of that general principle does not justify adopting a wholly dismissive attitude toward the evidence of disproportionally in the LMSD, or considering it in isolation from other evidence.

For the five-year span captured by these numbers, the percentage of Caucasian students in special education classes in LMSD was roughly equivalent to, though always less than, the total percentage of Caucasian students in the LMSD student body.  For most of that time frame, the percentage of African-American students enrolled in special education classes in LMSD was *twice* the percentage of the number of African-Americans in the student body.  These percentages do not exist in a vacuum.

**1.    Plaintiffs' Expert Dr. Conroy Placed the Statistical Evidence in Context**

Plaintiffs produced the testimony of an expert witness, Dr. James W. Conroy, Ph.D, who studied enrollment and student placement in the various courses at LMSD.[19]  He found that, while African-American students were greatly overrepresented in "low expectation" classes, they were dramatically underrepresented in more demanding college preparatory and advanced placement courses.  J.A. at 1671-74.  "The pattern is that these courses with the highest proportions of Black students *tend strongly* to be courses that I would label as 'low expectations' courses."  *Id*., at 1673-74 (italics added).

Conroy also examined the racial composition of the twelve advanced or "high expectation" classes.  He found that

---

[19]   Although it is not necessary to note Conroy's qualifications at this stage, it is important to consider that it includes "39 years of research in disability, education, and health issues among children and adults," and since graduating Cum Laude, from Yale and earning his Ph.D. in Medical Sociology from Temple University, "With Distinction," he has qualified as an expert in disability research, disability policy, special education *and statistical analysis*. J.A. at 1670.

in 2008, not only were African-American students underrepresented in those classes; the percentage of African-American students in "high expectation" classes was "*zero*." *Id.* at 1674-75 (emphasis in original). In other words, *not a single* African-American student was assigned to *any* of the twelve high expectation classes in LMSD in 2008.[20] *Id.* Lest one think 2008 was a fluke or a statistical aberration, Conroy found exactly the same pattern "for each of the years 2005, 2006, 2007, and 2008." *Id*. at 1675. For each of those years not a single African-American student was assigned to a college prep or "high expectation" class in this school district.

Conroy testified that the extent of this disparity was "'significant' in the statistical sense." *Id.* at 1676. In fact, Conroy concluded that the disproportionally in LMSD was so evident that one need not be an expert in statistics to grasp its significance. Rather, he believed that "[t]he Lower Merion population data may be judged practically significant by simple observation of large differences in the kinds of courses students [sic] Black and Others students wind up in." *Id.* at 1677 (emphasis in original). His conclusion, rejected by the District Court as a matter of law, was that: "there is something systematic about the LMSD practices related to Ethnicity." *Id*. at 1676 (emphasis in original).

The Majority states that "[t]he District Court . . . discussed in detail the statistical data that the plaintiffs put forward." Majority Op. at 92. Yet, both my colleagues and the District Court ignore that absolutely no African-American students were placed in "high expectation" classes during the period examined by Conroy, and the Majority fails to note that the District Court ignored the expert conclusion that LMSD employed these "practices related to Ethnicity." However, even if the statistics could properly be viewed in isolation, the issue remains not whether those disparities establish deliberate indifference, but whether they create an issue of fact about African-American students' placement in

---

[20] Those classes included: Latin 3H, AP Calculus BC, IB Senior Project, IB Theory of Knowledge, Economics H, IB History of Americas HL 2, IB English A1 HL (Part 2), Art 2 H, AP Spanish Language, AP Physics C Electromagnetism, and Organic Chemistry H. J.A. at 1674.

"low expectation classes" during this time frame, which was a period when LMSD did not place a single African-American student into any "high expectation" college prep or Advanced Placement test.

The Majority attempts to further minimize the evidentiary value of this testimony by noting that:

> [t]he Supreme Court also has rejected the use of particular standard deviations or 'any alternative mathematical standard' in establishing a prima facie case of employment discrimination, and has stressed that the significance or substantiality of numerical disparities must be judged on a case-by-case basis . . . [and they] must be sufficiently substantial that they raise an inference of causation.

Majority Op. at 47 (quoting *Watson v. Fort Worth Bank & Trust,* 487 U.S. 977, 996 (1988).

There are other problems with the Majority's attempt to ignore the force of the statistical evidence. First, in *Watson*, the Court was deciding whether a statistically based disparate impact analysis was applicable to a claim of disparate treatment in a "subjective or discretionary promotion system." 487 U.S. at 999. The Court said nothing that would assist us in determining the propriety of a sample size or the probative force of the "deviation" here. Indeed, the Court's only mention of "deviation" was the following reference in a footnote:

> Courts have also referred to the 'standard deviation' analysis sometimes used in jury selection cases. We have emphasized the useful role that statistical methods can have in Title VII cases, but we have not suggested that any particular number of 'standard deviations' can determine whether a plaintiff has made out a prima facie case in the complex area of employment discrimination.

*Id.* at 995 n.3 (internal citations omitted).

The Majority seems concerned with the sample size here as well as the significance of the deviation. They cite to *Watson*, stating: "the Supreme Court has explained that neither the 'courts nor defendants [are] obliged to assume that plaintiffs' statistical evidence is reliable,' and has cited, for example, the weaknesses inherent in small or incomplete data sets and/or inadequate statistical techniques." Majority Op. at 46 (internal citation omitted). That is clearly true as a general proposition, but I do not understand how that general proposition advances our inquiry. There is nothing on this record to suggest that the Plaintiffs' experts' statistical analysis is flawed, that the data set is "incomplete and/or inadequate," or that their experts' statistical techniques are flawed. The District Court made no such finding and it appears that LMSD did not make any such argument to the district court.

The issue in *Watson* was whether a disparate impact analysis could be used to establish disparate treatment in an employment discrimination suit involving a discretionary promotion system at a bank having 80 employees – far fewer than the numbers involved here. There, the African-American plaintiff had attempted to use statistical evidence of the paucity of African-Americans who had been promoted at the bank, in order to establish her disparate treatment claim that the bank had failed to promote her because of her race. The Supreme Court held that statistical evidence of disparate impact could be used to establish a prima facie case of disparate treatment but rejected the position of some courts that looked to EEOC Uniform Guidelines on Employment Selection Procedures. Those courts had "adopted an enforcement rule under which adverse impact" would "not ordinarily be inferred unless the members of a particular . . . group [were] selected at a rate that [was] less than four-fifths of the rate at which the group with the highest rate [was] selected." *Watson*, 487 U.S. at 995 n.3. The Court restated the *"*useful role that statistical methods can have in Title VII cases," but cautioned that it had "not suggested that any particular number of 'standard deviations' can determine whether a plaintiff has made out a prima facie case . . .." *Id.* (emphasis added).

The situation here is remarkably different. In order to establish deliberate indifference under the theory advanced here, Plaintiffs had to first establish that African-American students were being placed in "low expectation" classes at a significantly disproportionate rate to Caucasian students. Even my colleagues seem to concede that the record establishes that, and LMSD does not really deny that. Any dispute about statistical sampling, standard deviations, and "z scores," is beside the point.

## 2. There are Issues Regarding Defendants' Expert's Methodology

Plaintiffs' expert explained his methodology in great detail and we have only my colleagues' countervailing implied mastery of statistics to dismiss the statistical validity of Plaintiffs' expert's conclusions. My colleagues' concern about such statistical terms of art as: "data sets" and "statistical techniques" and sample size, is even more puzzling when one considers that the Defendants' expert, Dr. Daniel Reschly, reached a conclusion that was contrary to Plaintiffs' expert based on a much *smaller* sample size. Reschly only looked at two years of student placements as opposed to the five years that Conroy used to reach a conclusion about the role of race in LMSD's placements. Moreover, Reschly admitted that his inquiry was hurried and that he did not request additional information required to perform the kind of analysis he would otherwise have conducted because there was insufficient time. J.A. at 2979. *Id.* at 2590.

Although I do not address the Majority's rejection of Plaintiffs' appeal of the District Court's decision to consider Reschly's evidence without subjecting it to a *Daubert* hearing, I neither agree with that decision, nor do I understand why the District Court denied the requested *Daubert* hearing. I do not discuss it in detail because that ruling has no bearing on whether Plaintiffs offered enough evidence to survive summary judgment. If Reschly's report could withstand a *Daubert* inquiry, we have a classic battle of the experts that a jury should resolve. If it is not admitted under *Daubert,* the record still contains a factual issue that must be decided by a jury.

37

I do note that my colleagues misstate the Plaintiffs' basis for challenging the District Court's denial of their request for a *Daubert* hearing. My colleagues suggest that Plaintiffs' objection to Reschly's report "lies with one paragraph." Majority Op. at 84. That is the District Court's acceptance of Reschly's definition of "disproportionality." My colleagues explain their rejection of this claim as follows: "[w]e find this use of Reschly's wording to define disproportionality to be immaterial to the outcome of this litigation." *Id.*

However, there are many more issues with Reschly's report than the definition of "disproportonality," and these are set forth in the Memorandum of Law filed in support of Plaintiffs' *Daubert* Motion to Partially Exclude and/or Limit the Report and Testimony of Daniel J. Reschly, Ph.D. J.A. at 2916. Arguably, there are numerous problems with Reschly's report, including the fact that he admitted that he did not have enough time to conduct the kind of comparison he otherwise would have, the files he compared were selected by agents of LMSD, and he only compared two years of class assignments.

The issue for us is not, of course, which expert is correct. Rather we should only be concerned with whether this disagreement raises a genuine dispute of material fact. The majority does not believe it does because my colleagues simply reject the statistical evidence supporting the Plaintiffs' claim of bias. That is improper. *See Federal Laboratories v. Barringer Research, Ltd.*, 696 F.2d 275, 274 (3d Cir. 1982) ("A court may not . . . resolve 'disputed and relevant factual issues on conflicting affidavits of qualified experts.' Nor is it at liberty to disbelieve the good faith statements of experts contained in depositions or affidavits and presented by the non-moving party") (internal citations omitted).

Although my colleagues cite to *Teamsters v. United States*, 431 U.S. 324, 340 (1977), they manage to overlook the thrust of the Court's analysis there. In *Teamsters*, the defendant employer argued that "statistics can never in and of themselves prove the existence of a pattern or practice of discrimination, or even establish a *prima facie* case shifting to the employer the burden of rebutting the inference raised by the figures." 431 U.S. at 338. The Court rejected the

defendant's attempt to minimize the importance of statistical analysis by explaining: "our cases make it unmistakably clear that '[s]tatistical analyses have served and will continue to serve an important role' in cases in which the existence of discrimination is a disputed issue." 431 U.S. at 338, (brackets in original). This is such a case.

Moreover, the invocation of the maxim that statistics cannot "by themselves" establish discriminatory intent, should not obscure the fact that there is "more," on this record. There is much more. Thus, even if the opinion of the Plaintiffs' expert could not, by itself, raise an issue of fact, it is neither proper nor fair to discuss Plaintiffs' proof as if they were only relying on that evidence to establish an issue of fact about discriminatory intent under the deliberate indifference standard.

**C.    Evidence of a "MAP" Program was Improperly Excluded and Raises a Dispute of Fact.**

Before discussing the MAP evidence, it is helpful to reiterate the nature of the disputed factual issues in this case. As my colleagues readily concede, proof of intent can rarely be achieved by direct evidence. *See* Majority Op. at 45. Accordingly, as noted earlier, "[c]ourts today must be increasingly vigilant in their efforts to ensure that prohibited discrimination is not approved under the auspices of legitimate conduct, and a plaintiff's ability, to prove discrimination [i.e. deliberate indifference rising to the level of discriminatory intent] indirectly, circumstantially, must not be crippled . . . because of crabbed notions of relevance or excessive mistrust of juries." *Cort Furniture*, 85 F.3d at 1082 (internal quotation marks omitted, ellipsis in original).

Moreover, the practical problems of proof in cases such as this counsel in favor of the same kind of practical assessment of proof that the courts have adopted pursuant to the Supreme Court's *McDonnell Douglas* burden shifting analysis. *See McDonnell Douglas Corp. v. Green,* at 411 U.S. 792, 802 & n.13 (1973). The District Court acknowledged the flexible nature of the proof required to establish a *prima facie* case. The court explained: "the *prima facie* case is flexible and must be tailored to fit the specific

context in which it is applied." 826 F.3d at 758 (quoting *Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 797 (3d Cir. 2003)) (internal citation and quotation marks omitted). Yet, the court's inquiry was inconsistent with the flexible approach the court acknowledged it must adopt.

With respect to the MAP presentation and the attendant authentication testimony from Dr. Barbara Moore-Williams, the District Court and the Majority commit different errors. The District Court abused its discretion by failing to admit the MAP presentation because it held that the document was improperly authenticated under Federal Rule of Evidence 901(a). On the other hand, the Majority ostensibly does not contest the admissibility of the document and instead simply holds that it is insufficient to demonstrate that the LMSD intentionally discriminated against plaintiffs. Such a position is problematic because it places an improper burden on the Plaintiffs, and again transgresses into fact-finding. The MAP testimony *is* admissible and admissibility—not probative weight, is the focus of a summary judgment inquiry.

As an initial matter, it is important to understand what the MAP presentation is. During discovery, LMSD disclosed a PowerPoint presentation entitled "Minority Achievement Program" (MAP) on LMSD letterhead dated October 2010 that the District Court deemed inadmissible because it was not properly authenticated. That was an abuse of discretion that had a very significant impact on this litigation, and threw one more obstacle in the path of having a jury determine the validity of Plaintiffs' allegations against this school district.

The MAP "document lists alleged characteristics of African-American students, including a preference for 'tactile learning' and '[s]ubdued lighting' that they '[r]ely heavily on visual input rather than auditory input,' and that they '[r]eact intensely to being praised or criticized.'" *Blunt*, 826 F.Supp.2d at 761 (brackets in original). The District Court refused to consider the contents of the brochure because "the record does not reveal who created this document or under what circumstances and what position the creator or creators occupied within the School District. There is no evidence that the purported presentation was ever used." *Id.* The

majority agrees with the District Court that the fundamental problem with admitting the MAP testimony is the lack of evidence that it was used, noting that it "assume[s] the contention that this presentation, if used by LMSD, would provide evidence of discriminatory intent, or deliberate indifference to a third party's discriminatory intent." Majority Op. at 82.

Dr. Barbara Moore-Williams, Ed. D. is an educational consultant retained by LMSD to assist LMSD in addressing issues of racial disparity in educational placements. She was retained by LMSD's Assistant Principal after he saw her give a presentation at a consortium of area schools. J.A. at 1410. Her presentation addressed the issue of "cultural proficiency" and educational success "as a national issue." *Id*. at 1411. According to Moore-Williams, the Assistant Principal was apparently interested in retaining her because he thought her work and information would be helpful to LMSD. *Id.* at 1410. Her work focused on "cultural proficiency among staff that teach children who are not their culture, their race, their ethnicity, and the need to pay attention to African-American males who are struggling in America to get an education . . . ." *Id.*

The District Court refused to consider the entirety of Dr. Moore-Williams's testimony that LMSD "discriminated against African-Americans" because she also testified that "there is racism in all school districts and that Lower Merion School District's problems are no different from any other suburban school district." *Blunt*, 828 F.Supp.2d at 761.[21] The District Court thought that Dr. Moore-Williams' testimony was little more than her "personal belief and hearsay statements of others." *Id*. The District Court concluded that for these reasons, "her statements cannot create a genuine issue of material fact regarding the School District's intent to discriminate." *Id*. My colleagues agree.

---

[21] When asked directly whether, based on her experience and conversations with LMSD personnel regarding prejudice in the teaching staff, there was any prejudice in the teaching staff, she stated that "[b]ased on [her] experience, there's prejudice in everybody. So, yes, there's prejudice in the Lower Merion School District." J.A. at 1412.

Majority Op. at 89-90. Regardless, parts of her testimony were nevertheless admissible for the purpose of shedding light on the MAP PowerPoint.

As I have just noted, that PowerPoint purported to list several things that were characteristic of the way African-American students learn. It stated in part:

"Many African-American students prefer:

> more kinesthetic/tactile learning.
> subdued lighting rather than bright light.
> rely heavily on visual input rather than auditory input.
> respond to cooperative learning.
> simultaneous talk instead of alternating talk.
> to study while music or conversation occurs in the room..
> outer-directed rather than egocentric focus.
> more active environments v. sedentary learning environments of American Schools.
> rely more on information from their surroundings.

J.A. at 1838. During her deposition, Moore-Williams was asked if she had "ever heard a teacher or a staff member from Lower Merion School District discuss the use of visual input rather than auditory input in their classrooms." *Id.* at 1414. She affirmed that she had. *Id.* She was then asked about each of the items listed in the MAP PowerPoint. *Id.* Counsel referred to them by their place on the list. *Id.* Although she had not heard teachers refer to each of the bullet points, she had heard teachers refer to some of them. *Id.* The following exchange occurred as counsel took Moore-Williams through the PowerPoint:

Q. [W]ith regard to the fourth bullet point concerning highly cooperative learning?
A.. Yes.
Q. That has been implemented?
A. Yes.

42

Q. And has the fifth bullet point concerning simultaneous talk instead alternating talk been implemented in Lower Merion School District?

A. Yes.

Q. And what about the use of music of conversation in the room while studying?

A. I haven't heard.

Q. And that was the sixth bullet point. Now, what about the seventh bullet point concerning the outer-directed rather than egocentric focus?

A. No.

Q. And what about the eighth bullet point concerning, I believe you said, more active environments versus sedentary learning environments.?

A. Yes.

Q. And how have teachers described . . . active environments versus sedentary learning environments with African-American students in the district?

A. Kind of along with cooperative learning, because cooperative learning is active. So it's in conjunction with, we need to do more things where the kids are up and about and interacting with each other.[22]

*Id.* at 1414.

Although Moore-Williams could not corroborate that the MAP PowerPoint presentation had been used in its entirety, the District Court abused its discretion by so focusing on the generalities of her beliefs about the extent to which all public schools are infected with some degree of racism that it overlooked the fact that her testimony was relevant to establishing the very fact the District Court found lacking - that teachers had adopted the MAP PowerPoint (at least in part).

My colleagues conclude that because "Dr. Moore-Williams did not testify about the MAP presentation *itself*," it necessarily follows that her testimony "does not establish who prepared the presentation, or whether LMSD ever used it or for what purpose." Majority Op. at 83. The conclusion

---

[22] "Cooperative learning" is the 14th bullet point on the MAP PowerPoint: "Function better under cooperative conditions." J.A. at 1838.

43

fails to consider the detail with which Moore-Williams referred to the presentation.

More importantly, it does not refute the admissibility of the testimony or the presentation. While the District Court disputed the authenticity of the presentation, the Majority does not identify any such failure to meet the requirements of Federal Rule of Evidence 901(a). Perhaps this is because authentication under Federal Rule of Evidence 901(a) is an incredibly "slight" burden, which may be satisfied by simply producing "evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a).

My colleagues concede that Moore-Williams "indicated that she heard of certain bullet points," but they argue that "she noted that they were not related to African-American students. At most, her testimony is relevant to the extent that she heard from LMSD personnel that they used different teaching strategies for particular students." Majority Op. at 83. My colleagues then dismiss the probative value of Moore-Williams' testimony because she did not testify that she heard teachers specifically connect the MAP strategies to African-American students. However, the portion of the MAP document quoted above begins with the statement: "Many African-American students prefer . . .". The fact that Moore-Williams did not hear teachers mention African-American students when discussing the unique learning styles suggested in the MAP presentation is clearly fodder for defense counsel's closing argument at trial. It is not a reason to ignore the existence of a disputed fact. While Moore-Williams' testimony need only place relevant "dots" into evidence, Plaintiffs should be able to rely on the resulting inferences to connect them. They should not, however, have to explicitly connect all of the dots, color in the resulting image, and frame the picture to survive summary judgment. There is enough on the record to support an inference that the distinct teaching approaches were aimed at African-American students given the language of the MAP presentation and the specificity of Moore-Williams' testimony about what she heard certain teachers discussing.

Moore-Williams' testimony, taken along with the evidence itself, clearly supports a reasonable inference that

LMSD both was a proprietor of and, through their teachers and other personnel, used the MAP. The document is on LMSD's letterhead in its header and LMSD supplied it in discovery. There is no suggestion that it was fabricated, and neither the Majority nor the District Court contest the veracity of the document. Yet, because Plaintiffs could not identify the author of this document it was deemed inadmissible.

As a final matter, the Majority contends that the District Court properly rejected Moore-Williams' testimony as inadmissible hearsay. Majority Op. at 89-90. However, Moore-Williams was testifying about statements teachers made to her about the conclusions in the MAP. It certainly appears that the statements were made by teachers acting within the scope of their duties as teachers at LMSD, and neither my colleagues nor the District Court suggest anything to the contrary. Accordingly, those statements were not hearsay. They were party opponent admissions. *See* Fed. R. Evid. 801(d)(2)(D) (noting that a statement is not hearsay when "[t]he statement is offered against an opposing party and . . . was made by the party's agent or employee on a matter within the scope of that relationship and while it existed.").

### D.   Testimony of Psychologists and Parents Supports Plaintiffs' Contention that Race is a Factor in Assigning Students to Special Education Classes

Plaintiffs produced the expert Rebuttal Report of Tawanna J. Jones, Ed. S. Certified School Psychologist. *See id.* at 2306. Her Curriculum Vitae was attached to her report, and her expertise in the appropriate areas is not disputed.[23] She was retained by Plaintiffs to rebut the expert report of Reschly, LMSD's expert. Jones was specifically asked to

---

[23] Jones was then serving as a Certified School Psychologist for the School District of Philadelphia. Her primary responsibilities included evaluating students and determining eligibility for Special Education Services. She was also a collaborative team member working to ensure proper student placement, provision of adequate services, "development of appropriate behavioral and academic goals, and transition planning for post-secondary options." J.A. at 2306.

give her expert opinion about "whether: (1) each of the student Plaintiffs were properly identified by [LMSD] as having a learning disability; (2) based on LMSD's placement of each student Plaintiffs [sic] into low level and/or special education classes, were the student Plaintiffs denied the equality of education they should have otherwise received . . . ." *Id.* at 2307-08. Jones found that the students whose files she reviewed were erroneously evaluated by the school district. *See* J.A. at 2318-20. Specifically, as discussed below, three of the plaintiffs, Q.G, C.H., and S.H., were incorrectly placed in special education courses although they did not meet the criteria for placement in those courses. *Id.* Jones's testimony is corroborated and supported by the testimony of Dr. Barbara Shapiro, Ph.D. the Assistant Director of Pupil Services, who supervised school psychologists at LMSD.

Jones opined that Plaintiff Q.G., an African-American student at LMSD, "was incorrectly identified by LMSD as a student who met the criteria for a Learning Disability in the area of Language Arts." *Id.* at 2318. She added: "[a]s an initial matter of import, Language Arts is **not** a disability category." *Id.* at 2318 (emphasis in original). Thus, even assuming the accuracy of LMSD's conclusion that Q.G. was deficient in Language Arts, according to the undisputed testimony of Plaintiffs' expert, that should not have resulted in Q.G. being placed in special education classes. Q.G.'s academic skills then declined over time "*after* being placed in Special Education." *Id*. at 2319 (emphasis in original).

The dubious nature of Q.G.'s placement based on a single deficiency is corroborated by the testimony of Shapiro. Shapiro began working in the LMSD in the fall of 2003 as Assistant Director of Pupil Services. J.A. at 1387. She supervised ten school psychologists in that capacity until March 1, 2009, during that time she "collaborated with the special ed supervisors regarding special ed services district wide." *Id*.

Shapiro testified that *no student should ever be placed into special education classes based on one score. Id.* at 1393. "As a psychologist, you would look at the entire picture of a child and never just determine a disability based

on one piece of information." *Id*. Yet, that was not the process used to place Q.G. in special education classes that she did not need, and which impeded her educational development.

Shapiro also testified that LMSD did not comply with the American Psychological Association's protocol for record retention. J.A. at 1397. This meant that testing protocols that determined students' placement in classes were sometimes destroyed before parents could examine (and thereby challenge) them. Although parents were informed that they had a right to request these protocols, Shapiro did not believe that parents were ever informed of this shortened retention policy. The result was that parents would often ask to see their child's testing protocols, only to learn they had already been disposed of. *Id.*[24]

Jones also opined that the initial evaluation for another African-American student, Plaintiff C.H., "provided a clear indication, that there were deficits and needs in the areas of Reading Comprehension and Basic reading skills (reading decoding)." However, "[t]here was no evidence, . . . that she met the criteria for SLD [specific learning disability] in the area of Written Expression or Mathematics." *Id.* at 2319. Jones believed that the absence of data made it impossible to give C.H. the support she needed to address *the one area* where she appeared deficient, and still allow her to progress normally in the areas where the need for such support was not indicated. *Id*. at 2319-20.

Jones' evaluation of yet another student, Plaintiff S.H., may be the most troubling. "All of S.H.'s skills and abilities measured in the 'Average' range at the point of the initial assessment . . . . Despite the lack of evidence required to determine eligibility, the evaluator labeled S.H. as meeting the criteria for a SLD and subsequently doomed S.H. to an academic experience [in special ed – low expectation courses]

---

[24] I mention this evidence merely to illustrate the extent to which Plaintiffs raised genuine disputes of material facts regarding those claims and they should have been resolved by a fact finder. I am not suggesting that this necessarily proves nefarious conduct by LMSD employees.

that impeded her development rather than remediated or accelerated her academic progress." *Id.* at 2320. According to Dr. Jones, "[i]t is evident from the data provided that S.H. was never a candidate for Special Education under the auspices of a SLD." *Id.* In her view, "[i]t is apparent that subsequent evaluators either were not aware of the criteria for a SLD or intentionally chose to ignore the criteria as demonstrated by the fact that S.H.'s not initially meeting the criteria for SLD was never subsequently addressed by LMSD." *Id.*

S.H.'s mother testified that she did not believe her daughter was denied educational services *per se*, but was troubled because S.H. was placed in lower level courses that were not demanding. S.H.'s mother did not initially object to the placement because she received letters from LMSD informing her that S.H. was receiving reading support, which S.H.'s mother interpreted as giving her daughter extra help. She said that "[N]obody in the school told [her] that it was a remedial course, no. I just thought it was an enrichment. It was presented as an enrichment course to help kids with reading. So, to me, more is better."[25] *Id.* at 1165. Like most of the parents here, S.H.'s mother did not initially object because she trusted the school officials and assumed they were acting in S.H.'s best interests. S.H.'s mother testified that she finally objected to S.H.'s placement after an independent psychologist evaluated S.H. in tenth grade and concluded that S.H. did not have a learning disability. According to the mother, the school then gave her "pushback." *Id.* at 1167; *see generally*, *id.* at 1153-67. This pushback demonstrates that the school was aware of the issues involved in S.H.'s placement, and responded in a manner that a jury could conclude was deliberately indifferent.

The differing kinds of omissions and irregularities evidenced by Dr. Jones' assessment of the placements of Q.G., C.H., S.H., as well as Shapiro's testimony, reflect some

[25] Although the District Court held that S.H.'s mother's testimony was inadmissible with respect to other issues (third hand accounts of teachers' statements to students), this testimony does not provide any such problem.

of the difficulties in the way this case has been litigated as well as some of the conceptual difficulties and confusion inherent in the litigation posture here. Indeed, counsel for CBP addressed this concern at oral argument:

> The general confusion in this case is that initially there were special-education claims in the case; those claims were dismissed because of failure to exhaust. There were also Title VI claims. What happened was, through the course of discovery and though the process of evaluations, the children discovered that . . . most of them had never had the disabilities that the district said they had.[26]

Transcript of Oral Argument at 17, *Blunt v. Lower Merion School District*, --F.3d-- (Nos. 11-4200, 11-4201, 11-4315). At the risk of repetition: "the totality of the evidence . . . must guide our analysis rather than the strength of each individual argument." *Bray v. Marriott Hotels*, 110 F.3d 986, 991 (3d Cir. 1997).

In response to this glaring evidence in support of Plaintiffs' claims that they were placed into special education classes because of their race rather than their relative academic need, the Majority simply makes a blanket assertion that "if the same evaluation procedures are used for all students or [sic] their race there is simply no discrimination." Majority Op. at 93. This statement is deeply problematic for two reasons. First, it assumes that the procedures themselves cannot be discriminatory. Second, and most importantly here, it assumes the "procedures" comprise the whole of the evaluation,

---

[26] The District Court commented on what it must have seen as a "moving target" by noting: "[i]n their brief in opposition to the motion for summary judgment, plaintiffs now assert that they are not disabled and were wrongly placed in special education programs on the basis of race. This assertion that they are not disabled is in stark contrast to the Third Amended Complaint . . ." *Blunt*, 826 F.Supp.2d at 753. However, for purposes of deciding the summary judgment motion, the District Court assumed that the student plaintiffs were "in fact not disabled." *Id*. at 754 n.4.

thus ignoring the discretion and subjectivity afforded the examiner who is applying the procedures and interpreting the results of the evaluations.

As noted above, clearly the procedures were not applied appropriately with respect to Plaintiffs. LMSD's own Assistant Director of Pupil Services testified that procedures were not followed, including those for dictating which students should be placed in special education classes. *See supra* at 71-72. For instance, as noted above, LMSD evaluated Q.G. as having a learning disability in the subject of language arts, which is not even a disability category. J.A. at 2318. This directly belies the Majority's broad assertion that as long as the procedures are neutral, the consequences cannot, *as a matter of law*, be considered discriminatory. Similar procedures and evaluative tools can always be applied in patently discriminatory ways, and evidence of their misapplication with respect to the Plaintiffs is certainly evidence of discrimination and deliberate indifference. *See infra* n. 16 at 34.

It is, of course, possible to argue that the errors in placement on this record are simply the result of the district's less than desirable and inartful method of selecting students for special education classes. Mistakes can surely happen, especially in such a complicated, subtle and intricate process as identifying students who cannot handle regular academic work in a classroom. However, LMSD had every opportunity to come forward with evidence that numbers of White students are also mistakenly placed in special education classes and that could have negated the causal nexus of the erroneous placement of these African-American plaintiffs. It offered no such evidence.

Even if it could be argued that the decision to forego production of any such evidence results from political considerations rather than absence of such proof (and nothing on this record supports such rank speculation), the fact remains that this record only contains evidence of African-American students erroneously being labeled as "learning disabled" and being denied the full benefits of a public education. There is no evidence of this happening with White students and the inference that Plaintiffs are entitled to should

50

prevent the LMSD from getting an evidentiary bye. Moreover, to the extent that innocent mistakes happen in placement, it should be noted that, where the more challenging curricula is concerned, all such mistakes seem to happen in only one direction. There were no African-American students in "high expectation," college prep or advanced placement classes in the school district during the years the experts studied. Speculation about diagnostic error is simply that—"speculation;" it should play no role in our legal inquiry.

## F. There is Testimony that Teachers and School Administrators Had Notice of These Allegations

Plaintiffs have also put forward sufficient evidence of deliberate indifference. They established that LMSD was aware of the racial problems arising from the classroom assignments and provision of resources, and it ignored Plaintiffs' requests to remedy the racial disparities. As noted in the section on CBP's standing above, Ms. Metzger, a former special education teacher at LMSD, testified that as a teacher she "was invited to and sat in on a portion of a Concerned Black Parents conversation with some of the school administrators." J.A. at 1456. At this meeting, parents and students raised concerns that "African-American students, as a whole, as we have discussed, were not performing at the same rate, not experiencing the same success as other students; that [African American families in the District] believed that [African American] students didn't feel welcome in the school; that [African American families in the District] believed that at times, guidance counselors or others, personnel, maybe *didn't afford the same consideration when it came to the college planning process*." *Id.* (emphasis added). As Metzger's testimony makes clear, the "school administrators" who attended this meeting along with her had notice that African American families had complained that they were not receiving the same education as their peers, and, yet, nothing changed.

In addition, as I discussed above, when the mother of one of these plaintiffs objected to her daughter being identified as having a learning disability, the school gave her "pushback," rather than undertaking an inquiry into the

51

appropriateness of her daughter's placement in special education.  J.A. at 1167.

## IV.  CONCLUSION

We all recognize the difficulty of identifying students who are best served by the kind of remediation that special education classes are intended to provide. and that no process of evaluation is perfect.  However, this case is not about second-guessing the placement of students in remedial classes.  It is not about frustrated hopes of parents or students.  And, despite the specter of the The Quota Boogeyman raised by the Majority,[27] it is not about how many African-American students should be placed in a particular academic track.

This case is about whether courts will allow plaintiffs who have produced the kind of proof that I have discussed above to survive summary judgment and have their day in court to prove something as subjective and evasive as the deliberate indifference that is tantamount to racial bias.

When plaintiffs can produce the kind of evidence that has been produced here, the law requires that their ultimate claims of bias be determined by a fact finder, not by a court.  As Judge Baylson stated in *Doe 1 v. Lower Merion Sch. Dist.*:*"*The Supreme Court has clarified that [d]etermining whether invidious discriminatory purpose was a motivating factor demands a *sensitive inquiry into such circumstantial* and direct evidence of intent as may be available."  689 F. Supp. 2d at 755. (emphasis in original, internal quotation marks omitted).  That is sorely lacking here.

I also note the laudable caution of Judge Baylson in *Doe 1*, in explaining: "[this] Court is particularly reluctant to grant summary judgment and to deny Plaintiffs the right to trial in this case, which involves issues of public policy and great concern to the community." *Id.*

---

[27] *See* Majority Op. at 94 ("We certainly are not going to require or even suggest that school districts use a quota system in assigning students to special education classes [to achieve proportionality].").

I therefore must respectfully disagree with my colleagues' belief that the District Court did not err in concluding that no genuine dispute of material fact exists on this record.